**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .    Chapter 11
                                .
NORTHWESTERN CORPORATION,       .    Case No. 03-12872(CGC)
                                .
        Debtor.                 .    Oct. 8, 2004 (8:50 a.m.)
                                .    (Phoenix, Arizona)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHARLES G. CASE, II
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

1   THE CLERK:  (Microphone not recording.)

2   THE COURT:  All right.  Good morning, counsel.

3   We'll note the appearances of counsel who are on the

4   appearance sheet that I have.  Just give me a moment to

5   review it.  I don't see either Ms. Steingart or Mr. Snellings

6   on the list.  Are they on the phone?

7   UNIDENTIFIED SPEAKER (TELEPHONIC):  Microphone not

8   recording.  Two parties are talking simultaneously.)

9   MS. STEINGART (TELEPHONIC):  . . . had noted to the

10  Clerk that both Ms. Costello and I are on the phone.  I'm

11  connected through Ms. Costello because I am still traveling.

12  THE COURT:  All right, in any event, I just wanted

13  to make sure that we had representatives of both Law

14  Debenture and Magten.  Apparently we do.  I see Mr. Huston,

15  who is representing Mr. Hylland.

16  MR. HUSTON (TELEPHONIC):  Yes, Your Honor.

17  THE COURT:  And is Mr. Morris or somebody from his

18  office on the phone?

19  MR. PASHMAN (TELEPHONIC):  This is Scott Pashman

20  from Cronish Leib (phonetical) on behalf of John Morris for

21  RCG Carpathia Master Fund and Kellogg Capital Group.

22  THE COURT:  Yes, that's fine.  Oh, I do see Ms.

23  Steingart now that I look at the list more carefully.  All

24  right, then we have representatives of the debtor and the

25  Committee.

3

MR. AUSTIN (TELEPHONIC): Yes, Your Honor, it's Jesse Austin for Northwestern.

THE COURT: All right.

MR. KORNBERG (TELEPHONIC): And Alan Kornberg for the Committee, Your Honor.

THE COURT: All right. This morning this will be a decision on the record constituting findings of fact and conclusions of law concerning the confirmation hearing for the debtor's second amended plan. I think it's actually denominated Second Amended and Restated Plan of Reorganization. It was listed as Exhibit 151 in evidence at these proceedings. I will note that in connection with the plaintiff's class action security matter, I've entered a separate order concerning the MOU that I assume has been transmitted to counsel. Has that been received by counsel?

MR. AUSTIN (TELEPHONIC): Yes, Your Honor, this is Jesse Austin for the record. That order was received yesterday. It has been distributed to counsel for the Committee, and I know it's been distributed to counsel for the defendant and the plaintiffs in the securities class action case.

THE COURT: And also to Magten?

UNIDENTIFIED SPEAKER (TELEPHONIC): . . . received a copy of it.

THE COURT: All right, and Magten's counsel has a

4

1    copy of that also?

2         MR. AUSTIN (TELEPHONIC):  I have not sent it to

3    them, Your Honor, but we will make sure it gets out to them.

4         THE COURT:  Have you seen that, Ms. Steingart?

5         MS. STEINGART (TELEPHONIC):  Your Honor, I have

6    heard that it was entered.  I have not seen it.

7         THE COURT:  All right, well, I'll talk briefly

8    about that during the course of this proceeding.

9         MS. STEINGART (TELEPHONIC):  I am not in my office.

10        THE COURT:  I understand.

11        MS. STEINGART (TELEPHONIC):  Have not had it

12   available.

13        THE COURT:  This Chapter 11 proceeding concerns

14   Northwestern Corporation, which is a electric and gas energy

15   transmission and distribution company doing business in

16   certain parts of Montana, South Dakota, and Nebraska with a

17   substantial majority of its business being dedicated to

18   electric as opposed to gas.  The evidence has indicated that

19   there's some modest amount of generation capacity with

20   Northwestern, but that it is primarily a transmission and

21   distribution company.  In addition there are certain core

22   businesses and assets that either have been sold or are to be

23   sold, so that what is being reorganized here is the remaining

24   core business.  The debtor filed a plan and a first amended

25   plan and a second amended plan.  The proceedings today and

5

for the last couple of days are dealing with the second
amended plan.  Under that plan generally, and this is simply
an overview, administrative and priority claims are to be
paid in full.  The secured debt is unimpaired including
payment of the DIP, the secured bondholders are unimpaired,
CSFE is unimpaired, other secured claims are unimpaired.  The
fundamental operative aspect of the plan is a equity for
debts swap that provides for the payment or the distribution
of one hundred percent of the new equity of the reorganized
debtor, 92 percent to the senior unsecured debt and 8 percent
to the so-called junior debt or the Toppers or Quips.  In
addition, the Class 9 general unsecured claims, I believe,
under the plan shared pro rata with the senior unsecured bond
debt.  Class 8 is divided now into two subclasses.  Class 8-A
is the Toppers.  The pro rata share, they are to receive
their pro rata share with the Quips who so elect of 8 percent
of the new equity plus warrants for up to a pro rata share of
13 percent of the equity with the warrants having a strike
price of $28.  The conditional consideration arising out of
the treatment of the Toppers relates to an overall settlement
between that class of creditors, which was primarily
represented in these proceedings by Harbert Management, the
holder of certain of those securities, and Wilmington Trust
Company, the Trustee under those bond indentures that involve
the withdrawal of objections concerning the memorandum of

6

1  understanding on the plaintiff's security class action

2  litigation and the challenge that had been mounted by that

3  class of creditors to the validity of the senior unsecured

4  debt arising out of alleged non-compliance with the Public

5  Utility Holdings Company Act or PUHCA that was the subject of

6  previous proceedings during this case, particularly having to

7  do with motions for relief from stay in order to proceed on

8  that matter in front of the SEC.   In any event, that

9  objection, which had been put forth by the Toppers through

10  Harbert and Wilmington was resolved in consideration of the

11  increase of the amount to the junior unsecured debt from 2

12  percent to 8 percent and the provision for the warrants.  As

13  I understand the concept of the warrants, the strike price of

14  $28 was chosen or fixed to represent a price at which the

15  senior unsecured debt will have been paid in full based upon

16  the valuation that was -- upon which the plan of

17  reorganization was based, primarily the Lazard valuation.

