the holding in In re Union Financial Services Group, Inc., 303 B.R. 390, 421-22 (Bankr. E.D. Mo. 2003) and holds that there can be no unfair discrimination where a plan allocates to a class of junior creditors certain value to which those creditors "[had] no right, title or interest . . . [and] which would otherwise [have been] required by applicable law to be paid directly to" more senior creditors. Accordingly, the Plan does not discriminate unfairly and satisfies the requirements of Section 1123(a)(4) of the Bankruptcy Code.

U. Implementation of the Plan (Section 1123(a)(5)). Article V and the other provisions of the Plan provide adequate means for its implementation, including, but not limited to, the following provisions: (i) Section 5.1 provides for funding of the Plan; (ii) Section 5.4 provides for the issuance and distribution of New Common Stock; (iii) Section 5.1 and Article VI provide for the creation of the D&O Trust and the transfer of D&O Trust Assets and any proceeds or Causes of Action thereunder to the D&O Trust; (iv) Section 5.1 provides for the disbursement of cash payments to certain parties in accordance with the Plan; (v) Article IV and Section 5.5 provide for the cancellation of the Unsecured Notes, Unsecured Subordinated Notes and all Equity Interests; (vi) Sections 5.3, 5.7 and 9.4 provide for the continued corporate existence of the Debtor; (vii) Section 9.1 and 9.2 provide for the selection of the directors and officers of the Reorganized Debtor; and (viii) Section 9.3 provides for the necessary corporate action to be taken to effectuate the Plan. Accordingly, the Plan satisfies the requirements of Section 1123(a)(5) of the Bankruptcy Code.

V. Equity Securities (Section 1123(a)(6)). The Plan provides for the inclusion of a provision in the Reorganized Debtor Charter that prohibits the issuance of non-voting

equity securities and therefore, the Plan satisfies the requirements of Section 1123(a)(6) of the Bankruptcy Code. Plan, Section 5.3.

W. Selection of Officers and Directors (Section 1123(a)(7)). The Plan provides for the governance through a Board of Directors of Reorganized Debtor in a manner that is consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the Plan and therefore the Plan satisfies the requirements of Section 1123(a)(7) of the Bankruptcy Code.

X. Impairment or Unimpairment of Claims or Equity Interests and Modification of Rights of Secured Claims (Section 1123(b)(1) and (5)). The Plan impairs or leaves unimpaired, as the case may be, each Class of Claims or Equity Interests, and therefore complies with Section 1123(b)(1) and (5) of the Bankruptcy Code. Plan, Art. IV.

Y. Assumption or Rejection of Executory Contracts and Unexpired Leases (Section 1123(b)(2)). The Plan provides for the assumption of all executory contracts or unexpired leases that have not been rejected or otherwise treated in the Plan with the Bankruptcy Court's approval on or prior to the Confirmation Date. Plan, §8.1. The Debtor has represented that it intends to assume the obligations related to the permits. See Assumption Notice. The Debtor has also filed its Assumption Motion with the Court. In addition, in Section 8.1 of the Plan, the Debtor provided a procedure for parties to object to the cure amounts as provided in the Assumption Notice. Accordingly, the Plan complies with Section 1123(b)(2) of the Bankruptcy Code.

Z. Settlement and Compromise (Section 1123(b)(3)). The Plan provides for the settlement or adjustment of certain Claims or Equity Interests belonging to the Debtor or its estate

which is fair and equitable and in the best interests of the Debtor, its estate and all holders of Claims and Equity Interests. In particular, the Plan incorporates the settlement whereby the more-senior Class 7 shares a portion of distributions payable to it with the holders of Class 8(a) and Class 8(b).  See Plan, Art. IV.  Accordingly, the Plan complies with Section 1123(b)(3) of the Bankruptcy Code.

AA.      Compliance with Provisions of the Bankruptcy Code (Section 1129(a)(1)).  The Plan complies with all applicable provisions of the Bankruptcy Code including, without limitation, Sections 1122 and 1123 and, as required pursuant to Rule 3016(b) of the Bankruptcy Rules, is dated and identifies the Debtor as proponent of the Plan, and therefore the Plan satisfies the requirements of Section 1129(a)(1) of the Bankruptcy Code.

BB.      Plan Proponent's Compliance with Provisions of the Bankruptcy Code (Section 1129(a)(2)).  The Debtor, as proponent of the Plan, has complied with the applicable provisions of the Bankruptcy Code including, without limitation, Sections 1125 and 1126, and therefore the Debtor has satisfied the requirements of Section 1129(a)(2) of the Bankruptcy Code.

CC.      Plan Proposed in Good Faith (Section 1129(a)(3)).  The Plan has been proposed in good faith for the valid business purpose of restructuring the Debtor's indebtedness and has not been proposed by any means forbidden by law.  Confirmation Hearing Transcript at 115 (testimony of William Austin); Confirmation Hearing Transcript at 170 (testimony of Mike Hanson); Confirmation Hearing Transcript at 217 (testimony of Brian Bird).  Magten and Law Debenture are the only parties to contend that the Plan was not proposed in good faith and their objections have been overruled as set forth above in

Paragraph O. 12. Based upon the evidence presented, the arguments of counsel and after due deliberation, the Court hereby finds that the Plan was negotiated at arms' length among representatives of the Creditors' Committee and other parties-in-interest, Confirmation Hearing Transcript at 315, 328 (testimony of Bradley Geer), was proposed in good faith for a valid business purpose, Confirmation Hearing Transcript at 115 (testimony of William Austin); Confirmation Hearing Transcript at 170 (testimony of Mike Hanson); Confirmation Hearing Transcript at 217 (testimony of Brian Bird), and provides a return to unsecured creditors. Plan, §§ 4.7, 4.8, and 4.9. Accordingly, the Plan satisfies the requirements of Section 1129(a)(3) of the Bankruptcy Code.

DD.     Payment of Costs and Expenses (Section 1129(a)(4)). Any payment made or to be made by the Debtor for services or for costs and expenses in connection with this Chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, has been approved by, or will be subject to the approval of, this Court as reasonable, and therefore the Plan satisfies the requirements of Section 1129(a)(4) of the Bankruptcy Code.

EE. Disclosure of Identities of Officers, Directors and Insiders (Section 1129(a)(5)). The Debtor has disclosed the identity and affiliation of those individuals proposed to serve, after confirmation of the Plan, as a director, officer or trustee of the Reorganized Debtor pursuant to the Notice of Designation of Board Members for the Reorganized Debtor Pursuant to Section IV.G of the Debtor's First Amended Disclosure Statement [Dkt. No. 1878] filed with the Court on August 10, 2004. The terms of employment, and the appointment to, or continuance in such office of each designated individual is consistent with the interests of creditors and equity security holders and with public policy, and

therefore the Plan satisfies the requirements of Section 1129(a)(5) of the Bankruptcy Code.

FF. No Rate Change (Section 1129(a)(6)). The Plan does not contain any changes in rates subject to the jurisdiction of any governmental regulatory commission, and therefore the Plan satisfies the requirements of Section 1129(a)(5) of the Bankruptcy Code. Plan, § 12.2 and Disclosure Statement, Exhibit F-2.

GG.     Best Interests of Creditors (Section 1129(a)(7)). As discussed above in Paragraph 11, the testimony elicited by the Debtor and the Creditors' Committee at the August 25, 2004 Confirmation Hearing supports the treatment afforded to the Equity Holders as well as Class 8(b). This Court finds persuasive the testimony and evidence presented by the Debtor and the Creditors' Committee regarding valuation and as such, the Plan complies with the "absolute priority rule" set forth in Section 1129(b)(2) because there are no claimants junior to either Equity Holders or Class 8(b) that will receive or retain any property under the Plan. See 11 U.S.C. § 1129(b)(2)(B)(ii). With respect to each impaired Class of Claims and Equity Interests, such Class has either accepted the Plan, or each holder of a Claim or Equity Interest will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date. Therefore, the Plan satisfies the requirements of Section 1129(a)(7) of the Bankruptcy Code.