18  The 8-B Quips claims are to receive the same pro rata share

19  of 8 percent of the equity plus pro rata share of the

20  warrants up to a pro rata share of 13 percent of the equity

21  with the same strike price as $28, or they are to receive in

22  consideration the continuance of the fraudulent conveyance

23  litigation which has been previously filed and by that -- by

24  Magten, and any resulting claim from that litigation would be

25  treated as a member of Class 9 which is the general unsecured

7

class but taking that option would result in waiving the
right to receive any of the equity or the warrants that would
otherwise be provided to them.  So that if a holder of a
Quips claim were to elect the fraudulent conveyance
litigation treatment and that litigation was unsuccessful,
then the holder of that claim would receive zero.  The
general unsecured debt is classified in Class 9 and shares
pro rata with Class 7.  Class 10 is the convenience claims
which are up to $20,000 or claims that are reduced
voluntarily to that amount.  Class 11 consists of certain
environmental claims.  They are either unimpaired or treated
pursuant to the Mill Town Dam settlement that has been
previously approved by the Court, which involves the payment
of approximately $11 million in settlement of the estate's
liability with regard to the cleanup of that particular site.
Class 12 are the D&O trust claims.  These claims are to be
channeled into the trust.  They are claims of directors and
officers of the company against the company.  The plan
provides that in the trust they will be paid in a first-
in/first-out order to the same extent as they would have been
paid against the insurance that is the primary funding source
of the trust.  The debtor will assign its interest in certain
insurance policies covering the directors and officers into
the trust, and then the claims will be channeled through an
injunction by the trust and certain claims will be released

8

as part of that overall treatment.  The debtor would also

then contribute an additional two and a half million dollars

to the trust after and only if the remaining approximately 13

to $14 million of insurance proceeds after the payment of the

obligations under the plaintiff's security class action

settlement had been paid out and the payment of certain other

accrued but unpaid and estimated expenses, costs of defense,

and so on.  After those, there would be, as I said,

approximately 13 to $14 million remaining in insurance --

potential insurance proceeds which after they were exhausted

the debtor would contribute two and a half million dollars.

That would then be the race against which D&O claimants could

be paid upon the exhaustion of those two sources, then there

would be no further avenue for them to collect.  So there

would be no deficiency or unsecured claims remaining.  The

operation of this trust has been brought into question in

this case by the objection of Mr. Hylland, former chief

operating officer of the company, who in addition to

affirmative claims arising out of what he claims to be a

breach of contract relating to his employment also asserts

claims in the nature of the D&O claims that would be

channeled into the trust.  And I will discuss that more in

more detail later.  Class 13 are the equity security holders,

and they are treated as receiving nothing in rejecting the

plan as being out of the money.  Class 14 are the securities

9

1   claims which are to be paid through the MOU settlement, which

2   I approved yesterday, assuming that is also, of course,

3   approved by the District Judge in front of whom the case is

4   pending in South Dakota.  And that settlement includes $37

5   million in insurance proceeds from the D&O policies I

6   referenced earlier as well as contributions from certain non-

7   debtor third parties who are also defendants in that

8   particular action.  Class 15 are the opt-out securities

9   claims and from the debtor they are to receive nothing.  This

10  case or this proceeding having to do with the confirmation of

11  the second amended and restated plan, was heard before this

12  Court on August 25th and on October 6th.  So, therefore, the

13  requirements of Section 1128 concerning the necessity for

14  holding a confirmation hearing have been satisfied.  In order

15  for a plan to be satisfied, all requirements of Section

16  1129(a) of the Bankruptcy Code need to be found to have been

17  satisfied with the exception of 1129(a)(8) which if not

18  satisfied triggers the application of Section 1129(b), the

19  so-called cram-down proceedings.  The evidence that has been

20  submitted, and as to which there is no pending objection or a

21  claim to the contrary, demonstrates compliance with

22  1129(a)(2), (3), (4), (5), (6), (7), (9), (12) and (13).

23  There is a rejecting class here and again there is no issue

24  with regard to the solicitation and re-solicitation of the

25  votes, whether that was done in accordance either with this

10

1   Court's prior orders or with the applicable provisions of the

2   Bankruptcy Code.  But the fact that Class 8-B has rejected

3   implicates 1129(b) in that 1129(a)(8), therefore, is not

4   satisfied.  As I just briefly said, I will find that the

5   solicitation and re-solicitation comply with the requirements

6   of 1125 and 1126 with regard to both the voting procedures

7   and the acceptance requirements and rejection provisions for

8   the various classes, and no issue has been raised as to

9   voting.  There are several consenting impaired classes,

10  including Class 7, Class 8-A, Class 9, and Class 12 so that

11  1129(a)(10) has been complied with.  1129(a)(11) is the

12  feasibility provision.  There's no serious objection to the

13  feasibility except that which is raised by Wilmington Trust

14  -- Excuse me, by Law Debenture in its objection saying that

15  there's a likelihood of liquidation or further reorganization

16  because of the likelihood of the success on the fraudulent

17  conveyance claim and the necessity, therefore, of returning

18  the assets, the Montana utility assets from the debtor to

19  Clark Fork and Blackfoot.  Other than that issue, there is no

20  issue raised as to the soundness of the business plan or the

21  ability of the debtor to make the payments that are required

22  or the ability of the debtor to issue the new securities.  So

23  I will find that 1129(a)(11) is satisfied subject to my later

24  findings concerning the fraudulent conveyance action.  The

25  only issue that has arisen under 1129(a)(1) which requires

1   that the plan complies with all applicable provisions of the

2   title, is whether or not classification of 8-A and 8-B is

3   appropriate under Section 1122.  This issue will be reserved

4   and discussed further in connection with the disposition of

5   the objections.  Exhibit A to the debtor's supplemental

6   memorandum which is Exhibit 182 details all of the objections

7   that have been filed and those that have been resolved.  For

8   the record, I'll run through those briefly.  Objection No.

9   (1) is overruled hereby by the Court for lack of a

10  substantive basis.  Objections Nos. (2) through (4) have been

11  resolved as stated in Exhibit 182.  Objections (5) and (6)

12  have been withdrawn.  Objection (7) has been adequately

13  addressed by the modifications to the plan that are detailed

14  in Exhibit A.  Objection (8), which is Mr. Hylland's

15  objection, will be separately addressed.  Objection (9),

16  which is the Goldman Sachs objection, has been addressed and

17  will be resolved by the terms of the confirmation order,

18  assuming the plan is confirmed.  Objections (10) and (11),

19  which are raised by equity, will be separately addressed.

20  Objections (12), (13), (14), and (15), which are Magten and

21  Law Debenture, will be separately addressed.  Objection (16),

22  which is Touch America, will be resolved by the confirmation

23  order.  Objection (17), which is the United States of

24  America, will be resolved by the assumption of certain

25  agreements.  Objection (18), which is MPBR, will be resolved

12

separately outside of confirmation.  Objection (19) is the protective objection of the securities plaintiffs which is resolved by the approval of the MOU.  Objection (20), which is the Milbank Tweed objection, will be resolved by the confirmation order, assuming the plan is confirmed.  There have been informal objections by the United States Trustee, the Securities and Exchange Commission, and the Net Exit Unsecured Creditors Committee which have been resolved by language in the plan.  So based upon that, all provisions of 1129 have been satisfied as required with the exceptions that I have noted, and all objections have been resolved with the exception of the equity holders objection, the Magten and Law Debenture related objections, and the Hylland objections.  So I will now turn to those issues.  The equity, through the Cronish Leib firm by Mr. Morris, has objected that the absolute priority rule is violated because the enterprise value of the estate exceeds although the claims that are senior to equity therefore the equity is in the money.  The failure to provide any value to the equity, therefore, is not fair and equitable.  The Court has been aided in this case by three expert reports as well as testimony and cross-examination from each of the experts.  There is a report prepared by the Lazard firm as testified by Mr. Yearly on behalf of the debtor which indicates an enterprise value of the estate of the company at $1.5 billion.  There has been a