HH.     Plan Acceptance (Section 1129(a)(8)). Section 1129(a)(8) of the Bankruptcy Code requires that each Class has either accepted the Plan, or is not impaired under the Plan and thus is conclusively presumed to have accepted the Plan pursuant to Section

1126(f) of the Bankruptcy Code. Classes 1 through 6 and Classes 10, 11 and 14 are Unimpaired Under the Plan. Classes 7, 8(a), 9, and 12 have voted to accept the Plan. Classes 13 and 15 are presumed to have rejected the Plan because such classes will receive no Distribution under the Plan. Class 8(b) is the only impaired class to vote to reject the Plan. Therefore, the Plan fails to satisfy the requirements of Section 1129(a)(8) with respect to Classes 8(b), 13 and 15. Section 1129(b) of the Bankruptcy Code allows the Plan to be confirmed despite the rejection by Class 8(b) and the deemed rejection by Classes 13 and 15 because: (i) the Plan does not discriminate unfairly with respect to each non-accepting impaired class; (ii) the Plan is "fair and equitable" with respect to each non-accepting impaired class; (iii) at least one impaired class has accepted the Plan (without counting acceptances by insiders); and (iv) the Plan satisfies the requirements set forth in Section 1129(a) of the Bankruptcy Code other than Section 1129(a)(8). The Court reiterates its findings in Paragraph O.12 above where it held that the Plan did not discriminate unfairly against Class 8(b) and overruled the objections of Magten and Law Debenture. For the reasons set forth herein and above in Paragraph O.12, the Court finds that the Plan is fair and equitable. As set forth in the Voting Agent Resolicitation Declaration, Classes, 7, 8(a), 9, and 12 have voted to accept the Plan. Accordingly, the Court finds that the Plan can be confirmed under Section 1129(b) of the Bankruptcy Code.

II. Treatment of Administrative Claims, Priority Claims and Priority Tax Claims (Section 1129(a)(9)). The Plan satisfies the requirements of Section 1129(a)(9) of the Bankruptcy Code because, except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims pursuant

to Section 507(a)(1) of the Bankruptcy Code, Priority Claims pursuant to Sections 507(a)(2) through 507(a)(7) of the Bankruptcy Code and Priority Tax Claims pursuant to Section 507(a)(8) of the Bankruptcy Code, shall be treated in accordance with the applicable provisions of Section 1129(a)(9)(A), (B) or (C) of the Bankruptcy Code. Plan Sections 2.2, 2.3, and 4.1.

JJ. Acceptance By at Least One Impaired Class (Section 1129(a)(10)). Classes 7, 8(a), 9 and 12 are impaired under the Plan and have voted to accept the Plan. Voting Agent Resolicitation Declaration ¶ 16. Accordingly, at least one Class of Claims that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class, and therefore the Plan satisfies the requirements of Section 1129(a)(10) of the Bankruptcy Code.

KK.    Feasibility (Section 1129(a)(11)). Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or Reorganized Debtor. The Court hereby finds that given the Debtor's estimated expenses and income, and taking into account cash reserves, the Reorganized Debtor will be able to satisfy its obligations under the Plan, as well as its obligations arising in connection with its ongoing business operations. Upon review of the evidence presented at the Confirmation Hearing, particularly the testimony of William Austin (Confirmation Hearing Transcript at 116), Mike Hanson (Confirmation Hearing Transcript at 169-170) and Brian Bird (Confirmation Hearing Transcript at 218-219), and after due deliberation, the Court hereby finds that the Plan is feasible because it: (i) provides the financial wherewithal necessary to implement the Plan; and (ii) offers reasonable assurance that consummation of such Plan will not be followed by a liquidation or subsequent

reorganization of the Reorganized Debtor. See Plan, Art. V. Accordingly, the Plan satisfies Section 1129(a)(11) of the Bankruptcy Code.

LL. Payment of Fees (Section 1129(a)(12)). The Debtor has paid or, pursuant to Section 2.2 of the Plan, shall pay, on or prior to the Effective Date, all amounts due under 28 U.S.C. § 1930, and therefore the Plan satisfies the requirements of Section 1129(a)(12) of the Bankruptcy Code.

MM. Retiree Benefits (Section 1129(a)(13)). Pursuant to Section 8.6 of the Plan, from and after the Effective Date, the Reorganized Debtor shall continue to pay any retiree benefits (as such benefits may have been modified during the Chapter 11 Case) solely to the extent, and for the duration of the period, the Debtor is contractually or legally obligated to provide such benefits, subject to any and all rights of the Debtor under applicable law (including, without limitation, the Debtor's right to amend or terminate such benefits prior to or after the Effective Date), and therefore the Plan satisfies the requirements of Section 1129(a)(13).

NN. Cramdown (Section 1129(b)). Section 1129(b) of the Bankruptcy Code is not applicable to Classes 1, 2, 3, 4, 5, 6, 7, 8(a), 9, 10, 11, 12 and 14 because each such class has accepted (or are deemed to have accepted) the Plan. The Court reiterates its findings in Paragraph O. 12 above overruling the objections of Magten and Law Debenture. Holders of Class 8(b) claims are not discriminated against unfairly as such claims are subordinate to Class 7, Unsecured Note Claims. Section 1129(b) is satisfied with respect to holders of Class 8(b), QUIPS Claims, Class 13, Other Equity Interests, and Class 15, Opt-Out Securities Claim, because the Plan does not discriminate unfairly against such holders and no class junior to the such classes is retaining or receiving any property

under the Plan except as otherwise consented to in connection with the settlement implemented by the Plan pursuant to which Class 7 has consented to transferring a portion of the recovery they would otherwise be entitled to Class 8(a) and accepting members of Class 8(b). See Plan, §§ 4.7, 4.8 and 4.9.

OO.     No Other Plan (Section 1129(c)). No other plan of reorganization has been filed with respect to the Debtor's Chapter 11 Case.

PP. Avoidance of Taxes or Application of Securities Laws (Section 1129(d)). The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, and no party-in-interest that is a governmental unit has objected to Plan confirmation on such grounds. Thus, the Plan satisfies the requirements of Section 1129(d) of the Bankruptcy Code.

QQ.     Good Faith Solicitation (Section 1125(e)). Based on the record before the Bankruptcy Court in this Chapter 11 Case, the Debtor and the Committee, and all of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, partners, affiliates, and representatives have acted in "good faith" within the meaning of Section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules in connection with all their respective activities relating to the Plan, including, but not limited to, any action or inaction in connection with their participation in the activities described in Section 1125 of the Bankruptcy Code, and are entitled to the protection afforded by Section 1125(c) of the Bankruptcy Code and the exculpation provisions set forth in the Plan. Confirmation Hearing Transcript at 170 (testimony of Mike Hanson); Confirmation Hearing Transcript at 217 (testimony of Brian Bird).

RR.   Conditions Precedent to Confirmation. The Debtor has satisfied all conditions precedent set forth in Section 11.1 of the Plan.

SS. Implementation of the Plan. All documents necessary to implement the Plan, including without limitation, the D&O Trust Documents and all other relevant and necessary documents shall, upon execution, be valid, binding and enforceable agreements in accordance with their terms, and not be in conflict with any federal or state law.

TT. Plan Transfers. All transfers of real or personal property by the Debtor are transfers under the Plan and are, therefore, free from the imposition of taxes of the kind specified in Section 1146(c) of the Bankruptcy Code. Plan, § 14.2.

UU.   Exemption from Securities Laws. All securities (specifically including the New Common Stock and the Warrants) issued in connection with the Plan shall be exempt from registration requirements to the maximum extent permitted by Section 1145 of the Bankruptcy Code and applicable non-bankruptcy laws.