13

report by the Houlihan Lokey firm that suggests a range of
values between 1.4 billion and 1.67 billion.  Mr. Bradley
Geer testified with regard to that report, and there has been
a report by Seneca Financial -- Just give me one moment here
-- that suggests a value somewhere between 2.2 billion and
$2.4 billion, and Mr. James Harris testified in support of
that opinion.  I'll review these various opinions briefly.
The Lazard opinion by Mr. Yearly used three valuation
techniques including a discounted cash flow, a comparable
transaction method, and the comparable market valuation
method, which are the three accepted valuations methodologies
for companies of this type.  There were certain reductions
that were made by Mr. Yearly in connection with his multiples
for certain risk factors including the relative small size of
Northwestern and what he called "regulatory risk".  The
cross-examination revealed that some of those changes could
be suspect because of a lack of relation between the
comparables and their size, relative size.  In other words
there were some larger companies with lower multiples and
some smaller companies with higher multiples.  There was not
a clear pattern that would necessarily justify that kind of
adjustment.  There were a number of transactions relied upon
to determine multiples.  Several of those transactions were
older, and they were criticized by Mr. Harris as being older
and, therefore, not so relevant.  The report by Lazard did

14

1   rely upon one of the comparables also relied upon by Seneca,

2   which was Duquesne.  Mr. Yearly testified that Duquesne

3   trades higher in his opinion because of a higher dividend,

4   and that that increases the market attractiveness of that

5   particular entity.  Lazard separately valued the NOL and the

6   non-core assets.  The non-core assets were discounted at

7   present value at a 7 percent discount rate based upon the

8   estimation of when they would actually be sold and available

9   to market.  The Seneca -- Mr. Yearly also testified that the

10  Seneca valuation was largely in line with the Lazard

11  valuation on the market transaction analysis and criticized

12  Seneca for its exit multiple in the discounted cash flow

13  analysis of as high as 9.5 percent.  In the Houlihan

14  valuation, which was in a range between 1.4 and $1.67

15  billion, Mr. Geer also used three approaches:  The DCF for

16  discounted cash flow, the market multiple, and the

17  transaction multiple.  He included 150 to $195 million in

18  non-core assets in cash.  He did not find that there was any

19  hidden value in the growth rate.  He thought that the

20  company's rate of 1.1 or 1.2 percent was in line with or

21  perhaps even higher than the historical growth rate, and he

22  found no basis to find a higher rate.  He also took under

23  account what was called throughout these proceedings as the

24  QF liability, as did Mr. Yearly.  The QF liability has to do

25  with obligations of the debtor to pay on long-term contracts

15

to certain qualifying facilities to obtain power, and the

contract amounts are in excess of the amount recoverable by

the debtor through its regulated business as a part of its

rate base or cost of doing business.  So this creates then a

liability between what the debtor has to pay and what the

debtor can receive back so that the provision of energy on

that basis or the purchase of energy is not a pure pass-

through.  This matter was explored extensively in connection

with a settlement with one of the qualifying facilities as to

which I heard a substantial amount of testimony, and the --

during that hearing, the debtor explained how it was in a

conundrum and that its view was the best thing it could do

would be to assume the QF liabilities as restructured as

opposed to either reject them or seek to get power from other

sources, particularly the rejection of the contracts the

debtor believed could give rise to a Catch-22 where it would

not end up being the beneficiary of any reduced amounts, but

rather that amount would also then be reduced from what it

could recover under its various rate orders with the Montana

Power Commission.  So the question here is whether or not a

present value of the long-term loss is appropriate to be

capitalized and treated as a deduct from the overall

enterprise value.  And it was in that context that Mr. Yearly

and Mr. Geer both decided that it was appropriate to

capitalize that liability and deduct it from the enterprise

16

value, and Mr. Harris determined that it was not. Mr. Geer
also for Houlihan, and I will discuss the resolution of that
issue a little bit later, Mr. Geer also discussed and his
report included the conclusion that the non-core asset sales
are in relatively advanced stages, and it's reasonably
possible to determine an amount for those sales and to
include that within -- as an extra item within the overall
enterprise valuation. Again, the multiples that were
indicated by the market analyses were adjusted for size, for
being in lower growth markets, for a difficult regulatory
environment, and for an amount of uncertainty with regard to
overhead savings that were being projected. In connection
with the discounted cash flow analysis, Mr. Geer did as I say
deduct the qualified facility liability. He also testified
that he had normalized or removed those liabilities from the
capitalized cash flow so there wouldn't be a double impact.
He testified that the weighted average cost of capital that
he used was based upon certain feasible post-confirmation
capital structure and availability of funds from the capital
markets, and he also testified that he used management's
projections. Now, in connection with his analysis of the
market multiple, he determined earning levels that would be
representative of the future, and he reviewed EBIT, EBITDA,
and net income, again separately valued the NOLs. He
normalized the income streams for extraordinary expenses in

17

1    bankruptcy and related issues.  He adjusted the numbers
2    upwards for normalization purposes in several ways.  He, in
3    determining his selection of comparable companies, he limited
4    them to similarly regulated companies.  He eliminated gas
5    only companies, and he eliminated certain companies that he
6    determined has less regulatory risk, finding that Montana
7    historically was among the most consumer friendly states.
8    And that there was no substantial self-generation here on the
9    part of this company.  And then he did a comparative risk
10   analysis.  He selected his multiples and adjusted them as
11   indicated above.  For the transaction multiple, he used EBIT
12   and EBITDA and not net income numbers.  The NOLs were
13   separately valued, and he assumed that the debtor had
14   returned to full taxpayer status.  His multiples are derived
15   from more recent transactions than the ones in the Lazard
16   analysis.  Mr. Harris' opinion of 2.2 to 2.4 is based upon a
17   number of adjustments and different assumptions.  Number one,
18   he thought the rate growth -- the growth rate was too low.
19   That has been assumed by debtor's management and reviewed
20   various publicly available information concerning the
21   demographics of the service areas to conclude that a growth
22   rate was about double of what the debtor was suggesting would
23   be more appropriate.  He argued that the taxes were too high
24   and that the debtor -- and that the historical tax numbers
25   should be used rather than full taxpayer status.  This is a

18

1   difference in methodology here wherein the other ones used

2   full taxpayer status but instead had a capitalized value for

3   the net operating loss carried forwards that was then

4   included within the enterprise value. He indicated that in

5   his view, there should be no deduction for the QF liability,

6   that that was built into the cash flows and that it was more

7   typical, based upon his experience, that those kinds of

8   issues would be, quote, "worked out", close quote, over the

9   course of time, and that this was not a real hard liability

10  that needed to deduct the overall enterprise value of the

11  company. His approach with the non-core assets was not to

12  include them as part of the enterprise value but rather to

13  deduct that amount of cash and -- actual cash and realizable

14  cash from the sale of non-core assets from the so-called

15  claims hurdle number thereby lowering it to indicate the

16  point at which -- the break-even point at which equity was

17  either in or out of the money, the so-called water line where

18  you're either above or below water. He did include in his

19  report that he had detailed claims hurdle. He -- Just give

20  me a moment. Looking at it from the standpoint of equity,

21  his claims hurdle amount was $2.269 million from which he

22  deducted $180 million for the cash and cash equivalents that

23  would come from the non-core asset sales to come up with a

24  net debt number of just under $2.1 million. He did not

25  include post-petition interest on the debt that would have to

be paid which the record reflects, and I will so find, is an

amount of $180 million.  And as I said, instead of including

the 180 million or the 150 million or whatever number would

be appropriate as essentially an asset that would increase

the value, he included it as a deduct from the hurdle amount.