VV.   Performance and Compliance. The execution, delivery or performance by the Debtor or the Reorganized Debtor, as the case may be, of the Exit Financing Facility (as defined below) on the terms contemplated by the Plan, the Commitment Letter, the Orders of the Montana Public Service Commission and the Federal Energy Regulatory Commission (collectively, the "Financing Regulatory Orders") and all relevant and related documents and agreements and compliance by the Debtor or the Reorganized Debtor, as the case may be, with the terms thereof is authorized by, and shall not conflict with, the terms of the Plan or this Confirmation Order. The financial accommodations to be extended pursuant to the documents related to the Exit Financing Facility (collectively, the "Exit Financing Facility Documents"), which shall be comprised of the

$250 million credit facility comprised of (a) revolving credit facility and (b) a term B loan credit facility (or some combination thereof, and up to $350 million of senior secured notes, all to be secured by first mortgage bonds issued under the Debtor's indenture covering its Montana public utility assets and under the Debtor's indenture covering its South Dakota public utility assets (collectively, the "Exit Financing Facility"), are being extended in good faith and for legitimate business purposes. Confirmation Hearing Transcript at 210-212 (testimony of Brian Bird).

WW.     Modification of the Plan Documents. On October 4, 2004, the Debtor filed its Notice of Filing Plan Supplement in Connection with Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 2157, Debtor's Exh. 180] (the "Notice of Plan Supplement"). Attached to the Notice of Plan Supplement were revised forms of the following: (i) Insurance Assignment Agreement; (ii) D&O Protected Parties Settlement Agreement; (iii) NorthWestern Corporation D&O Trust Agreement; (iv) NorthWestern Corporation D&O Trust Distribution Procedures; (v) Certificate of Trust of the NorthWestern Corporation D&O Trust; and (vi) By-laws of the NorthWestern Corporation D&O Trust. In accordance with Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims who voted to accept the Plan are hereby deemed to have accepted the Plan and Plan Documents as amended. No holder of a Claim who has voted to accept the Plan shall be permitted to change its acceptance to a rejection as a consequence of the revised Plan Documents. Disclosure of the revised Plan Documents through the Notice of Plan Supplement constitutes due and sufficient notice thereof.

THEREFORE, NOW, after due deliberation, the Court hereby ORDERS, ADJUDGES AND DECREES that:

1. Confirmation. The Plan shall be, and hereby is, confirmed having met the requirements of Section 1129 of the Bankruptcy Code. To the extent not withdrawn, or otherwise resolved, any and all objections to confirmation shall be and hereby are overruled in their entirety.

2. Implementation of the Plan. In accordance with Section 1142 of the Bankruptcy Code, the implementation and consummation of the Plan in accordance with its terms shall be, and hereby is, authorized and approved, and the Debtor, or the Reorganized Debtor, as applicable, and other Persons contemplated by the Plan shall be, and they hereby are, authorized, empowered and directed to issue, execute, deliver, file and record any document, whether or not any such document is specifically referred to in the Plan, the Disclosure Statement, or any exhibit thereto, and to take any action necessary or appropriate to implement and consummate the Plan in accordance with its terms without further application to, or order of, this Court including, without limitation, the execution of any and all documents deemed necessary or appropriate in connection with the Exit Financing Facility, the New Common Stock and the D&O Trust and the consummation of the transactions contemplated thereby, including without limitation, the granting of

the security interests in certain assets of the Reorganized Debtor;
provided, however, that no such security interest granted by this
Order or the Plan shall alter, affect or subordinate the existing
security interest of the CSFB Lenders under the CSFB Facility in
the event that the CSFB Facility is not paid in full and replaced by,
in part, the Exit Financing Facility, and all such documents shall,
upon execution, be valid, binding and enforceable agreements in
accordance with their terms and not be in conflict with any federal
or state law.

3. Binding Effect. In accordance with Section 1141(a) of the
Bankruptcy Code, the Plan and its provisions shall be, and hereby
are, binding upon the Debtor, any Person acquiring or receiving a
distribution under the Plan, any entity issuing securities under the
Plan, any lessor of property to the Debtor, any lessee of property
from the Debtor, any creditor of the Debtor and any holder of a
Claim against or Equity Interest in the Debtor, and their respective
successors and permitted assigns, whether or not the Claim or
Equity Interest of such holder is impaired under the Plan and
whether or not such holder has accepted or rejected the Plan, or
will or will not receive a distribution under the Plan.

4. Transfers Free and Clear of Liens and Exemption From Transfer
Taxes. As set forth in Section 14.2 of the Plan, in accordance with
Section 1146(c) of the Bankruptcy Code, the issuance, transfer, or

exchange of a security, including, without limitation, the New
Common Stock, or the making or delivery of an instrument of
transfer pursuant to, in implementation of, or as contemplated by
the Plan, may not be taxed under any law imposing a stamp or
similar tax.

5. Acceptance and Execution of Plan Documents. Without in any
   manner limiting the relief granted pursuant to the preceding
   decretal paragraph, each recorder of deeds or similar official for
   any county, city or governmental unit in which any instrument
   under the Plan is to be recorded is hereby directed to accept any
   and all documents and instruments necessary and appropriate to
   consummate the transactions contemplated by the Plan, without
   requiring the payment of any documentary stamp tax, deed stamps,
   stamp tax, transfer tax, intangible tax or similar tax.

6. Issuance of New Securities. Pursuant to the Plan, the Debtor is
   authorized to issue the New Common Stock and the Warrants,
   without the need for any corporate action or action by the Debtor's
   shareholders or Board of Directors.

7. Allowance of Unsecured Note Claims. Under Section 4.7(b) of the
   Plan, as of the Effective Date, the Unsecured Note Claims shall be
   deemed allowed in the aggregate amount of $898,264,683, which
   includes accrued and unpaid interest on the Unsecured Note

Claims relating to the period up to but not including the Petition
Date.

8. Cancellation of Unsecured Notes and Related Instruments.

Pursuant to Section 4.7 of the Plan, as of the Effective Date: (i) all
Unsecured Notes shall be cancelled and deemed null and void and
of no further force and effect, and (ii) all obligations of any Person
under the Unsecured Notes, the Unsecured Notes Indentures and
all other agreements, instruments and documents evidencing the
Unsecured Notes and the rights of the holders thereof, are hereby
cancelled and deemed null and void and of no further force and
effect (all without further act or action by any Person), except that
such Unsecured Notes Indentures and other agreements that
govern the rights of holders of the Unsecured Notes shall continue
in effect solely for the purposes of allowing the Indenture Trustee,
agent or servicer thereunder to make the distributions to be made
on account of such Claims under the Plan, as provided in the Plan,
and allowing such Indenture Trustee, agent or servicer to enforce
its Indenture Trustee Charging Lien, as more particularly described
in Section 5.18 of the Plan. Without limiting the foregoing, each
holder of an Unsecured Note Claim is hereby deemed to consent to
the cancellation and release of any guarantee, instrument,
agreement or other documents respecting payment of the
Unsecured Notes and the release of any and all Claims it may have

with respect to any property or assets of the Debtor and/or the
Reorganized Debtor.

9. Allowance of Unsecured Subordinated Notes represented by the
TOPrS Notes and Related Instruments. Under Section 4.8(a)(i) of
the Plan, as of the Effective Date, the Unsecured Subordinated
Note Claims represented by the TOPrS Notes shall be deemed
Allowed in the aggregate amount of $321,069,399, which amount
shall include accrued and unpaid interest on the TOPrS Notes
relating to the period up to but not including the Petition Date.