I think the more appropriate way to do that is to -- to deal

with that number is to treat it as part of the enterprise

valuation which is what both of the other experts, Lazard and

Houlihan, did.  So, from an equity standpoint, I think it's a

reasonable conclusion to say that Mr. Harris has indicated a

hurdle rate of somewhere in excess of $2.3 billion which

would be his 2.269 plus a 100 million in post-petition

interest that would have to be paid before the equity would

be in the money.  Mr. Yearly prepared what he called a Lazard

to Seneca bridge which showed the items that separated the

Lazard valuation from the Seneca valuation and the imputed

amounts related to each one of those assumptions.   During

the presentation yesterday, as a demonstrative exhibit,

counsel for Magten prepared a similar document having to do

with what the hurdle rate would be, not for the equity but

rather for the sub-debt before the sub-debt became in the

money.  And that dealt with such things as the EBITDA

multiple reduction, the tax rate, the growth rate, the

assumptions on the multiple at the exit -- the exit multiple

in connection with the DCF analysis, and so on.  So that's

20

1  just a brief overview of the three different approaches that

2  were presented to the Court.  Now, to resolve the issue of

3  value.  For the purposes of this case, I don't believe that

4  an exact value needs to be calculated.  The first issue is

5  whether equity is in the money.  The second issue is whether

6  the Quips are in the money.  The Quips have -- that is to

7  say, Magten and Law Debenture have hitched their wagon to the

8  Seneca star without presenting their own evidence but rather

9  have argued that the Seneca valuation is more appropriate

10  than the Houlihan or the Lazard valuation for purposes of

11  indicating that they are in the money, as I will talk about

12  more specifically later.  This is significant for a number of

13  reasons not only the extent to which they might be in the

14  money as to what they might be entitled to under a plan, but

15  also whether or not the 8 percent that is being given to or

16  distributed to the Class 8 holders is a quote, "gift", close

17  quote, from the senior lenders or whether that is in fact an

18  amount to which they are entitled by virtue of the absolute

19  priority rule.  So the issue does need to be addressed both

20  from the standpoint of equity and from the standpoint of the

21  sub-debt.  Now with regard to the QF liability, having

22  reviewed this issue, I conclude that I think it's incorrect

23  to say that there is no deduction appropriate for QF

24  liability because it is quote, "baked into", close quote, the

25  projections, which I think was the term used by Mr. Morris.

21

1   Mr. Morris' argument was that the numbers for the five-year

2   projections already include the QF liability, and it in

3   effect is being burned off and that to deduct it separately

4   is to double count.  I don't think that's an accurate

5   conclusion.  The QF liability extends over a period of 28

6   years, and the record in this case indicates that it is

7   rather seriously back-loaded.  Nobody has argued that an

8   appropriate discounted present value of that number is in the

9   vicinity of $140 million.  What the parties have argued about

10  it, whether it's appropriate to deduct that $140 million from

11  the enterprise value that is otherwise indicated.  Because a

12  great deal of that liability is in the future and because --

13  far in the future beyond the five year period and that only a

14  relatively small amount is being burned off during the five-

15  year projection period and further that at least one of the

16  experts normalized the cash flows such that there would not

17  be such a burn-off.  That leads to the conclusion that this

18  is a real liability particularly in the utility business

19  where, because of the very large capital requirements and the

20  large amount of money and the need to obtain regular and

21  reliable sources of supply, long-term contracts are common

22  and the presumption should not be that somehow what actually

23  exists as a contractual obligation today will not exist in

24  the future.  So I don't think that the evidence supports a

25  conclusion that, quote, "these things get worked out", close

22

1   quote, as was suggested by Mr. Harris, but rather that this

2   is a real liability that represents real dollars and,

3   therefore, would be and should be taken into account in the

4   marketplace when valuing the enterprise value of this

5   particular company.  So I will accept the proposition that

6   there is a $140 million deduct for the QF liability.  As I

7   indicated before, the cash on the non-core assets should

8   appropriately be considered in the basic evaluation and not

9   used to reduce the hurdle rate.  And upon review of both the

10  Lazard and the Houlihan appraisals, I find that they do

11  appropriately do that.  The higher growth rates that had been

12  suggested by Mr. Harris really are -- while there is some

13  basis for them, they are nevertheless almost by definition

14  speculative, and they are not historically based but rather

15  based upon assumptions not made by management in this case.

16  The debtor has made a point of indicating that Mr. Harris did

17  not interview management, did not review why or how they came

18  to the conclusion of the 1.2 or 1.1 percent growth rate, but

19  rather simply adjusted it himself based upon his view of what

20  it ought to be.  Clearly, the valuation in cases like this

21  needs to be forward looking because we're talking about the

22  enterprise value in the future.  However, the forward looking

23  value needs to be based upon rational and, to the extent

24  possible, knowable assumptions, and, having reviewed the

25  evidence here, I find that the growth rate that was assumed

23

by the management is the appropriate one rather than the
growth rate that was speculated about by Mr. Harris.  Now, a
great deal is made by Mr. Morris during his cross-examination
on the so-called subjective changes that were -- or
modifications or reductions that were made particularly by
Mr. Yearly to the market indicated multiples of EBITDA or in
some cases of EBIT.  And I do think that the cross-
examination demonstrated that there was perhaps no empirical
or no discernable empirical relationship between size in the
indicated market multiples.  And from the standpoint of the
equity and the sub-debt, that's the good news.  The bad news
is that they really don't make that much difference if you
remove those changes that were relatively modest that were
made.  The impact is, in most cases, less than $100 million,
and there is a lot farther to go than that.  With regard to
what the hurdle appropriately ought to be, it seems to me
that the appropriate numbers are in the vicinity of 2.3, 2.2
to $2.3 billion for the equity, assuming that the non-core
assets are built into the valuation and not into the hurdle
rate, and that the appropriate number -- and including the
$100 million post-petition interest.  And for the Quips, the
number is about $1.9 billion, and that assumes pari passu
treatment of the Quips with the Toppers, another issue that I
will discuss in a minute, but assuming that in fact they are
of the same level of priority, it would be about $1.9