10. Cancellation of Unsecured Subordinated Notes represented by the
TOPrS Notes and Related Instruments. Pursuant to Section 4.8 of
the Plan, as of the Effective Date: (i) all Unsecured Subordinated
Notes represented by the TOPrS Notes shall be cancelled and
deemed null and void and of no further force and effect, and (ii) all
obligations of any Person under the Unsecured Subordinated Notes
represented by the TOPrS Notes, the Unsecured Subordinated
Notes Indentures and all other agreements, instruments and
documents evidencing the Unsecured Subordinated Notes
represented by the TOPrS Notes and the rights of the holders
thereof, including any related Claims and Causes of Action,
including, but not limited to, fraudulent transfer claims against the
Debtor, are hereby cancelled and deemed null and void and of no
further force and effect (all without further act or action by any

Person), except that such Unsecured Subordinated Notes
Indentures and other agreements that govern the rights of holders
of the Unsecured Subordinated Notes represented by the TOPrS
Notes shall continue in effect solely for the purposes of allowing
the Indenture Trustee, agent or servicer thereunder to make the
distributions to be made on account of such Claims under the Plan,
as provided in the Plan, and allowing such Indenture Trustee, agent
or servicer to enforce its Indenture Trustee Charging Lien, as more
particularly described in Section 5.18 of the Plan. Without
limiting the foregoing, each holder of an Unsecured Subordinated
Note Claim is hereby deemed to consent to the cancellation and
release of any guarantee, instrument, agreement or other
documents respecting payment of the Unsecured Subordinated
Notes represented by TOPrS Notes and the release of any and all
Claims it may have with respect to any property or assets of the
Debtor and/or the Reorganized Debtor except as expressly
provided in the Plan.

11. Allowance of Unsecured Subordinated Notes and other Claims
    represented by the QUIPS Notes and Related Instruments. Claims
    of the QUIPS holders shall be deemed allowed as provided for
    under Section 4.8(b) of the Plan.

12. Cancellation of Unsecured Subordinated Notes represented by the
    QUIPS Notes and Related Instruments.

a.       Except as provided in paragraph

12(b) below with respect to, and only with respect to, those

Claims or Causes of Action that are currently pending in

the QUIPS Litigation and being pursued by those holders

of the Unsecured Subordinated Notes represented by the

QUIPS Notes who chose or are deemed to have chosen

Option 2 pursuant to Section 4.8(b) of the Plan, and as of

the Effective Date: (i) all Unsecured Subordinated Notes

represented by the QUIPS Notes shall be cancelled and

deemed null and void and of no further force and effect,

and (ii) all obligations of any Person under the Unsecured

Subordinated Notes represented by the QUIPS Notes, the

QUIPS Indentures and all other agreements, instruments

and documents evidencing the Unsecured Subordinated

Notes represented by the QUIPS Notes and the rights of the

holders thereof, including any Claims and Causes of

Action, related thereto or arising thereunder are hereby

cancelled, released, terminated, and deemed null and void

and of no further force and effect (all without further act or

action by any Person), except that such QUIPS Indentures

and other agreements that govern the rights of holders of

the Unsecured Subordinated Notes represented by the

QUIPS Notes shall continue in effect solely for the

ATL/1060234.9                                    67

purposes of allowing the Indenture Trustee, agent or servicer thereunder to make the distributions to be made on account of such Claims under the Plan, as provided in the Plan, and allowing such Indenture Trustee, agent or servicer to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 of the Plan. Without limiting the foregoing, each holder of an Unsecured Subordinated Note Claim is hereby deemed to consent to the cancellation and release of any guarantee, instrument, agreement or other documents respecting payment of the QUIPS Notes and the release of any and all Claims that it may have with respect to any property or assets of the Debtor and/or the Reorganized Debtor.

b.     For those holders of Unsecured Subordinated Notes represented by the QUIPS Notes who have chosen Option 2, such holders shall, in accordance with Section 4.8(b)(ii)(2) of the Plan, now be deemed to hold disputed General Unsecured Claims against the Debtor (i.e. Class 9 Claims) in the amount of the indebtedness evidenced by such holders' QUIPS Notes, and shall be entitled to receive a Pro Rata Share of recoveries from the QUIPS Litigation, if any, upon resolution of such QUIPS Litigation, without the necessity

of becoming plaintiffs in the QUIPS Litigation so long as
the Indenture Trustee shall be a plaintiff in the QUIPS
Litigation or as may be approved by the Court. The QUIPS
Notes and related instruments shall remain valid against the
Debtor for the limited purposes of permitting the pursuit of
those Claims or Causes of Action that are currently
pending in the QUIPS Litigation and the Debtor hereby
recognizes that the cancellation of the QUIPS Notes
hereunder shall not be a defense to the QUIPS Litigation
for any purpose.

13. Cancellation of Other Equity Interests. On the Effective Date, all
    Equity Interests shall be deemed canceled, annulled and
    extinguished and all other agreements, instruments and documents
    evidencing the Equity Interests and the rights of the holders
    thereof, shall be automatically cancelled and deemed null and void
    and of no further force and effect (all without further act or action
    by any Person) and holders of Equity Interests shall not be entitled
    to receive or retain any property or interest in property under the
    Plan on account of such Equity Interest.

14. Cessation of Trading. Related to the provisions of Paragraphs, 8,
    10, 12 and 13 above, the trading of the Unsecured Notes,
    Unsecured Subordinated Notes and Equity Interests shall cease at
    5:00 p.m. (EST) on the Effective Date.

15. Securities Laws Exemption. Pursuant to Section 5.17 of the Plan,
the New Common Stock, the Warrants and other securities that
may be deemed to be issued pursuant to or in connection with the
Plan shall be exempt from registration requirements to the
maximum extent permitted by Section 1145 of the Bankruptcy
Code and applicable non-bankruptcy laws.

16. Indenture Trustees' Charging Lien. On the Effective Date, the
Reorganized Debtor is hereby authorized to pay the Indenture
Trustees' Fees and Expenses in full and in Cash, in an amount to
be agreed upon among the Debtor and each of the Indenture
Trustees. In the event that the parties cannot reach an agreement
on the amount thereof, any disputed amount shall be determined
by the Court, pursuant to Section 503 of the Bankruptcy Code, and
in accordance with the terms of the applicable Indenture.
Otherwise, the Indenture Trustees shall not be required to file an
application with the Court for payment of Indenture Trustees' Fees
and Expenses. Upon receipt of payment by any Indenture Trustee
of Indenture Trustees' Fees and Expenses, any Indenture Trustee
Charging Lien under the applicable Indenture shall automatically
be deemed released to the extent of payment on account of
Indenture Trustees' Fees and Expenses; to the extent any Indenture
Trustees' Fees and Expenses are not paid by the Reorganized
Debtor (whether as a result of disagreement between the Indenture

Trustee and the Reorganized Debtor, and/or following
determination by the Bankruptcy Court) the Indenture Trustee
Charging Lien of such Indenture Trustee shall not be impaired.
Such payments shall be in full and final satisfaction of all pre- and
post-petition Claims of the Indenture Trustees. Subject to the
Reorganized Debtor's obligations under Section 5.18 of the Plan,
distributions to holders of Unsecured Notes, Unsecured
Subordinated Notes, the South Dakota Pollution Control Bond
Claims, Gas Transition Bond Claims or the Montana Pollution
Control Bond Obligation Claims pursuant to the Plan will not be
reduced on account of payments made to the Indenture Trustees, as
applicable, on account of the Indenture Trustees Charging Liens.

Notwithstanding the above, on the Effective Date, and
subject only to the review of the fee auditor appointed in this
Chapter 11 Case, the Debtor, and/or the Reorganized Debtor, as
the case may be, is hereby authorized to pay Harbert and
Wilmington Trust an aggregate amount of $2.25 million on
account of their legal, advisory, consulting and other professional
fees and expenses, which amount shall be allocated among Harbert
and Wilmington Trust by agreement between Harbert and
Wilmington Trust. Notwithstanding anything set forth herein, the
fees of Goldin Associates shall not be subject to review by the fee
auditor appointed in this Chapter 11 Case. Neither Wilmington

Trust nor Harbert shall be required to file an application with the Court for payment of such fees and expenses, provided that to the extent that the aggregate legal, advisory, consulting and other professional fees and expenses incurred by Harbert and Wilmington Trust exceed S2.25 million, Harbert and Wilmington Trust (and their professionals) may seek reimbursement of such fees and expenses by submitting an application to the Court pursuant to Section 503(b) of the Bankruptcy Code, provided that the Creditors' Committee reserves the right to object to such application or applications as set forth in Section 5.18 of the Plan. Notwithstanding anything set forth herein, if the fees and expenses of Wilmington Trust are not reimbursed in full by the estate, the deficiency shall be paid out of the distributions received by Wilmington Trust on behalf of the Class 8(a) Claims. The Plan provides that Wilmington Trust shall have the right (but not the obligation) to sell in the public market that portion of the 6.60% of the New Common Stock distributed to Class 8(a) and received by Wilmington Trust as a distribution to the extent necessary to pay legal and advisory fees and expenses incurred by Wilmington Trust that are not otherwise reimbursed by the Debtor's estate.