24

billion. The issue of whether or not they are junior to the
Toppers would then put them farther down the road than that.
It was clear during the course of the evidence and Mr. Harris
agreed that for the equity to be in the money, that Seneca
needed to be right on all of its assumptions, and as
indicated by my previous comments, I find that it is not.
The growth rates, I think, by management in the detailed
projections are more appropriate than the other growth rates.
To a certain extent I think the so-called Standard and Poors
presentation does not illuminate the circumstances very much
having been prepared fundamentally for a different purpose
and not even necessarily supporting the conclusions that the
equity tried to draw from it. So I think that the management
projections and assumptions as part of the business plan are
more appropriate and reasonable. Likewise, I find that the QF
liability ought to be deducted, and that the non-cash assets
need to be included in the enterprise value and that any
double counting needs to be avoided. I'll also note that
while Seneca did all three methodologies, it relied almost
entirely upon the discounted cash flow methodology which
yielded a much higher number. As indicated before, Mr.
Yearly made the point of saying that, in the market
transaction analysis if you take into account the QF
differential that Seneca and Lazard are more or less in
tandem. I think it is a key point that the Seneca valuation

25

chose to ignore the comparable company and the market
transaction approaches in favor of DCF.  As a general rule,
when one methodology is sufficiently at odds with the other
two, both of which are market based, I don't think it's
reasonable to disregard the market-based methodologies and
rely solely upon the projection-based methodologies, which by
its nature, DCF is more sensitive to assumptions and more
dependent upon rejections and less tied to the reality of
actual results.  It is an accepted methodology, obviously,
but it does require any number of assumptions and projections
about the future that are frankly less knowable than the
numbers that can be extracted from actual transactions in the
marketplace.  And as further note, the use of non-T and D
comparables, which seem to be in part based upon the Standard
and Poors report, I found to be somewhat misleading because
this debtor, regardless of what it said in Standard and Poors
is an overwhelmingly T and D operation, and I think the only
reference in the Standard and Poors document was, in any
event, to South Dakota and not to Montana where by far the
bulk of the operations are.  Having reviewed all three on
balance, I am inclined to and hereby do adopt the Houlihan
analysis as a basis.  There are some modifications that I
think would be reasonable to make to the Houlihan analysis
but they are of a relatively modest amount.  And with the
hurdle rates that I have found, that would leave both the

26

1  equity and the sub-debt out of the market -- excuse me, out

2  of the money, and that even at the high end of the Houlihan

3  analysis, which does include the non-core assets, the sub-

4  debt remains out of the money by over $200 million.  With

5  regard to the objections that had been raised by Magten, they

6  turn largely upon the special circumstances alleged to exist

7  by Magten because of their having brought the fraudulent

8  conveyance case and having survived in that case a motion to

9  dismiss.  Again, I will note for the record that I largely

10  accepted the debtor's/defendant's arguments with regard to

11  the lack of standing by Magten to bring the action except if

12  Magten can show that there was actual fraud that occurred in

13  the context of the transaction itself.  That could lead, if

14  that were proven, to an unwinding of or to an invalidation of

15  the release of Clark Fork and the assumption by Northwestern,

16  which is the critical part of Northwestern's lack of standing

17  defense.  But in the absence of the actual fraud, I do think

18  the lack of standing defense still is valid.  Nevertheless,

19  there is a pending lawsuit and that's the burden that they

20  have to overcome, and I'm certainly making no prejudgment

21  today one way or the other about what the evidence will show

22  in that particular case but the primary point, a primary

23  point of the Magten position and the Law Debenture position

24  is that the Montana utility assets are not property of the

25  estate because they are subject in effect to a constructive

27

trust in favor of Magten as plaintiff in the fraudulent
conveyance case.  Everyone agrees that there has been no
action yet actually taken to impose a constructed trust.  At
this point we only have the allegations, which as noted, have
narrowly survived a motion to dismiss with a high burden
placed on the plaintiff even to stay in the game at this
point.  Magten strongly relies, frankly without citation,
upon Montana law from the notion that there is no remedy at
law but only equitable remedies that do not give rise to
money damages.  Therefore, it is not the holder of a claim
that can either be discharged or treated as an unsecured
claim, but rather it's the holder of, in effect, an in rem
interest in the Montana utility assets.  There's been no
Montana case cited to support this interpretation, and indeed
there was no case from any other jurisdiction with a
similarly situated or structured law.  And upon closer
examination, there is nothing arcane or extraordinary about
the remedies available under Montana law.  Montana has,
similarly to most jurisdictions around the country, adopted
the Uniform Fraudulent Transfer Act of which the section in
question, which is 31 to 339, is Section 7.  The Uniform
Fraudulent Transfer Act updated, modernized, and harmonized
fraudulent conveyance juris prudence with the 1978 Bankruptcy
Code among other things and just generally with the evolving
nature of fraudulent conveyance juris prudence over the years

28

from the statute of Elizabeth to the present.  And indeed, as
I read that section and the commentaries that are related to
that section, particularly Section 7 of the Uniform
Fraudulent Transfer Act, the intent was not to limit remedies
but to expand remedies.  For example, there were certain pre-
judgment remedies that were put into the law that to the
extent they are consistent with Supreme Court juris prudence
on notice and due process and so on, are now part of the
available remedies.  And, specifically, Section 7(a) which is
339(a) provides that a remedy is the avoidance, quote, "to
the extent necessary to satisfy the creditor's claim", close
quote.  That clearly contemplates money damages.  There's
nothing in the remedy section that I found of the Montana
fraudulent conveyance law that gives rise to an automatic
constructive trust upon the mere filing of a lawsuit, and as
my colloquy with counsel during the course of the proceeding
indicated, 1 would find that to be an extraordinary provision
indeed.  That would put at risk virtually every transaction
that was ever done until such time as the statute of
limitations would run.  On the other hand, I do think that
the general Montana law on constructive trust, which was
cited by the debtors, that's Montana Code 33319 would apply
and that does require clear and satisfactory and convincing
proof that is practically clear from doubt as stated by a
Montana case interpreting that particular statute.  Thus, I

29

think, what the law provides is that a constructive trust is

the exception and not the rule whether under Montana law or

generally.  And of course, the imposition of any constructive

trust is contrary to basic principles of ratable distribution

and is generally disfavored in the bankruptcy context because

of the adverse impact on other creditors, particularly where

there are ways of fashioning remedies that would protect the

plaintiffs or those asserting fraudulent conveyance theories.