If the fees and expenses of the respective Indenture Trustees (other than Wilmington Trust as noted above) are not reimbursed in full by the Debtor, then any deficiency may be paid

out of the distributions received by the respective Indenture

Trustee on behalf of their respective class claimants. Such

Indenture Trustee shall have the right, but not the obligation, to

sell into the public market any portion of the New Common Stock

distributed to its respective class claimants and received by the

Indenture Trustee as a distribution to the extent necessary to pay

legal and advisory fees and expenses incurred by the Indenture

Trustee that are not otherwise reimbursed by the Debtor.

Notwithstanding anything to the contrary in this Order or

the Plan, the Reorganized Debtor shall pay in the ordinary course

of the Reorganized Debtor's business the reasonable fees and

expenses of the Indenture Trustees after the Effective Date in

connection with the Distributions to holders of the Unsecured

Notes, the Unsecured Subordinated Notes, the South Dakota

Pollution Control Bond Claims, Gas Transition Bond Claims or the

Montana Pollution Control Bond Claims under the Plan. Nothing

in Section 5.19 of the Plan shall be deemed to limit the obligations

of the Reorganized Debtor to the trustee under the indentures with

respect to any Secured Bonds which are Reinstated under the

provisions of the Plan.

17. Creation of the D&O Trust. On the Effective Date, the D&O Trust

shall be created in accordance with the Plan and the D&O Trust

Documents. The D&O Trust shall be a "qualified settlement fund"

within the meaning of Section 468B of the Internal Revenue Code
and the regulations issued thereunder. On the Effective Date, all
right, title and interest in and to the D&O Trust Assets and any
proceeds or Causes of Action thereunder shall be transferred to and
vested in the D&O Trust, free and clear of all Claims, Equity
Interests, Encumbrances and other interests of any Person without
further action of any Person.

18. Transfer of Claims and Demands to the D&O Trust. On the
Effective Date, all liabilities, obligations, and responsibilities
relating to all D&O Trust Claims shall be transferred to the D&O
Trust.

19. Discharge of Liabilities to Holders of D&O Trust Claims. Except
as provided in the Plan Documents, as amended by the Debtor on
October 4, 2004 [Dkt. No. 2157], and the Confirmation Order, the
transfer to, vesting in, and assumption by the D&O Trust of the
D&O Trust Assets and the D&O Insurance Assignment, as
amended by the Debtor on October 4, 2004 [Dkt. No. 2157], as
contemplated by the Plan, the D&O Protected Parties Settlement
Agreement, as amended by the Debtor on October 4, 2004 [Dkt.
No. 2157], and the Insurance Assignment Agreement, as amended
by the Debtor on October 4, 2004 [Dkt. No. 2157], among other
things, on the Effective Date shall, and hereby does, (a) discharge,
release and extinguish all obligations and liabilities of the Debtor

and the Reorganized Debtor for and in respect of all D&O Trust
Claims, and (b) discharge, release and extinguish all obligations
and liabilities of the Released Parties for and in respect of all D&O
Trust Claims. On the Effective Date, the D&O Trust shall assume
liability for any D&O Trust Claims that arise out of the D&O
Proceedings and shall pay the D&O Trust Claims and Defense
Costs in accordance with the TDP.

20. D&O Trust Channeling Injunction. The sole recourse of the
holder of a D&O Trust Claim in respect of such Claim shall be the
D&O Trust pursuant to the provisions of the D&O Trust
Channeling Injunction and the TDP, and such holder shall have no
right whatsoever at any time to assert its D&O Trust Claim against
the Debtor, the Reorganized Debtor or any Released Party or any
property or interest in property of the Debtor, the Reorganized
Debtor or any Released Party; provided, however, that neither the
D&O Trust Channeling Injunction nor the D&O Insurance Entity
Injunction shall apply to the holders of the QUIPS, to the extent
that such holders did not consent to the releases.

21. Reinstatement of Unimpaired Secured Claims. Each holder of an
Allowed Bank One DIP Financing Claim, CSFB Financing Claim,
Secured Bondholder Claim, or Other Secured Claim shall receive
in full satisfaction, settlement, release, extinguishment and
discharge thereof, full Reinstatement of such Allowed Claim,

except to the extent that any of the aforementioned claims are paid
in full or paid in accordance with the Exit Financing Facility.

22. Corporate Action, New Incentive Plan and Management

Compensation. On the Effective Date, all matters provided for
under the Plan that would otherwise require further action by the
directors or stockholders of the Debtor or the Reorganized Debtor,
including, without limitation: (i) the adoption of the Reorganized
Debtor Charter and by-laws; (ii) removal of existing directors and
the initial selection of directors and officers of the Reorganized
Debtor; and (iii) the distribution of Cash and the issuance and
distribution of New Common Stock and Warrants pursuant to the
Plan; and (iv) implementation of the New Incentive Plan, including
the Special Recognition Grants to management employees
provided in Section 9.3(b) of the Plan, were actual, necessary costs
and expenses of preserving the bankruptcy estate and shall be
deemed to have occurred, be authorized, and be in effect from and
after the Effective Date in each case without further action under
applicable law, regulation, order, or rule, including without
limitation, any action by the stockholders of the Debtor or the
Reorganized Debtor.

Other than as provided in Section 9.3(b) of the Plan, the
New Board, in its sole discretion, shall be authorized to decide all
other issues related to the New Incentive Plan and management

compensation including, but not limited to, employment

agreements, base salaries, change of control provisions, short and

long-term incentives, benefits and the like as is normal and

customary for senior management of corporations similar to

Reorganized Debtor.

23. Reorganized Debtor Corporate Structure. The Reorganized Debtor

is hereby directed to "ring fence" its regulated energy and utility

business and assets in that such assets and businesses will be

owned by the Reorganized Debtor as the parent company. All of

the Debtor's and the Reorganized Debtor's non-regulated energy

related or other businesses will be held in wholly owned

subsidiaries of the Reorganized Debtor. Such wholly owned

subsidiaries will have no employees of their own, but will be

served by the Reorganized Debtor's utility employees whose costs

will be charged to the non-regulated subsidiaries through

intercompany transfer pricing, which pricing mechanisms shall be

subject to review by the regulatory commissions having

jurisdiction over the Reorganized Debtor's rates. Any debt

incurred by the non-regulated subsidiaries' operations will be

incurred at the subsidiary level and will be non-recourse to the

Reorganized Debtor.

24. Amendment or Modification of the Plan of Reorganization. The

Plan may be altered, amended or modified at any time before or

77

after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under Section 1129 of the Bankruptcy Code. A holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder. The Debtor specifically reserves the right to amend or modify the Plan in the event that the Court or the District Court either does not approve, in total, the settlement of the Class Action pursuant to the proposed Class Action Settlement Documents, or approves the proposed settlement of the Class Action but limits the parties to whom the Debtor may give releases pursuant to such settlement. In such event, the Debtor's claims against any parties not released as proposed in the Class Action Settlement Documents shall be preserved for the benefit of the Debtor's creditors and Estate and the Plan, as may be amended, may provide a mechanism reasonably satisfactory to the Creditors' Committee to prosecute and/or preserve such claims for the benefit of the Debtor's Estate. The Debtor may, with notice to the

Creditors' Committee, the DIP Lenders and the CSFB Lenders, but without notice to holders of Claims or Equity Interests insofar as it does not materially and adversely affect the interests of any such holders, correct any defect or omission in the Plan and any exhibit hereto or in any Plan Document.