Although Section 550 is not applicable here because this is

not an action brought by a trustee to avoid either under

545(b) or 548, I think it is instructive of the policies

behind fraudulent conveyance law as it has evolved, and 550

clearly contemplates that in addition to the mere setting

aside avoidance or return of the assets that a money

equivalent is appropriate.  So my conclusion on that issue is

that there is no constructive trust at present.  It is

unlikely that there will be one even if the plaintiffs are

successful, that the Montana assets are property of the

estate, that the Quips have an adequate remedy of law, that

there is no in rem right or property right created by virtue

of their status as a plaintiff in a fraudulent conveyance

case in those Montana utility assets.  I find and conclude

that the Quips come to the debtor's table like any other

unsecured creditors are to be treated in the same way.  And

indeed if it was different from that, the issue of unfair

30

discrimination would run the other way.  And that would be
unfair to those creditors.  So, in sum, is this an unsecured
claim?  The answer is, yes.  Is it a property interest?  The
answer is, no.  Is it a disputed unsecured claim?  Certainly
at this point it is.  Is it entitled, therefore, to a
reserve?  It would certainly appear that it is under Section
7.5 of the plan.  Is it entitled to a cash reserve?  No, it's
not entitled to a any reserve that's different from the
reserve that would be set up in connection with any other
unsecured claim so that it would be entitled to property or a
reserve of the distributable stock just like any other
unsecured claim, and the amount would then need to be
determined in accordance with the procedures set forth in the
7.5 of the plan, which includes either the amount of the
claim or such other amount as is estimated by the Court if
the parties can't agree.  So, I'm going to leave that part to
play out its course assuming the ultimate confirmation of
this plan.  Now, what about the election of remedies issue?
This is frankly the heart of the Magten objection, from where
I sit, and that is whether or not it is fair and equitable to
-- Just give me one moment here.  Basically, Magten's
argument is the debtor's best case or as Ms. Steingart put
it, the best day for the debtor is the 8 percent plus the
warrants.  Why is it fair for the Quips to lose that recovery
if they choose also to pursue the fraudulent conveyance?

31

1   Well, I've already found that based upon the valuation that

2   this is indeed what can be fairly called a gift case, that is

3   to say that there is not an absolute entitlement to the 8

4   percent or the 13 percent in warrants that has been set aside

5   here for Class 8, but rather that is money that is coming out

6   of the recoveries that would otherwise be available to

7   Classes 7 and 9 as non-subordinated unsecured creditors.

8   Magten suggested even if this is a so-called gift case, that

9   the requirements of the Code would nevertheless apply with

10   regard to the fairness of the treatment.  As a general

11   proposition, I don't agree with that, but I do think that

12   there might be circumstances under which a treatment could be

13   so substantially unfair that notwithstanding the fact that

14   it's a gift that it would be subject to inquiry by the Court,

15   but I don't think that set of facts and circumstances arises

16   here.  And as I've said before, the valuation establishes

17   that the sub-debt is out of the money.  Now the election of

18   remedies provision of Class 8-B requires a choice.  The sub-

19   debt, Magten argue that that violates -- it is contrary to

20   the holding of the AOV case.  AOV is, however, I think

21   different because there were two independent claims in AOV, a

22   primary claim and a secondary claim or a guarantee claim that

23   were -- that co-existed.  The question here is whether or not

24   these two claims can in fact co-exist.  If there was a

25   fraudulent conveyance than Northwestern is not liable on the

32

1   Quips, and it would be unfair to the other unsecured

2   creditors for the Quips to receive a distribution on a debt

3   on which the debtor is not liable.  If there wasn't a

4   fraudulent conveyance, then the Quips are in fact owed the

5   money.  So the real issue presented is why shouldn't the

6   Quips have the backstop of the 8 percent if it turns out that

7   they are wrong and they lose the lawsuit.  That's the heart

8   of what Magten is arguing.  I'm certain the plan could have

9   been drafted that way, but it certainly is not.  The question

10   then is does that make the plan with regard to the treatment

11   of 8-B un-confirmable.  My conclusion is, no.  The valuation

12   establishes that there's no right to the 8 percent because

13   the sub-debt is out of the money.  If the plan had separated

14   them out and not given them that treatment, then as suggested

15   the unfair discrimination might be implicated.  But we don't

16   get to that point because it does give them the 8 percent.

17   The two particular kinds of remedies are in fact completely

18   inconsistent.  And it is consistent with election of remedies

19   law that you have to choose which path you're going to do

20   down.  In addition here, where a class does not have a vested

21   right to a certain treatment, the 8 percent, it is not

22   unreasonable or unfair to make it pay for the option of

23   seeking a higher return based upon a legal theory which if

24   correct would disqualify them even from getting the gift.  In

25   effect, this is a put your money where your mouth is plan,

33

1    and in the absence of an independent secondary liability,

2    which would exist coincidentally with the right to receive a

3    distribution under the plan, it is not unfair to require them

4    to make that choice.  There's also a classification argument

5    that is raised by the sub-debt that it is inappropriate to

6    put the note claims, the Quips claims and the fraudulent

7    conveyance claims in the same class pursuant to this election

8    procedure.  As I just stated, the note claims, however, are

9    premised upon affirmance of the obligation by Northwestern to

10   the Quips and this only arises if the going-flat transaction

11   remains in place.  The assumption of the debtor under the

12   second indenture doesn't change this.  Mr. Snellings I

13   thought valiantly tried to convince me that there was a

14   separate basis for the assumption by Northwestern of the

15   Quips obligation.  However, in reviewing all of the

16   underlying transaction documents in connection with the

17   going-flat transaction, it is clear to me -- and the

18   applicable law, it is clear to me that this was really all

19   one transaction.  So that the second indenture was one step

20   in an overall going-flat transaction and to leave it intact,

21   and to undo the rest would exalt form over substance, and

22   that absent the going-flat transaction, Northwestern would

23   have no liability on the Quips.  If the fraudulent conveyance

24   claims -- they are premised upon the undoing of the going-

25   flat transaction including the assumption of the Quips by

34

Nor.  Under this view of the world, the obligor should be Clark Fork and Blackfoot, not Northwestern.  And Clark Fork and Blackfoot still would have the Montana utility assets to satisfy the claims of the Quips.  So, viewed in that way, I find and conclude that these two sets of claims are exclusionary and not cumulative.  So that it is not inappropriate to have a member of Class B choose which one of these paths they want to do down.  If they were separate and independent liabilities that could co-exist and could essentially be paid or could be two separate bases upon which payment could be made and exist at the same time, I think the conclusion would be different.  The next question is whether the Quips and the Toppers should be in the same class.  This is going to be a little tedious but I think it's important to talk about it.  Magten's original objection was that they shouldn't be in the same class.  Now, in effect, they're taking the opposite view.  Section 1122 does not require that all claims of similar priority be placed in the same class, rather only and if claims are placed in the same class that they have to be substantially similar.  The case law has developed to limit excessive classes primarily because of attempts to create a consenting impaired class to satisfy 1129(a)(10) so that a non-consenting and usually much larger class of similar priority may be crammed down.  That's not what's happening here.  Indeed, a ballot report suggests that

35

1   if 8-A and 8-B were aggregated the class would accept the

2   plan, and we wouldn't have a cram-down situation at all.

3   Here the separate classification protects the rights of the

4   Quips, which is the smaller debt issue rather than adversely

5   effecting those rights by allowing a larger debt issue to

6   Toppers to dominate.  There are many essential differences.

7   These are different issues of debt, different issuers,

8   different trustees, and more importantly there are different

9   litigation rights.  While both parties may have had standing

10  to raise PUHCA issues, the reality is only the Toppers

11  actually raised them in any meaningful way.  Only the Quips

12  had the standing or the potential standing to raise

13  fraudulent conveyance issues as to the going-flat

14  transaction.  Thus, it begs the question, in my view, to

15  suggest that the Toppers should be treated exactly the same

16  as the Quips when that is impossible given the facts that the

17  Quips have two types of claims that are exclusionary and not

18  cumulative.  So that leads to the question of whether also

19  the Quips and the Toppers are pari passu or is one

20  subordinate to the other.  Well, the debtor's plan treats

21  them as pari passu.  Wilmington Trust had previously asserted

22  that such pari passu treatment was improper.  Although that

23  issue was not fully briefed, it was simply raised in a pro

24  forma objection.  In reviewing the indentures I have

25  concluded the following:  The Quips' indenture provides that

36

1    senior indebtedness means any debt for borrowed money and

2    that includes assumed debt.  Unless the other instrument in

3    this case, the Toppers' indenture, expressly provides that

4    the Toppers are junior to or pari passu with the Quips.  And

5    there is no such provision in the Toppers' indenture either

6    specifically or generally unless the senior indebtedness

7    definition in the Toppers' indenture includes the Quips.