25. Distributions to Holders as of the Record Date. As of the close of business on October 20, 2004 (the "Record Date"), the claims register (for Claims) and the transfer ledgers (for Secured Notes and Unsecured Notes) shall be closed, and there shall be no further changes in the record holders of any Claims or Equity Interests. The Debtor and Reorganized Debtor shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring after the close of business on the Record Date, and shall instead be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan pursuant to Section 7.1 of the Plan) with only those holders of record as of the close of business on the Record Date.

26. Distributions to Class 10. Each holder of an Allowed Convenience Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (i) Cash equal to the amount of the Allowed Convenience Claim up to $20,000, on or as soon as practicable after the later of (1) sixty (60) days after the Effective Date and (2) the date that is ten (10) Business Days after

a Class 2 Unsecured Priority Claim becomes an Allowed Convenience Claim by a Final Order; or (ii) such other treatment as the Debtor and such holder shall have agreed upon in writing.

The Debtor shall file a schedule of convenience class claims at least five (5) days prior to the Effective Date. Such schedules shall include the holder of the Allowed Convenience Claim and the amount of such Allowed Convenience Claim. On or before the Effective Date, the Debtor shall segregate the funds necessary to pay the scheduled Allowed Convenience Claims into a segregated account. Parties-in-interest shall have ten (10) days from the date of filing of the schedule of convenience class claims to file objections to the amount of the Allowed Convenience Claim. Within sixty (60) days after the Effective Date or as soon thereafter as practicable, the Debtor shall pay such Allowed Convenience Claims so long as no objections have been filed to such Claim or the parties have agreed to an Allowed Convenience Claim amount.

27. Disputed Claims Reserve. The Reorganized Debtor is hereby directed to maintain the Disputed Claims Reserve equal to the aggregate of any distributable amounts of New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such

80

Disputed Claim or such lesser amount as required by a Final Order. The Debtor shall establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve and such reserve may be subject to adjustment prior to the Effective Date pursuant to Section 7.5 of the Plan. As to PPLM, its reserve has been established pursuant to the PPLM Stipulation [Dkt. No. 2183] entered by the Court on October 6, 2004. In the event the Cornerstone Settlement is not approved, the Reorganized Debtor shall increase both the Disputed Claim Reserve and the reserve of New Common Stock for the Disputed Claim Reserve in connection with the disputed Cornerstone claims in the amount of the Cornerstone claims or such lesser amount as may be agreed to by the parties or established by the Court.

28. Releases, Injunctions and Exculpations. The discharge, injunction, release and exculpation and other provisions contained in Article X of the Plan are approved in all respects, in accordance with the terms and conditions of this Order, and are fair, equitable, reasonable and in the best interests of the Debtor, its Estate, its creditors and other parties-in-interest in the Chapter 11 Case.

29. No Release for Certain Netexit Parties. Notwithstanding any language to the contrary contained in the Plan, Confirmation Order and/or Plan Documents including, but not limited to, the D&O

Trust Documents, no provision shall release the officers, directors, assignees, agents, employees, or attorneys of the Netexit Debtors from liability to the Netexit Debtors, or any creditor, trustee or the Official Committee of Unsecured Creditors appointed in the Netexit Cases, except to the extent any such claim, right or Cause of Action may be characterized as a D&O Proceeding or covered by the D&O Policies, the D&O Trust Channeling Injunction or the D&O Insurance Entity Injunction.

Notwithstanding any provision to the contrary in the Plan or this Confirmation Order, the Debtor's claims asserted against the Netexit Debtors shall not be released or discharged.

30. No Release, Discharge, Injunction as to Richard Hylland. Notwithstanding any provision to the contrary set forth in the Plan, nothing in the Plan or this Confirmation Order shall be deemed to release, discharge or otherwise affect the Debtor's or Reorganized Debtor's rights to assert Claims or Causes of Action against Richard Hylland (excluding Claims for rights of indemnification and contribution with respect to the Class Action and D&O Proceedings), or defenses to any Claims which Richard Hylland has asserted or may assert against the Debtor.

31. No Release for Magten Asset Management Corporation. Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, the Plan documents, or this

Confirmation Order, no provision shall release Magten Asset
Management Corporation, or any of its respective present or
former Affiliates, officers or directors, or any of their respective
present or former stockholders, members (in their capacity as
members only), employees, advisors, attorneys, financial advisors,
agents or Professionals in their capacities as such.

32. Mutual Releases with Respect to Wilmington Trust and Harbert.

As of the Effective Date and other than with respect to
Distributions provided for in Section 4.8 of the Plan on account of
their respective Allowed Unsecured Subordinated Note Claims and
as part of the compromise and settlement with respect to
Distributions to Class 8(a) provided for in the Plan, any and all
Claims and Causes of Action both known and unknown on behalf
of Harbert and Wilmington Trust, individually and collectively on
the one hand, and on behalf of the Debtor, the Reorganized Debtor
and the Creditors' Committee, on the other hand, and each of the
foregoing respective Affiliates and their parents, subsidiaries,
officers, directors or any of their former or present stockholders,
members (in their capacity as members only), employees, advisors,
attorneys, financial advisors, accountants, auditors, agents or
Professionals in their capacities as such, shall be deemed forever
mutually released and discharged from any and all known and
unknown Causes of Action of any nature that any Person may have

asserted, or could have asserted or could in the future assert, directly or indirectly, against each of Harbert, Wilmington Trust and the Debtor, the Reorganized Debtor and the Creditors' Committee, respectively, specifically including but not limited to claims and issues which have been raised by Harbert and Wilmington Trust concerning the Debtor's filings with respect to and claims of an exemption under PUHCA; provided, however, that any claims which Wilmington Trust may have in respect of an Indenture Trustee Charging Lien or that Wilmington Trust and/or Harbert may have pursuant to Section 5.18 herein are excluded from the forgoing releases subject to any objections that the Debtor, the Reorganized Debtor or the Creditors' Committee may assert thereto.

33. No Release as to Pension Plans. Notwithstanding any language to the contrary in the Debtor's Plan, nothing in the Plan or this Confirmation Order shall be construed as releasing, discharging, or otherwise relieving the Debtor or any other party who may be a fiduciary with respect to the Pension Plans of any potential liability for breaches of fiduciary duties owed to the Pension Plans under ERISA.

34. No Release as to the Securities and Exchange Commission. Notwithstanding any language to the contrary in the Debtor's Plan, nothing in the Plan or this Confirmation Order shall release any

non-Debtor, including any officer and/or director of the Debtor and/or any Non-Debtor included in the Released Parties, from liability to the United States Securities and Exchange Commission, in connection with any legal action brought by such governmental unit against such person(s).

35. No Injunction Against or Impairment of Claims of Goldman Sachs & Co. or Milbank Tweed Hadley & McCloy LLP Against Non-Debtors. Notwithstanding any language to the contrary in the Debtor's Plan, nothing in the Plan or this Confirmation Order enjoins, releases or otherwise impairs any claim of Goldman Sachs & Co. or Milbank Tweed Hadley & McCloy LLP against any person or entity other than the Debtor and the Reorganized Debtor or otherwise limits any defense, setoff, counterclaim or cross claim either may have against any person or entity, except that any recovery by Goldman Sachs & Co. or Milbank Tweed Hadley & McCloy LLP on such counterclaim or cross claim against the Debtor or Reorganized Debtor shall be limited by the Plan.

36. Preservation of Rights of TA Debtors. Notwithstanding any provisions of the Plan to the contrary, confirmation of the Plan and the occurrence of the Effective Date thereunder shall not: (i) affect or in any way impede or diminish any rights, if any, that the TA Debtors may have with respect to certain insurance policies held in the name of the Montana Power Company, (ii) affect any setoff

rights that have been asserted previously in a timely filed proof of claim or a motion filed prior to confirmation of the Plan; and (iii) limit or release in any way any claims of the TA Debtors against any individual who previously served as an officer or director of any of the TA Debtors, or their present or former predecessors, in such individual's capacity as an officer or director of such TA Debtor.