8    Now, does the Toppers' indenture so provide?  Well, the

9    Toppers' indenture provides that the senior indebtedness

10   means indebtedness issued by the company, Northwestern.

11   Evidence by securities except that that is by its terms

12   subordinated to a pari passu with the Toppers.  The Quips'

13   indentures requires that the Toppers' indenture expressly

14   provide that the Toppers are junior or pari passu, and there

15   is no such expressed provision.  So one could conclude that

16   in fact the Toppers are senior to the Quips.  However, the

17   same could be said of the Quips' indenture.  In other words,

18   beginning from the Toppers' side, one could conclude that the

19   Quips are senior because that indenture does not, quote, "by

20   its terms", close quote, which is the language used,

21   subordinate or made pay passu the Quips to the Toppers.

22   There are a couple of other interesting differences.  First,

23   the senior debt under the Toppers' indenture only extends --

24   that is to say, senior indebtedness to the Toppers only

25   extends to debt that's issued by Northwestern.  At least

that's how it reads.  The underlying debenture supporting the
Quips was issued by Montana Power and then to the financing
vehicle and not by Northwestern.  And unlike the Toppers'
indenture which expressly includes assumed debt, which is
what the Quips are, the Quips' indenture is limited to issued
debt.  So it strikes me that there is a potential there under
that particular difference between issued and assumed debt
that it could be concluded that the Quips are -- or that the
Toppers are senior to the Quips.  In addition, there's
another exception to the senior indebtedness and the Toppers'
indenture relied upon by Wilmington that at first had some
surface appeal.  This is because it references debt issued
through a financing vehicle such as occurred here with
Montana Power in the trust that was set up and the trust set
up as part of the transaction.  But as I read that exception,
it is limited by its terms to debt by or among Northwestern
and its affiliates, as that term is used in the indenture,
and the Quips do not fall within that definition.  Now, in
conclusion on this rather arcane issue, it is an issue that
has not been fully litigated or briefed.  It was merely
mentioned but not briefed by Wilmington in the objection
filed before the settlement was reached.  The language in the
two indentures is substantially similar though not identical
with regard to the circularity issue or problem of the senior
versus the junior debt.  So that it can neither be said that

38

1   the Quips' indenture by its terms subordinates the Quips to

2   the Toppers nor can it be said that the Toppers' indenture,

3   quote, "expressly provide", close quote, which is the

4   language from that indenture that the Toppers are not

5   superior to the Quips.  Likewise, the other exception in the

6   Toppers' indenture appears not to apply because the Quips are

7   not debt between Nor and its affiliate, and that particularly

8   the trust, which actually issued the Quips themselves, does

9   not qualify as an affiliate, I don't believe, but even if it

10  did, it wouldn't work because the debt must be issued to,

11  quote, "any other trust", suggesting that there has to be

12  another layer.  But there is this material difference between

13  the issued language and the assumed language that could

14  support the conclusion that the Toppers are seniors to the

15  Quips.  Obviously, the debtor's plan does not suggest that.

16  However, that change or that difference to me is another

17  substantial reason why the separate classification of 8-A and

18  8-B is appropriate.  Does this have an impact upon whether or

19  not this is a gift plan or not?  Well the analysis of value

20  above moots out that issue because my conclusion is that the

21  sub-debt is out of the money even if the two issues of sub-

22  debt are pari passu.  We next have the issue of unfair

23  discrimination.  That basically is if Classes 9 and 11 are

24  treated better than Class 8-B, and that they are of similar

25  priority.  Well, Class 11 is treated pursuant to a settlement

1   approved by the Court which compromises substantially, very

2   substantially, larger liability that the debtor had.  That's

3   the environmental claims on the Mill Town Dam and plus the

4   nature of the claim, you know, may be of a relatively same

5   priority is different because of obligations under the

6   environmental laws under 28 U.S.C. 959 and so on.  So this is

7   an area where because of the regulation and the public

8   interest and importance of environmental laws, make it as not

9   unfair discrimination to treat them better.  Certainly Class

10  9 is not treated better than the fraudulent conveyance claim,

11  because I found that the fraudulent conveyance claim should

12  be in 9 and should be treated as 9.  And in fact, 9 is better

13  than 8-B because 8-B is contractually subordinated to 7 and 9

14  is not.  So there's no unfair discrimination in terms of how

15  those particular classifications work.  There is an argument

16  that the plan violates the absolute priority rule because the

17  payment to the security claim plaintiffs in effect gives

18  money to equity equivalent parties who have 510(b) claims

19  without paying in full the senior debt obligations, in this

20  case, the Quips.  But, I've already found in connection with

21  my memorandum decision for the MOU that the proceeds are not

22  property of the estate so that does not implicate, therefore,

23  the absolute priority rule.  Part of Law Debenture's argument

24  further is that the adversary proceeding must be resolved

25  before the plan can be confirmed.  In my view this is

40

1   antithetical to fundamental Chapter 11 principles.  There are

2   many vehicles available for determining such claims.  For

3   example, temporary allowance estimation and other procedures

4   in the courts that deal with speedy resolution of claims.

5   And so, the real issue is, is there an adequate way to

6   protect the interest of the Quips, any final outcome of the

7   adversary proceeding as to those Quips who actually choose to

8   go that way, and what is the nature of that claim, and I've

9   already found that they are unsecured claims, and that there

10  is a way of protecting them through the establishment of a

11  reserve.  Magten also raises issues with the D&O trust

12  channelling injunction and releases.  I will note that this

13  is not a Quips' issue.  This is not really an issue in which

14  the Magten or the holders of the Quips have any particular

15  interest.  However, their argument is that the plan can't be

16  confirmed with that provision in it if it violates law so I

17  need to take an independent look at that.  Their argument is

18  these are non-consensual releases and that they release

19  valuable claims of the estate.  However, I will note that I

20  disagree.  Section 524(e) does not limit injunctions of this

21  sort as found by a number of cases in this district and in

22  other districts where there's an identity of interest because

23  of the contractual and statutory indemnification

24  reimbursement rights between the debtor in this case and the

25  Ds and Os, whether there is sufficient consideration for the

41

1  releases, and I find that there is.  Where there's a

2  mechanism where this is included as a way of providing a

3  mechanism to implement the MOU that is itself of significant

4  benefit to the estate, and where, perhaps most importantly,

5  has been unanimously supported by the class members who voted

6  who the ones who are directly affected by this provision.