37. Limitations of Releases, Exculpation, Discharge and Injunction. Except as specifically provided for in the Plan, the releases, exculpation, discharge and injunctions (other than the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction) with respect to non-Debtor third parties are hereby approved and shall be effective only as to those holders of Claims and Interests which vote to accept the Plan and mark their respective ballots in the place provided consenting and agreeing to the release, exculpation, discharge and injunction provisions of the Plan. The releases, exculpation, discharge and injunctions provided for in the Plan shall not be effective with respect to those releases and settlement of claims proposed to be released and settled under the Class Action Settlement Documents in the event that both this Court and the District Court do not approve such proposed settlement by final, non-appealable judgment and/or order, or approve the settlement on the condition that the Debtor limit the

parties to whom the Debtor may give releases pursuant to such Class Action Settlement Documents.

In the event the Class Action Settlement is not approved by the District Court and does not become effective: (a) the Plan and any proposed Order confirming the Plan (i) will not release any non-Debtor defendants in the Securities Litigation or any non-Debtor for that matter, from the claims asserted or to be asserted in the Securities Litigation; and (ii) will not affect, in any way, the Class Claimants' rights to obtain relief for their claims in the Securities Litigation; (b) the Lead Plaintiffs and the Class Claimants shall retain their rights to pursue their claims and access the proceeds of any available D&O Policies that provide coverage for the claims asserted in the Securities Litigation; and (c) the Debtor's current and former officers and directors, financial advisors, accountants, auditors, agents or professionals will not be released and discharged from any cause of action in connection with the Class Action.

38. Exit Financing Facility Documents. Pursuant to the Order Authorizing the Debtor to Enter into Certain Agreements Related to Exit Financing Facility and to Pay Fees in Connection Therewith Pursuant to 11 U.S.C. §§ 105, 107(b) and 363(b) and Bankruptcy Rule 9018 entered on September 22, 2004 (the "Commitment Letter Order"), and the Financing Regulatory

Orders, the Debtor was authorized to enter into the Commitment Letter dated August 12, 2004 (the "Commitment Letter"). The Commitment Letter indicated that the liens securing the Exit Financing Facility will be secured by new first mortgage bonds which, in part, shall replace the CSFB Facility Montana First Mortgage Bonds and the CSFB Facility South Dakota First Mortgage Bonds, however, nothing in this Order, the Plan or the Commitment Letter Order shall in any way alter, affect or subordinate the existing security interests of the CSFB Lenders granted under the CSFB Facility in the event the CSFB Facility is not paid in full and replaced by, in part, the Exit Financing Facility. The Montana Indenture shall constitute a first lien on the Montana utility business assets (and on such related or other assets as provided in the Montana Indenture) now existing and after-acquired subject to the exceptions permitted by the Montana Indenture. The South Dakota Indenture shall constitute a first lien on the South Dakota, North Dakota, Iowa and Nebraska utility business assets (and on such related or other assets as provided in the South Dakota Indenture) now existing and after-acquired subject to the exceptions permitted by the South Dakota Indenture.

Consistent with Sections 1.157 and 5.2 of the Plan, nothing contained in this Order, the Plan, or the Exit Financing Facility Documents shall in any way violate any Secured Bonds indenture

88

covenants or otherwise alter, affect, or subordinate the existing security interests in or liens (the "Bond Liens") upon any of the Debtor's assets (or the priority thereof) granted under, in respect of, or in connection with the Secured Bonds, or the indentures, security agreements, or other documents entered into in connection with the issuance of Secured Bonds (collectively, the "Secured Bond Documents").

The new first mortgage bonds or any other instrument securing the Exit Financing Facility shall not bear the legend requested by Magten and/or Law Debenture. Any objection to the Exit Financing Facility or confirmation of the Debtor's Plan, in particular the objections of Magten and/or Law Debenture, requesting that such instruments bear a legend is overruled.

39. Post-Effective Date Authority.  On or after the Effective Date, the Reorganized Debtor shall be authorized to use, acquire and dispose of property and compromise or settle any post-Effective Date claims or interests without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than restrictions expressly imposed by the Plan or this Order.

40. Term of Injunctions or Stay.  Unless otherwise provided in the Plan or this Order, all injunctions or stays provided for in the Chapter 11 Case pursuant to Section 105 or 362 of the Bankruptcy

Code, or otherwise, and in existence on the date hereof, will
remain in full force and effect until the Effective Date.

Each of the injunctions relating to the D&O Proceedings
and the D&O Trust as set forth in the Plan are hereby approved
and shall become effective on the Effective Date and shall
continue in effect at all times thereafter unless otherwise provided
by the Plan. Notwithstanding anything to the contrary contained in
the Plan, all actions in the nature of those to be enjoined by such
injunctions shall be enjoined during the period between the
Confirmation Date and the Effective Date.

Any and all injunctions contemplated by the Plan shall be
limited to the extent necessary to permit the Debtor and/or the TA
Debtors, or any trustee, agent or committee of creditors acting on
behalf of or in the place of the Debtor and/or the TA Debtors, to
commence and litigate any and all Claims or Causes of Action
with respect to the alleged ownership interests in the MPC
Policies.

41. Revesting of Assets. Except as otherwise provided by the Plan,
    pursuant to Section 1141(b) of the Bankruptcy Code, on the
    Effective Date, title to all properties and assets of the Debtor and
    its Estate shall vest in the Reorganized Debtor free and clear of all
    liens, claims and encumbrances, except as expressly provided in
    the Plan, and this Order shall be a judicial determination of

discharge and extinguishment of all such Claims, Liens, or Equity Interests.

Nothing in the Plan or this Order releases or nullifies any liability to a governmental entity under police and regulatory statutes and regulations that any entity would be subject to as the owner or operator of property after the Effective Date. Nothing in the Plan or this Order shall release, discharge, or preclude any Claim that arises after the Effective Date that the United States Environmental Protection Agency or any state environmental agency may have against the Debtor or any remedies of the United State Environmental Protection Agency or state environmental agencies that are not within the definition of Claim as set forth in Section 101(5) of the Bankruptcy Code.

42. Revesting of Railroad Permits in Reorganized Debtor's Name. On the Effective Date, or as soon thereafter as practicable, the Disbursing Agent shall be authorized to pay $1,000 to Burlington Northern Santa Fe Railroad Company, Montana Rail Link, Inc., Montana Western Railway Company, and Rarus Railway Company and the Reorganized Debtor shall receive blanket assignment of all permits currently held in the name of Montana Power Company or NorthWestern Energy, LLC.

43. Full and Final Satisfaction. Notwithstanding anything to the contrary in this Order or the Plan, upon receipt of and acceptance

91

of a full and final Distribution from the Reorganized Debtor, any and all Claims and Causes of Action as between the Debtor and the claimant accepting the Distribution shall be fully and finally resolved.

44. Avaya Indemnification Obligation. On November 24, 2003, the Court entered an Order Authorizing the Debtor to Incur and Perform Obligations Under the Expanets, Inc. Asset Purchase Agreement and All Ancillary Documents and Granting Related Relief. Pursuant to such order and this Confirmation Order, the Debtor has and is hereby deemed to assume the indemnification obligations detailed in the documents executed in connection with the sale of the Netexit, Inc.'s assets to Avaya, Inc.

45. Plan Documents. All Persons holding Claims or Equity Interests which are dealt with under the Plan, including, without limitation, the D&O Protected Parties Settlement Agreement and the Insurance Assignment Agreement, shall be, and they hereby are, directed to execute, deliver, file or record any document, and to take any action necessary to implement, effectuate and consummate the Plan in accordance with its terms, and all such Persons shall be bound by the terms and provisions of all documents to be executed by them in connection with the Plan, whether or not such documents actually have been executed by such Persons.

46. Executory Contracts and Unexpired Leases. Any unexpired lease or executory contract that has not been expressly assumed or rejected by the Debtor (or otherwise treated by the Plan) shall be, and hereby are, deemed to have been assumed by the Debtor as of the Effective Date of the Plan.