7  And while the plan does not guarantee full payment to claims

8  that are channeled to the trust, it provides more than would

9  be otherwise available because of the subordinated status of

10  the claims and the contribution of the 2.5 million.  By the

11  subordinated status of the claims I mean the fact that these

12  reimbursement claims are themselves 510(b) claims.  And it

13  does provide a mechanism for opt-out parties to recover

14  although there is no guarantee of full payment.  So based

15  upon those findings, I find it consistent with applicable law

16  the D&O channelling trust injunction and the releases are

17  appropriate and do not require that the plan not be

18  confirmed.  Law Debenture raises a number of other issues,

19  which are similar.  One that the interest in the Montana

20  utility assets must be protected specifically, but I found

21  that it is not an in rem interest and so, therefore, property

22  right protection is not appropriate and that there has to be

23  a cash reserve of at least $69 million, and number one, the

24  voting shows that there are $50 million only who have opted

25  the fraudulent conveyance lawsuit route and that they don't

42

1   need to be protected in cash.  That reserve needs to be set

2   up in accordance with applicable plan procedures, and if the

3   parties cannot agree, the Court will set that amount and a

4   subsequent hearing to be set on shortened notice.  Finally,

5   there's an issue with regard to unfair discrimination arguing

6   that Class 9 is receiving a substantially higher amount then

7   Class 8-B, and there is a difference in what is being received

8   but it's not unfair because Class 8-B is subject to the

9   subordination provisions and Class 9 is not.  And further, it

10  is misleading to say that Class 11 is receiving a hundred

11  percent where in fact the amount being paid under Class 11 is

12  a deeply discounted compromised amount with the bulk of that

13  liability being assumed by third party Arco.  The last issue

14  raised by Law Debenture is PUHCA asserting trying to

15  bootstrap essentially on the PUHCA issues that have been

16  previously raised by Wilmington and Harbert.  But there was

17  not a shred of evidence presented by Law Debenture or Magten

18  on this, and there's no basis to determine, no evidentiary

19  basis at all to determine that the senior debt should be

20  voided or subordinated.  So, that objection is overruled.

21  With regard to Mr. Hylland, he complains that the plan

22  deprives him of the right to arbitrate his claim.  That's

23  been resolved.  The debtor has consented or clarified that

24  that was not the intent.  Mr. Hylland further thinks that to

25  the extent -- that the plan is unfair because to the extent

43

there is a claim against the D&O trust that he may have that
is not paid in full, because of the wasting nature of the D&O
trust, that he should have a claim back against the debtor
for that amount but then should go through the claim
allowance process.  I've reviewed the cases on this issue,
and it is clear that claims that are subject to reimbursement
-- subject to the trust, are reimbursement claims for costs
incurred in connection with litigation of the type that is
covered by Section 510(b), and so they are clearly
subordinated under 510(b).  This has been explicitly
recognized in Delaware, see in particular Judge Walsh's
opinion in Mid-America Waste at 228 BR 816, decided in 1999.
And because these are the only kinds of claims that are going
to get funneled into the trust, it's not unfair to
subordinate them in advance and avoid the costs and delay
associated with the claims resolution process.  Mr. Hylland's
next argument is that the FIFO aspect of the trust is unfair.
It should be pro rata.  However, understanding that that may
give rise to some race to the courthouse, the fact is that
it's the same rights that would have existed otherwise and
that the primary funding device are the insurance policies
which are themselves FIFO policies.  So, this is one of those
issues where I think the debtor could have arranged it to be
on a pro rata basis, although that would have been, I think,
administratively more difficult because you would have had to

44

set up reserves. Within that amount you would have to waited
for final determination of claims before any distributions
could be made. So this is certainly a more efficient way,
and I don't think because it mirrors the rights that the
parties had outside of bankruptcy, that it can be said that
it is sufficiently unfair that it is not confirmable. So I
will overrule that objection. The final issue is whether or
not the two and a half million dollars that's being paid
after the exhaustion of all of the remaining proceeds should
extend to Mr. Hylland also. It is limited under the terms of
the plan to current officers and directors. This
contribution is additional consideration given by the debtor
for the channeling injunction and the releases, and it
increases fairness and provides additional liquidity of the
trust beyond the remaining 13 to $14 million of insurance
proceeds. The issue is whether or not the differentiation
between the current and former officers is supported by
consideration because of their service during the pending of
the proceedings and whether or not it unfairly discriminates.
My view is that, again, although it could have been drafted a
different way, the fact that it's drafted in this way is not
itself an unfair -- does not unfairly discriminate because of
the additional consideration that has been provided by the
current officers and directors. So, for that reason, I will
overrule that objection also. I think with that, that I have

45

1   addressed all of the objections and all of the affirmative

2   requirements of 1129(a), and I will find that all provisions

3   of 1129(a) have been satisfied except for 1129(a)(8).  I will

4   find that 1129(b) has been satisfied, and that the plan is

5   fair and equitable to dissenting classes and does not

6   unfairly discriminate against them.  All objections not

7   previously resolved as indicated in my opening comments are

8   overruled in accordance with this oral ruling.  These are the

9   Court's oral findings and conclusions pursuant to Rule 52.

10  Further findings and conclusions may be included in written

11  findings in the confirmation order to be submitted to the

12  extent they are not inconsistent with the record that has

13  been made and with this ruling.  And so, therefore, based

14  upon those findings and conclusions it's ordered confirming

15  the second amended and restated plan of Northwestern

16  Corporation, and counsel is to prepare and circulate the

17  confirmation order to the interested parties and to submit

18  that upon certification of counsel.  All right, I know this

19  has been a somewhat long-winded time this morning.  Let me

20  just ask if anybody has any questions or if there's anything

21  I said that was unclear in this telephonic transmission?

22  Hearing none, therefore -- Are you all still there?

23          MR. AUSTIN (TELEPHONIC):  Yes, Your Honor.  This is

24  Jesse Austin on behalf of Northwestern.

25          THE COURT:  All right.  Well, of course, a CD

46

1  recording of this proceeding will be available and a

2  transcript can be made immediately available and under the

3  normal procedures.  We will see that a -- frankly, I don't

4  know how we do that, Stacey, whether we do it here or we send

5  it to Delaware.  What have we been doing?  We will burn a CD

6  and send it to the Bankruptcy Court in Delaware by overnight

7  mail.  It will be there on Monday, so any party who wishes to

8  either have a transcript or a copy of the CD can get it that

9  way.  All right.  I don't think we have anything else to do,

10  and with that, we are adjourned.

11       ALL (TELEPHONIC):  Thank you, Your Honor.

12       (Whereupon at 10:20 p.m. these proceedings in this

13  matter were concluded.)

18       I, Elaine M. Ryan, approved transcriber for the

19  United States Courts, certify that the foregoing is a correct

20  transcript from the electronic sound recording of the

21  proceedings in the above-entitled matter.

23  Elaine M. Ryan                              10-15-04
    2801 Faulkland Road
24  Wilmington, DE 19808
    (302) 683-0221