47. Distributions of Cure Amounts. The Debtor filed its Omnibus Motion for Court Approval to Assume Certain Executory Contracts Pursuant to Section 365 of the Bankruptcy Code and Granting Related Relief on September 22, 2004. The motion included the party to the contract to be assumed and the amount of the cure payment. On or before the Effective Date, the Debtor shall segregate the funds necessary to pay the cure amounts, including sufficient funds to pay any disputed cure amounts in full, into a segregated account. Within sixty (60) days after the Effective Date or as soon thereafter as practicable, the Debtor shall pay such cure amounts so long as no objections have been filed to such cure amounts or the parties have agreed to a different cure amount.

48. Payment of Fees and Expenses of the MPSC and MCC. Pursuant to the Order Approving Stipulation and Settlement Agreement Among Debtor, Montana Public Service Commission and Montana Consumer Counsel entered on July 19, 2004 [Dkt. No. 1706], the Debtor shall pay professional fees and expenses of the Montana

Public Service Commission, Montana Consumer Counsel and the Montana Attorney General in the amount of approximately $2,297,768.86 as of May 31, 2004 and any additional fees and expenses of such parties incurred through the Effective Date. Such fees and expenses shall be paid pursuant to Section 1129(a)(4) of the Bankruptcy Code and such payments will be made no later than the Effective Date. The Montana Public Service Commission, Montana Consumer Counsel and the Montana Attorney General shall not be required to file an application with the Court for payment of such fees and expenses.

49. Written Verification of Material Non-Public Information for Wilmington Trust and Harbert. On the Effective Date, the Debtor shall deliver to Wilmington Trust and Harbert written verification that all material non-public information that has been disclosed to Wilmington Trust and/or Harbert by the Debtor and its advisors prior to the Effective Date has been publicly disclosed (pursuant to the Disclosure Statement or otherwise).

50. Effect of Failure of Conditions. In the event that one or more of the conditions specified in Section 11.2 of the Plan have not occurred on or before 120 days after the Confirmation Date, upon notification submitted by the Debtor to the Court, counsel for the Creditors' Committee, counsel for the DIP Lenders, and counsel for the CSFB Lenders (a) this Confirmation Order shall be

vacated, (b) no Distributions under the Plan shall be made, (c) the
Debtor and all holders of Claims and Equity Interests shall be
restored to the status quo ante as of the day immediately preceding
the Confirmation Date as though the Confirmation Date never
occurred and (d) the Debtor's obligations with respect to the
Claims and Equity Interests shall remain unchanged and nothing
contained herein shall constitute or be deemed a waiver or release
of any Claims or Equity Interests by or against the Debtor or any
other Person or to prejudice in any manner the rights of the Debtor
or any Person in any further proceedings involving the Debtor.

51. Retention of Jurisdiction. This Court hereby retains jurisdiction of
this Chapter 11 Case pursuant to, to the extent and scope of, and
for the purposes set forth in Article XIII of the Plan.

52. Professional Fees. All Persons seeking an award by the Court of
Professional Fees, or of compensation for services rendered to the
Debtor or a Committee or reimbursement of expenses incurred
through and including the Effective Date under Sections 503(b)(2),
503(b)(3), 503(b)(4), 503(b)(5) of the Bankruptcy Code, (a) shall
file their respective final applications for allowance of
compensation for services rendered and reimbursement of
expenses incurred through the Effective Date within thirty (30)
days after the Effective Date, and (b) if granted such an award by
the Court, shall be paid in full in such amounts as are Allowed by

the Court (i) on the later of the Effective Date or the date such
Administrative Claim becomes an Allowed Administrative Claim,
or as soon thereafter as is practicable, (ii) upon such other terms as
may be mutually agreed upon between such holder of an Allowed
Administrative Claim and the Debtor or, on and after the Effective
Date, Reorganized Debtor, or (iii) in accordance with the terms of
any applicable administrative procedures order entered by the
Court. Parties-in-interest shall have thirty (30) days after the filing
of a final fee application to object to such fee application. All
Professional Fees for services rendered in connection with the
Chapter 11 Case and the Plan after the Effective Date, including,
without limitation, those relating to the occurrence of the Effective
Date, the prosecution of Causes of Action preserved hereunder and
the resolution of Disputed Claims, shall be paid by the
Reorganized Debtor upon receipt of an invoice therefore, or on
such other terms as Reorganized Debtor may agree to, without the
need for further Bankruptcy Court authorization or entry of a Final
Order. If the Reorganized Debtor and any Professional cannot
agree on the amount of post-Effective Date fees and expenses to be
paid to such Professional, such amount shall be determined by this
Court.

53. [Final Fee Application Hearing. A hearing to consider final
Professional Fee applications shall be held before this Court on

96

_____, 200___ at _____, or as soon thereafter as counsel can be heard.]

54. Notice. Notice of entry of this Order and of the Effective Date of the Plan, substantially in the form annexed hereto as Exhibit A (which notice is hereby approved in all respects) shall be, and hereby is, deemed sufficient if (a) served by first-class mail within twenty (20) days following the Effective Date upon: (i) all person having filed a notice of appearance herein and (ii) all holders of Claims and Equity Interests which are impaired under the Plan and (b) published once in each of the following: (i) Great Falls Tribune; (ii) the Missoulian; (iii) New York Times; (iv) Rapid City Journal; (v) USA Today; (vi) The Wall Street Journal; (vii) Billings Gazette; and (viii) Argus Leader. A copy of this Order may also be obtained by submitting a written request for such document to the Debtor's noticing agent, Kurtzman Carson Consultants LLC, 12910 Culver Blvd., Suite I, Los Angeles, California 90066-6709; Attn: NorthWestern Corporation, or by viewing the documents on the noticing agent's website at http://www.kccllc.net/northwestern. In addition, copies of the this Order may be viewed on the Debtor's website, www.northwestern.com.

55. Effect of Reference to Plan in this Order. The failure to reference or discuss any particular provision of the Plan in this Order shall

have no effect on the validity, binding effect and enforceability of
such provision, and each provision of the Plan shall have the same
validity, binding effect and enforceability as if fully set forth in
this Order.

56. Headings. Headings utilized herein are for the convenience of
reference only, and shall not constitute a part of the Plan or this
Order for any other purpose.

57. No Preclusive Effect. In the event that the Plan does not become
effective, no findings of fact entered by this Court in connection
with confirmation of this Plan will have preclusive effect in
connection with confirmation of any subsequently-filed plan of
reorganization.

58. Reversal. If any or all of the provisions of this Order are hereafter
reversed, modified or vacated by subsequent order of the Court or
any other court, such reversal, modification or vacatur shall not
affect the validity of the acts or obligations incurred or undertaken
under, or in connection with, the Plan prior to receipt of written
notice of such order by the Debtor. Notwithstanding any such
reversal, modification or vacatur of this Order, any such act or
obligation incurred or undertaken pursuant to, and in reliance on,
this Order prior to the effective date of such reversal, modification
or vacatur shall be governed in all respects by the provisions of

this Order, the Plan, all documents relating to the Plan and any amendments or modifications to any of the foregoing.

59. Inconsistencies. In the event of any discrepancies, inconsistencies or conflicts between the Plan or other document executed under or in connection with the Plan, the provisions of the Plan shall govern. In the event of any discrepancies, inconsistencies or conflicts between the Court's oral ruling on October 8, 2004 and this Order, the provisions of the Court's October 8, 2004 oral ruling shall govern.

60. Integration of Confirmation Order Provisions. The provisions of this Order are integrated with each other and are non-severable and mutually dependent.

61. Final Order. This Order is a Final Order and the period in which an appeal must be filed shall commence immediately upon the entry hereof. Notwithstanding Bankruptcy Rule 3020(e), this Order shall be effective and enforceable immediately upon entry hereof.

Dated: October 19, 2004
Wilmington, Delaware

_United States Bankruptcy Judge_