IN UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x
MAGTEN ASSET MANAGEMENT      :
CORPORATION, Suing individually and    :
Derivatively on behalf of CLARK FORK   :
AND BLACKFOOT, LLC,                    :
                                         :
            Plaintiff,            :
                                         :
      v.                          :     Civil Action No. 04-1256 JJF
                                         :
PAUL, HASTINGS, JANOFSKY &       :
WALKER LLP,                       :
                                         :
           Defendant.       :
------------------------------------------------------x

**COMPENDIUM OF UNREPORTED DECISIONS
CITED IN PAUL, HASTINGS, JANOFSKY & WALKER
LLP'S BRIEF IN SUPPORT OF MOTION FOR
<u>JUDGMENT ON THE PLEADINGS</u>**

MORRIS, NICHOLS, ARSHT &
 TUNNELL LLP
Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

*Of Counsel:*
DAVIS POLK & WARDWELL
Dennis E. Glazer
Paul Spagnoletti
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

## TABLE OF AUTHORITIES

TAB #

Baker O'Neal Holdings v. Ernst & Young,
No. 1:03-CV-0132-DFH, 2004 U.S. Dist. LEXIS
6277 (S.D. Ind. March 24, 2004) ................................................................. 1

Bondi v. Citigroup, Inc.,
No. BER-L-10902-04, 2005 WL 975856 (N.J.
Super. Feb. 28, 2005) ................................................................................... 2

FDIC v. White,
No. 3:96-CV-0560-P, 1998 U.S. Dist. LEXIS 3020
(N.D. Tex. March 5, 1998) ............................................................................ 3

In re NorthWestern Corp.,
No. 03-12872 (CGC), 2004 WL 1661016 (Bankr.
D. Del. July 23, 2004) .................................................................................. 4

Magten Asset Mgmt. Corp. v. Mike J. Hanson, et al.,
No. CV-04-26-BU-RFC (D. Mont. Jan. 27, 2005) ......................................... 5

NorthWestern Corp. v. McGreevey (In re NorthWestern
Corp.),
Case No. 03-12872, Adv. No. 05-52525, 2005
Bankr. LEXIS 2146 (JLP) (Bankr. D. Del. Oct. 25) ........................................ 6

Starrels v. First Nat'l Bank of Chi.,
No. 85 C 6458, 1987 U.S. Dist. LEXIS 518 (N.D.
Ill. Jan. 21, 1987), aff'd, 870 F.2d 1168 (7th Cir.
1989) ......................................................................................................... 7

Thomson Kernaghan & Co. v. Global Intellicom, Inc.,
99 Civ. 3005 (DLC), 1999 U.S. Dist. LEXIS 13723
(S.D.N.Y. Sept. 14, 1999) ............................................................................ 8

513660

**TAB 1**

BAKER O'NEAL HOLDINGS, INC. and AMERICAN PUBLIC AUTOMOTIVE GROUP, INC., Plaintiffs, v. ERNST & YOUNG LLP and CHARLES J. ROACH, Defendants.

CASE NO. 1:03-cv-0132-DFH

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISION

2004 U.S. Dist. LEXIS 6277

March 24, 2004, Decided

**DISPOSITION:** {*1} Plaintiffs' objection sustained. Defendants' motion to dismiss granted in part and denied in part. Plaintiffs' motion for leave to amend the complaint granted. Defendants' motion to dismiss granted in part and denied in part.

**COUNSEL:** For Ernst & Young LLP, Charles Roach, APPELLANTS: Brian W Welch, Bingham McHale, Scott R Leisz, Bingham McHale, LLP, Indianapolis, IN USA.

For Ernst & Young LLP, Charles Roach, APPELLANTS: John J Tharp, Jr, Stanley J Parzen, Mayer Brown Rowe & Maw, Chicago, IL USA.

For Charles Roach, APPELLANT: Roger E Zuckerman, Steven M Salky, Zuckerman Spaeder LLP, Washington, DC USA.

For Baker O'Neal Holdings, Inc, American Public Automotive Group, Inc, APPELLEES: Andrew W Hull, Sean T White, Hoover Hull Baker & Heath LLP, Indianapolis, IN USA.

**JUDGES:** DAVID F. HAMILTON, JUDGE, United States District Court, Southern District of Indiana.

**OPINIONBY:** DAVID F. HAMILTON

**OPINION:** ENTRY ON PENDING MOTIONS

Defendants Ernst & Young and Charles J. Roach, an Ernst & Young partner, provided accounting services to {*2} plaintiffs Baker O'Neal Holdings, Inc. (BOH) and its wholly owned subsidiary, American Public Automotive Group, Inc. (APAG). BOH and APAG have sued defendants on claims arising from their alleged role in participating in or aiding and abetting the fraudulent transfer of assets from BOH and APAG by James O'Neal, President and Chief Executive Officer of BOH and APAG. O'Neal is alleged to have transferred more than $ 3.7 million from BOH and APAG under the guise of officer "loans" he could not and did not repay.

BOH and APAG both filed for bankruptcy protection on October 9, 1998, tolling any applicable statutes of limitations. The bankruptcy court confirmed the debtors' plan of reorganization on February 23, 2000. This action was filed as an adversary proceeding within the bankruptcy proceeding. The reference to the bankruptcy court was withdrawn so that the case would proceed in the district court.

The case is now before the court on plaintiffs' objection to the magistrate judge's denial of leave to file a Fourth Amended Complaint and defendants' motion to dismiss for failure to state a claim upon which relief can be granted. For the reasons discussed below, plaintiffs' objection {*3} is sustained, and plaintiffs are granted leave to file the Fourth Amended Complaint. Defendants' motion to dismiss is granted in part and denied in part.

I. *Plaintiffs' Objection to Magistrate Judge's Order Denying Leave to File Fourth Amended Complaint*

Plaintiffs amended their complaint three times prior to this entry. Two amendments came while the parties were contesting before the bankruptcy court defendants' motion to compel arbitration. After the case arrived in the district court, the magistrate judge permitted plaintiffs to file a third amended complaint on May 29, 2003. In July 2003, defendants filed their pending motion to dismiss Counts VI to XVII. That motion to dismiss has been defendants' first substantive response to plaintiffs' claims.

As part of their response to the motion to dismiss, plaintiffs sought leave to file a Fourth Amended Complaint. The magistrate judge denied plaintiffs' motion to file a fourth amended complaint on October 28, 2003. Plaintiffs objected pursuant to **28 U.S.C. § 636(b)(1),** which authorizes a district judge to reconsider such a decision if the magistrate judge's decision was clearly erroneous or contrary to {*4} law. Because the proposed Fourth Amended Complaint is plaintiffs' first response to defendants' first substantive attack on the plaintiffs' claims, the court finds that the magistrate judge's decision was clearly erroneous and contrary to law.

Plaintiffs' proposed Fourth Amended Complaint makes a number of substantive changes. It expands on the

allegations made in the previous version of the complaint, but does not assert any new causes of action. The proposed complaint adds new allegations designed to support plaintiffs' theory that a fiduciary relationship existed between Ernst & Young and BOH and APAG. The Fourth Amended Complaint also alleges that plaintiffs were fraudulently induced to enter into the engagement letters that formed the contract between the parties regarding Ernst & Young's accounting and financial services. Finally, the Fourth Amended Complaint removes language tending to suggest that BOH and APAG were aware of or participated in the fraudulent transfer scheme allegedly undertaken by O'Neal and Roach.

**Rule 15(a) of the Federal Rules of Civil Procedure** provides that leave to amend pleadings "shall be freely given when justice {*5} so requires," but leave to amend is not automatic. *Johnson v. Methodist Medical Ctr. of Ill,* 10 F.3d 1300, 1303 (7th Cir. 1993) (affirming denial of leave to file third amended complaint). "In *Foman v. Davis,* 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962), the Court determined that leave to amend should be granted under **Federal Rule of Civil Procedure 15(a)** unless there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'" *Ferguson v. Roberts,* 11 F.3d 696, 706 (7th Cir. 1993); accord, *Perrian v. O'Grady,* 958 F.2d 192, 194 (7th Cir. 1992) (affirming denial of leave to amend). When determining leave to amend, the court should also consider judicial economy. *Perrian,* 958 F.2d at 195; *Bohen v. East Chicago,* 799 F.2d 1180, 1184-85 (7th Cir. 1986). All of those factors must be balanced against any potential harm that could befall a moving party if leave is {*6} not granted. 3 Moore's Federal Practice § 15.15(1) (3d ed. 2003).

After reviewing the course of the proceedings, the court sees no valid reason for denying leave to file the Fourth Amended Complaint. In considering the *Foman* factors, first, there has been no undue delay by plaintiffs. Substantial time has passed since the suit was first filed in December 1999. Most of this delay, however, is attributable to the parties' dispute as to whether plaintiffs' claims should be arbitrated. That dispute, which was the subject of an interlocutory appeal, lasted into 2003.

Second, there is no pattern of repeated failures to cure deficiencies by previous amendments. Although this will be plaintiffs' fourth amended complaint, it is still their first request to amend in response to a challenge to the sufficiency of their pleading. Plaintiffs' request

to amend is a direct response to defendants' motion to dismiss, which is the first time that defendants have attacked the complaint on the merits. Fairness requires that plaintiffs be allowed an opportunity to cure the perceived defects in their complaint. "The Federal Rules reject the approach that pleading is a game of skill in which one misstep {*7} by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson,* 355 U.S. 41, 48, 2 L. Ed. 2d 80, 78 S. Ct. 99(1957). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman,* 371 U.S. at 182.

The court also finds no evidence of bad faith on the part of plaintiffs in proposing the amendment. There are of course serious issues on the merits here. Those issues should not prevent plaintiffs from responding to the motion to dismiss, including deletion of allegations that plaintiffs contend the defendants have misconstrued in an effort to secure dismissal.

Defendants are not significantly prejudiced by allowing plaintiffs to amend. The arguments presented in defendants' motion to dismiss are still relevant because plaintiffs' substantive claims have not changed. n1 Indeed, the majority (if not all) of the changes made in the Fourth Amended Complaint are consistent with the allegations of the Third Amended Complaint. Under these circumstances, {*8} BOH and APAG could have asserted these new allegations in a brief, without seeking leave to amend their complaint. See *Hrubec v. Nat'l R.R. Passenger Corp.,* 981 F.2d 962, 963-64 (7th Cir. 1992) (in responding to a motion to dismiss, "[a] plaintiff need not put all of the essential facts in the complaint. He may add them by affidavit or brief - even a brief on appeal."); see also *Chavez v. Illinois State Police,* 251 F.3d 612, 650 (7th Cir. 2001) (stating that "the well-established law of this circuit provides that, when reviewing a dismissal under **Rule 12(b)(6)**, 'we will consider new factual allegations raised for the first time on appeal provided they are consistent with the complaint.'"), quoting *Veazey v. Communications & Cable of Chicago, Inc.,* 194 F.3d 850, 854, 861 (7th Cir. 1999), quoting in turn *Highsmith v. Chrysler Credit Corp.,* 18 F.3d 434, 439 (7th Cir. 1994).

- - -Footnotes- - -

N1 Because the court grants plaintiffs' motion to amend the complaint, defendants' motion to dismiss the Third Amended Complaint technically is moot. However, to prevent a wasteful repetition

of the briefing, the court's ruling today applies to the Fourth Amended Complaint.

- - -End Footnotes- - -
{*9}

The only new allegations that defendants contend are inconsistent with the Third Amended Complaint are those relating to the fraudulent inducement theory. The new allegations respond to a partial affirmative defense. With rare exceptions, a plaintiff is not required to anticipate affirmative defenses in a complaint. *U.S. Gypsum Co. v. Indiana Gas Co.,* **350 F.3d 623, 626 (7th Cir. 2003)**; accord, *Gomez v. Toledo,* **446 U.S. 635, 64 L. Ed. 2d 572, 100 S. Ct. 1920 (1980)**. When a defense is raised, the plaintiff is entitled to respond. These allegations do no more than that. To the extent they are arguably inconsistent with other allegations in the complaint, which assume the validity of the engagement letters as contracts, the plaintiff is entitled to plead in the alternative. See **Fed. R. Civ. P. 8(e)(2)**. Moreover, since services were provided and money was paid, there clearly was a contract for professional services that could be the basis of a professional malpractice claim, even if one party's agreement to that contract was fraudulently induced and even if there is a dispute concerning the specific terms of the contract.

The court {*10} sees no prejudice to defendants by allowing the amendment. The court recognizes that defendants have spent significant time in drafting their motion to dismiss. Such effort, however, does not amount to "prejudice" sufficient to deny a plaintiff leave to amend his pleadings at least once in response to those briefs. As a general rule, a plaintiff whose complaint has been dismissed by the court is ordinarily entitled to amend it to try to cure the defects, unless it is apparent that such an effort would be futile. *E.g.,* *Hart v. Bayer Corp.,* **199 F.3d 239, 247 n.6 (5th Cir. 2000)** (district court erred by denying leave to amend); *Frey v. City of Herculaneum,* **44 F.3d 667, 672 (8th Cir. 1995)** (reversing denial of leave to amend); *Polich v. Burlington Northern, Inc.,* **942 F.2d 1467, 1472 (9th Cir. 1991)** (reversing denial of leave to amend). That's one major reason why **Rule 12(b)(6)** motions often seem to be more effective for educating the opposing party rather than narrowing the claims or issues. As explained below, however, the vast majority of the defendants' motion to dismiss still applies to the Fourth Amended Complaint. Under these circumstances, {*11} defendants are not unduly prejudiced by plaintiffs' proposed amendments to the complaint.

Upon consideration of all the factors under *Foman v. Davis,* therefore, the court sees no sound basis for denying plaintiffs leave to amend their complaint. The court sustains the plaintiffs' objection to the magistrate judge's order denying such leave, and the Fourth Amended Complaint shall be deemed filed today.

## II. *Motion to Dismiss*

The Fourth Amended Complaint includes three groups of claims. Counts I to V seek to treat the fees that were paid by BOH and APAG to Ernst & Young as avoidable preferences or fraudulent conveyances, which BOH and APAG are entitled to recover. Defendants have not challenged these counts in their motion to dismiss.

Counts VI to XI and XVII assert a variety of common law claims against defendants, including breach of fiduciary duty, fraud, constructive fraud, civil action by a crime victim, negligence and breach of contract. Defendants have moved to dismiss all of these counts arguing that the doctrine of *in pari delicto* bars BOH and APAG from asserting these common law claims. Defendants additionally contend that the one-year statute of limitations {*12} period of the **Indiana Accountancy Act of 1993** applies here to bar plaintiffs' common law claims. Finally, defendants attack several of the common law claims on an individual basis.

Counts XII to XVI allege that the O'Neal loan transfers were avoidable preferences and fraudulent conveyances. Defendants have moved to dismiss these counts on the ground that they were neither transferees nor beneficiaries of the transfers, so they cannot be held liable under the federal **Bankruptcy Act** or the **Indiana Uniform Fraudulent Transfer Act** (IUFTA).

For the reasons explained below, the court denies defendants' motion to dismiss with respect to Counts VI to XI and XVII, and grants defendants' motion to dismiss with respect to Counts XII to XVI.

### A. *Factual Allegations*

In ruling on a motion to dismiss under **Federal Rule of Civil Procedure 12(b)(6)**, the court must assume as true all well-pleaded facts set forth in the complaint, construing the allegations liberally and drawing all inferences in the light most favorable to the plaintiffs. See, *e.g., Jackson v. E.J. Brach Corp.,* **176 F.3d 971, 977-78 (7th Cir. 1999)**; *Zemke v. City of Chicago,* **100 F.3d 511, 513 (7th Cir. 1996)**; {*13} *McMath v. City of Gary,* **976 F.2d 1026, 1031 (7th Cir. 1992)**.

For purposes of the motion, the court determines whether the plaintiffs might be able to prove any set of facts consistent with the allegations that would give the plaintiffs a right to relief. *Wudtke v. Davel,* **128 F.3d**

1057, 1061 (7th Cir. 1997), citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993). Dismissal is appropriate only if it appears beyond a doubt that the plaintiffs can prove no facts that would entitle them to relief. *Kennedy v. National Juvenile Detention Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999).

For the purpose of considering this motion, the court accepts the following allegations as true. Patrick Baker is the sole shareholder and Chairman of the Board of Directors of both BOH and APAG. APAG was created with the objective of developing and operating auto malls. The BOH and APAG business plan called for the purchase of automobile dealerships owned by Donald Massey. To this end, BOH and APAG raised money through loans from investors who were given promissory notes that {*14} were convertible into APAG stock. The notes were personally guaranteed by Baker and O'Neal.

O'Neal and Charles Roach had a close relationship prior to O'Neal's employment with BOH and APAG. In the late 1980s and early 1990s, O'Neal and Roach had both been officers of the Arnold Palmer Automotive Group (here, "the Palmer Group"). While with the Palmer Group, O'Neal had misappropriated corporate assets for his own personal use, including a significant amount of cash, which was taken under the guise of officer loans. The owners of the Palmer Group eventually obtained a multi-million dollar judgment against O'Neal for these misappropriations. Arising from his tenure with the Palmer Group, O'Neal was also prosecuted by the State of Florida on felony counts for theft of more than $ 300,000 in state sales tax funds that were held in trust for the state. Roach, who also worked for the Palmer Group during this period, was aware of O'Neal's malfeasance and the judgments against him.

After leaving the Palmer Group, O'Neal joined BOH and APAG. Roach left the Palmer Group and joined Ernst & Young as a partner. Beginning in 1994, O'Neal hired Roach and Ernst & Young to perform accounting, consulting {*15} and tax services for BOH and APAG. During this time, Roach operated as the "*de facto* CFO for both BOH and APAG." Cplt. P 36. O'Neal directed all accounting-related questions to Roach. O'Neal directed BOH's and APAG's bookkeeper Paul Mohabir to follow Roach's instructions on all financial matters. Roach prepared BOH's tax returns in 1994 and 1995, and prepared APAG's tax returns in 1995. In 1996, BOH and APAG retained Ernst & Young to audit and report on APAG's financial statements and the consolidated financial statements of the Massey auto dealership group. In

1997, BOH and APAG retained Ernst & Young to act as its exclusive financial advisor in the majority acquisition of Massey's auto dealership group.

At BOH and APAG, O'Neal removed large sums of money from the business. The transfers of cash were recorded as officer loans. Baker claims to have had no knowledge of these transfers. Roach had O'Neal execute promissory notes to account for the loan transactions. Roach had these loans listed as company assets in the BOH and APAG financial statements and tax filings even though he knew that O'Neal had no income and could not afford to repay the loans. Roach was aware of O'Neal's {*16} insolvency. In 1996 Roach had prepared a financial affidavit for O'Neal in an effort to show Florida probation officials that he should be given leniency on the state tax charges because he was unable to repay the stolen money. The affidavit showed no unencumbered assets, and liabilities exceeding $ 18 million. Also in 1996, prior to accepting the engagement with BOH and APAG, Ernst & Young conducted an internal review of BOH and APAG that revealed O'Neal's insolvency and checkered business history. Nevertheless, Roach recommended the engagement, personally vouching for O'Neal's integrity. Ernst & Young accepted the engagement.

O'Neal withdrew over $ 3.7 million from BOP and APAG through the officer loans. Ernst & Young was paid over $ 600,000 in fees by BOP and APAG. In 1995, Roach was appointed to the APAG board of directors. He was also expected to be the CFO and a director of the new entity to be created following the expected Massey acquisition. The Massey acquisition, however, never was consummated. When Baker discovered the loan transactions in 1988, he removed O'Neal from his positions with BOH and APAG. Additional allegations are noted below.

B. *Counts VI to XI and XVII* {*17} - *Common Law Claims*

1. *Imputation of O'Neal's Wrongdoing and Knowledge*

Defendants argue that knowledge of the O'Neal loan transfers should be imputed to BOH and APAG. Since the transfers form the basis of plaintiffs' common law claims, defendants argue that the doctrine of *in pari delicto* - literally, "of equal fault" - bars these claims since the corporate plaintiffs were complicit in O'Neal's wrongdoing. While the court agrees that knowledge of and responsibility for the O'Neal transfers must be imputed to BOH and APAG, the court is unable to say based solely on a review of the pleadings that the defense of *in pari delicto* applies to bar the claims asserted in Counts VI to XI and XVII.

O'Neal's conduct is imputable to BOH and APAG in several different ways. First, based on a bankruptcy court judgment, BOH and APAG are estopped from denying that they were complicit in O'Neal's wrongdoing. Federal law applies to collateral estoppel issues when, as here, the judgment to be given preclusive effect was a federal judgment. *Havoco of America, Ltd. v. Freeman, Atkins & Coleman, Ltd.,* **58 F.3d 303, 307 n.7 (7th Cir. 1995)**. For issue preclusion to apply: (1) {*18} the issue must be the same as the one involved in the prior action; (2) the issue must actually have been litigated in the prior action; (3) the determination of the issue must have been essential to the prior final judgment; and (4) the party against whom issue preclusion is asserted must have been fully represented in the prior action. *Id.* **at 307**.

In the proceeding brought by BOH and APAG against O'Neal and his family were seeking relief under **Section 14(1) of the IUFTA, Ind. Code § 32-18-2-14(1)**, which required a finding that the debtors, BOH and APAG, had "actual intent to hinder, delay or defraud" their creditors.

In the proceeding brought by BOH and APAG against O'Neal and his family to void the loan transfers as fraudulent conveyances, the bankruptcy court adopted the argument urged by BOH and APAG, holding as a matter of law that "O'Neal's fraudulent intent may be imputed to the Debtors [BOH and APAG]." Def. Ex. 12, Bankruptcy Court Findings of Fact and Conclusions of Law and Final Judgment PP 30, 33. This finding was essential to the court's judgment that the O'Neal transfers amounted to a fraudulent conveyance. BOH and APAG were seeking relief under **Section 14(1) of the IUFTA, Ind. Code § 32-18-2-14(1)**, which required a finding that the debtors, BOH and APAG, had "actual intent to hinder, delay or defraud" their creditors.

Plaintiffs contend that the issue decided by the bankruptcy court is {*19} different from the issue to be decided here. In the prior proceeding, they argue, the bankruptcy court considered whether O'Neal's conduct with respect to the fraudulent transfers could be imputed to BOH and APAG, while in this proceeding the issue is whether O'Neal's entire wrongdoing may be imputed to plaintiffs. The allegations of the complaint, however, contain no mention of any wrongdoing on the part of O'Neal that could be considered separate and apart from the fraudulent transfers. When pressed at this court's hearing to identify additional wrongful conduct by O'Neal outside of the fraudulent loans, plaintiffs' counsel was able to cite only the improper capitalization of certain "expenses" alleged in paragraph 53 of the Third Amended Complaint (paragraph 63 in the Fourth Amended Complaint). But as plaintiffs' counsel conceded, these "expenses" were in fact the fraudulent loans obtained by O'Neal. The bankruptcy court - at the request of BOH and APAG - imputed O'Neal's fraudulent conduct to BOH and

APAG. As a result, BOH and APAG are estopped from denying the same imputation in this proceeding.

BOH and APAG also had constructive knowledge of the O'Neal loans. Paul Mohabir, the {*20} internal accountant for BOH and APAG, was completely familiar with the loans and their dubious accounting treatment - so much so that Mohabir repeatedly expressed concern to Roach on the issue. Mohabir Aff. P 6. Nor were the loans in any sense "hidden." The loans were recorded in the plaintiffs' key financial records - financial statements, promissory notes, and tax returns - of which Baker, as sole shareholder and Chairman of the Board of Directors, is deemed to have knowledge. See *FDIC v. Lauterbach,* **626 F.2d 1327, 1334 (7th Cir. 1980)** ("A corporate director may not claim total ignorance of the corporation's affairs, particularly those matters fairly disclosed by the directors' meetings and those corporate records to which directors had access."). n2

- - -Footnotes- - -

n2 In arguing that O'Neal's conduct should be imputed to BOH and APAG, defendants also rely on the "sole actor" doctrine. That doctrine teaches that even where an agent has acted to defraud the principal, the principal may still be charged with the agent's fraud where that agent is "the sole representative of the principal in the transaction in question." *First Nat'l Bank of Cicero v. Lewco Sec. Corp.,* **860 F.2d 1407, 1417-18 (7th Cir. 1988)** ("This 'sole actor' exception is founded on the notion that, where a principal cannot embrace a transaction except through the acts of an unsupervised agent, the principal must accept the consequences of the agent's misconduct because it was the principal who allowed the agent to operate without accountability."). The Seventh Circuit has held, however, that the "sole actor" exception may not apply where the adverse party was aware of the agent's fraud and even participated in it. *Ash v. Georgia-Pacific Corp.,* **957 F.2d 432, 436 (7th Cir. 1992)** (affirming verdict in favor of corporation's successor against party who persuaded corporation's chief operating officer to act to defraud the corporation). Accordingly, the court does not rely on the "sole actor" exception to impute O'Neal's alleged wrongdoing to BOH and APAG.

- - -End Footnotes- - -

{*21}

2. *The In Pari Delicto Defense*

Even given the imputation of O'Neal's wrongdoing to BOH and APAG, whether plaintiffs' claims are barred by the *in pari delicto* doctrine is a different question. "The doctrine known by the latin phrase *in pari delicto* literally means 'of equal fault.'" *Theye v. Bates,* **166 Ind. App. 652, 337 N.E.2d 837, 844 (Ind. App. 1975)**, quoting *Perma Life Mufflers, Inc. v. International Parts Corp.,* **392 U.S. 134, 135, 20 L. Ed. 2d 982, 88 S. Ct. 1981 (1968)**. "The expression 'in pari delicto' is a portion of the longer Latin sentence, 'In pari delicto potior est conditio defendentis,' which means that where the wrong of both parties is equal, the position of the defendant is the stronger." *Theye,* **337 N.E.2d at 844**, quoting W.M. Moldof, Annotation, *Purchaser's Right To Set Up Invalidity of Contract Because of Violation of State Securities Regulation as Affected by Doctrines of Estoppel or Pari Delicto,* **84 A.L.R.2d 479, 491**. As legal entities, corporations are subject to the *in pari delicto* defense, although to some extent the doctrine "loses its sting when the person who is *in pari delicto* is {*22} eliminated." *Scholes v. Lehmann,* **56 F.3d 750, 754-55 (7th Cir. 1995)**, citing *McCandless v. Furlaud,* **296 U.S. 140, 160, 80 L. Ed. 121, 56 S. Ct. 41 (1935)**.

Two recent Seventh Circuit decisions have addressed in detail the scope of the *in pari delicto* defense. In *Scholes v. Lehmann,* the Seventh Circuit was faced with a Ponzi scheme in which the perpetrator of the fraud, a Michael Douglas, had carried out the scheme through the use of three wholly owned corporations that he had created specifically for that purpose. The corporations solicited funds from "investors." Those funds were used to pay dividends to previous investors and to maintain the Ponzi scheme. Douglas also caused the corporations to pay funds to himself, his ex-wife, and his favorite charities. Douglas's scheme was eventually exposed, and he pled guilty to federal fraud charges. In the wake of the criminal proceedings, the court appointed Scholes as a receiver for Douglas and the corporations.

Scholes filed a fraudulent conveyance action under Illinois law against the entities that had received pay-outs from the Ponzi corporations. The Seventh Circuit was asked to consider whether the *in* {*23} *pari delicto* defense barred Scholes from pursuing the Illinois fraudulent conveyance action. The court held that it did not. The court found that the rationale behind *in pari delicto* - "that the wrongdoer must not be allowed to profit from his wrong" - did not apply to the receiver's action since "Douglas himself did not stand to benefit from the receiver's suit." *Scholes,* **56 F.3d at 754**. The wrong invoked to support the defense

of *in pari delicto* was chargeable to the Ponzi perpetrator. After the receivership entities were "freed from his spell[,] they became entitled to the return of the moneys ... that Douglas had made the corporations divert to unauthorized purposes." *Id.*

The Seventh Circuit revisited this issue in *Knauer v. Jonathon Roberts Financial Group, Inc.,* **348 F.3d 230, 234 (7th Cir. 2003)**. Like *Scholes, Knauer* arose out of a classic Ponzi scheme. Kenneth Payne and several other individuals, operating under the auspices of Heartland Financial Services and JMS Investment Group, defrauded nearly a thousand investors of millions of dollars. *Knauer* differed from *Scholes,* however, in that the receiver in *Knauer* {*24} was not seeking to void a fraudulent conveyance but rather was pursuing tort damages against several securities broker-dealers for failing to adequately supervise Payne, who was a registered representative of the broker-dealers. *Id.* at 234. Judge Tinder had granted a motion to dismiss based on the *in pari delicto* defense, and the Seventh Circuit affirmed.

In *Knauer,* the Seventh Circuit held that *in pari delicto* barred the receiver's tort claims. However, as Judge Tinder expressed in his district court opinion, see **2002 U.S. Dist. LEXIS 20978, 2002 WL 31431484, *10 (S.D. Ind. 2002)**, and as the Seventh Circuit confirmed, the equitable context in which the *in pari delicto* defense is asserted is crucial. In the Seventh Circuit's view, the key distinction between *Scholes* and *Knauer* was that in *Scholes* the receiver had been seeking to recover "diverted funds from the beneficiaries of the diversions," while the broker-dealer defendants in *Knauer* "had derived no benefit from the embezzlements." *Knauer,* **348 F.3d at 236**. *In pari delicto* was appropriate in *Knauer* because the equitable balancing favored the defendants. They had not seen {*25} a cent of the diverted funds, and their "involvement in the Ponzi scheme as a whole was quite minor." *Id.* at 237. On the other side of the equation, the Ponzi entities, as a result of the machinations of Payne, "were very much at the forefront of the Ponzi scheme." *Id.* It must also be noted that *Knauer* was decided on the pleadings.

For present purposes, however, the court must acknowledge the limits the Seventh Circuit placed on its reasoning. The Seventh Circuit emphasized that under the facts alleged in *Knauer* "there is no allegation whatsoever that the defendants were directly involved in the embezzlements or benefitted from them." *Id.* "Had the broker dealers been directly involved in the embezzlements, or attained some tangible benefit from them, this would be a different case." *Id.* at 237 n.6.

The case before the court is a different case from the one the Seventh Circuit decided in *Knauer* and, at least on the pleadings, could fit within the situation described in footnote 6. Here the plaintiffs have alleged that Roach (and thus Ernst & Young) were *directly* involved in O'Neal's wrongdoing. Applying the reasoning of {*26} *Scholes* and *Knauer,* the court cannot hold as a matter of law, based on the pleadings alone, that *in pari delicto* applies here. In weighing plaintiffs' culpability, O'Neal's misconduct is imputed to BOH and APAG. O'Neal's removal from BOH and APAG lessens the "sting" of *in pari delicto* to some degree, see *Scholes v. Lehmann,* 56 F.3d at 754, but does not totally exculpate the entity. *See Knauer,* 348 F.3d at 237 (applying *in pari delicto* even where the fraud perpetrator had been removed from the receivership entity).

Accepting plaintiffs' allegations, as the court must at this point, defendants engaged in a course of conduct that went far beyond simply facilitating O'Neal's fraudulent loans. Plaintiffs allege that Roach and Ernst & Young committed several torts in the course of their relationship with BOH and APAG. Plaintiffs also allege that Roach and Ernst & Young acted negligently and fraudulently in not disclosing what they knew of O'Neal's financial and professional history and how these circumstances would affect the accounting treatment of the loans. n3 According to BOH and APAG, defendants also had a duty, as established by {*27} the Statement on Standards for Accounting and Review Services, to report the lack of "management integrity" within the company. Moreover, plaintiffs claim that Roach and Ernst & Young had a duty to blow the whistle on themselves. Plaintiffs' view is that defendants were so compromised by their prior dealings with O'Neal that they committed a tort just by agreeing to provide advisory services.

- - -Footnotes- - -

n3 While knowledge of the O'Neal loans is fairly imputed to BOH and APAG, the court cannot say on this record on a motion to dismiss that Baker himself should be charged with knowledge that the O'Neal loans would not be collectable.

- - -End Footnotes- - -

Also, at least under the allegations of the complaint, Roach and Ernst & Young stood to benefit from their alleged wrongful conduct. Defendants disagree, citing *Knauer* for the proposition that the professional service fees an alleged tortfeasor receives during the course of his fraudulent conduct do not count as a "tangible

benefit" for the purposes of the *in pari delicto* consideration. {*28} That is not a correct reading of *Knauer.* First, the broker-dealers in *Knauer* were alleged to have been the *employers* of Payne and the other Ponzi perpetrators. 348 F.3d at 232. The broker-dealers' alleged duty to supervise originated from their employment of the Ponzi perpetrators, not from any fees they received. Nowhere in the *Knauer* opinion are fees mentioned. Second, in this case the fees and benefits received by Roach and Ernst & Young are alleged to have been obtained directly as *a result* of fraudulent conduct. Ernst & Young secured its auditing engagement through O'Neal. Roach was appointed to the Board of Directors of APAG and was allegedly intended to serve on the Board of the new entity created to facilitate the Massey acquisition. Cplt. PP 29, 31. Plaintiffs have further alleged that O'Neal promised Roach future business opportunities with BOH and APAG. Cplt. P 24. Plaintiffs are entitled to the inference that the benefits O'Neal distributed to Roach and Ernst & Young were the result of defendants' involvement in O'Neal's allegedly fraudulent scheme to enrich himself.

As the Seventh Circuit recognized in *Knauer, "in pari delicto* is an {*29} affirmative defense and generally dependent on the facts, and so often not an appropriate basis for dismissal." *Knauer,* 348 F.3d at 237 n.6 (affirming dismissal, though, based on the facts "thoroughly alleged" in the complaint"). Within the confines of deciding the **Rule 12(b)(6)** motion, the court cannot find as a matter of law that BOH's and APAG's alleged fault in the O'Neal transactions exceeded that of defendants. Unlike the situation in *Knauer,* there are allegations in this case that defendants both were involved in the fraudulent conduct and benefitted from it.

The risk of a liberal application of *in pari delicto* is that tortfeasors preparing to defraud an entity could potentially immunize themselves from liability simply by enlisting the help of an executive in the victim-corporation. That seems to be improbable, as the Seventh Circuit has indicated in a similar situation. See *Ash v. Georgia-Pacific Corp.,* 957 F.2d 432, 436 (7th Cir. 1992) ("Georgia-Pacific's argument implies that anyone who suborns the chief operating officer of a corporation has by virtue of that success purchased immunity from liability to the principal victim. We {*30} cannot believe that Illinois treats successful schemes as self-protecting."). Outside of a fraudulent conveyance scenario, the best case for *not* applying the *in pari delicto* defense is where the insider and the third-party tortfeasor were essentially acting as co-conspirators. That is a fair summary of plaintiffs' allegations here, though it remains to be seen whether

they can be proved. The doctrine of *in pari delicto* does not require dismissal at this stage of the litigation.

3. *Accountancy Act Statute of Limitations*

The Indiana Accountancy Act, **Ind. Code § 25-2.1-1-1, *et seq.*,** imposes a one-year statute of limitations on all claims governed by the Act. The Accountancy Act applies to all actions

> based on negligence or breach of contract brought against an accountant, a partnership of accountants, or an accounting corporation registered, licensed, or practicing in Indiana by an individual or a business entity claiming to have been injured as a result of financial statements or other information examined, compiled, certified, audited, or reported on by the defendant accountant as a result of an agreement to provide professional {*31} accounting services.

**Ind. Code § 25-2.1-15-1.** By its terms, the Act does not apply to Counts VI to IX because these counts allege neither negligence nor breach of contract.

Defendants argue that *Crowe, Chizek, and Co. v. Oil Tech., Inc.,* 771 N.E.2d 1203, 1211 (Ind. App. 2002), and *Shideler v. Dwyer,* 275 Ind. 270, 417 N.E.2d 281, 286 (Ind. 1981), support a more expansive reading of the Accountancy Act's scope. In *Crowe, Chizek* the Indiana Court of Appeals applied the Accountancy Act's statute of limitations to a simple negligence action. In addressing the plaintiff's claim that constructive fraud operated to toll the statute of limitations, the court held that no evidence of constructive fraud had been presented. *Crowe, Chizek,* **771 N.E.2d at 1210.** Contrary to defendants' argument, the bar to the constructive fraud claim in *Crowe, Chizek* was not the Accountancy Act but rather a lack of evidence.

In *Shideler,* the Indiana Supreme Court reaffirmed the general rule that plaintiffs cannot avoid otherwise applicable statutes of limitations by artful pleading. The court held that despite {*32} the plaintiff's pleading of multiple counts, each asserting a different theory of recovery for the same injury, plaintiff's claim was essentially one of legal malpractice. As such, it was subject to the general two-year statute of limitations applicable to personal injuries and property damage. **417 N.E.2d at 286-87.**

The difference between *Shideler,* see Ind. Code § 34-1-2-2, and this case is that the Accountancy Act statute of limitations explicitly limits the causes of actions that it governs. The statute of limitations embedded in the Accountancy Act deliberately uses limited terms to

give special treatment to certain types of claims that otherwise would have been governed by the general two-year limitations period or other more general statutes of limitation. Claims that are not specifically encompassed by the Act - such as plaintiffs' claims of fraud, constructive fraud, breach of fiduciary duty and civil action by crime victim - are governed by the more general rule. They are not within the deliberately narrower scope of the Accountancy Act's statute of limitations. With the Accountancy Act, the Indiana legislature crafted a purposefully {*33} narrow statute of limitations. This court is obliged to respect the Act's limits. n4

> - - -Footnotes- - -
>
> n4 The pending motion does not call on the court to decide which of the more general limitations periods should apply to these claims.

> - - -End Footnotes- - -

Additional analysis is necessary to decide whether the Accountancy Act applies to Counts X and XI, which allege negligence and breach of contract respectively. Defendants argue that the Act applies to these counts because Roach and Ernst & Young were engaged in the "practice of accountancy," as defined in the Act. See **Ind. Code § 25-2.1-1-10.** This phrase, however, is not employed in the one-year statute of limitations section of the Act. Under the statutory language, the relevant inquiry is significantly narrower: whether BOH and APAG are "claiming to have been injured as a result of financial statements or other information examined, compiled, certified, audited, or reported on by the defendant accountant as a result of an agreement to provide professional accounting {*34} services." **Ind. Code § 25-2.1-15-1.** At least some of plaintiffs' allegations, such as defendants' alleged failure to disclose to Baker what they knew about O'Neal's background and his personal financial situation, do not, at least obviously, amount to claims of injury resulting from "financial statements or other information examined, compiled, certified, audited, or reported on by the defendant accountant as a result of an agreement to provide professional accounting services."

The statute specifically distinguishes between activities within the "practice of accountancy" and the narrower range of activities that are covered under the section of the Act dealing with negligence and breach of contract actions. Drawing that line accurately presents a challenge, especially at the pleadings stage. At this point, plaintiffs are entitled to the benefit of a range of favorable inferences and hypotheses. It would not be

prudent at this point to try to map the boundary between the broader "practice of accountancy" and the covered claims for negligence and breach of contract without significantly more factual development. At this stage in the litigation, the court {*35} does not hold as a matter of law that the Accountancy Act's statute of limitations applies to Counts X and XI.

### 4. Objections to Individual Tort Counts

Count IX asserts that BOH and APAG are entitled to recover in tort for various crimes perpetrated upon them by Roach and Ernst & Young. While the court has its doubts about certain of the crimes that plaintiffs have alleged, the allegations of the complaint do present facts that generally conform to the elements of the crimes of fraud and conversion. Defendants' argument that there is no tort liability for aiding and abetting or conspiring to commit a crime is irrelevant because plaintiffs have also alleged that Roach and Ernst & Young actually committed the crimes as principals. Further, *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449, 453 (7th Cir. 1982), does not stand for the proposition that there can be no aiding and abetting liability under tort law, only that no separate tort of "aiding and abetting" is required since an aider and abettor is necessarily liable as a participant in the criminal venture. See *Eastern Trading Co. v. Refco, Inc.* 229 F.3d 617, 623 (7th Cir. 2000). Count IX asserts {*36} a viable theory of recovery.

Count XVII alleges that defendants aided and abetted O'Neal and conspired with him to breach his fiduciary duties. Defendants are correct that no *separate* tort for aiding and abetting the breach of a fiduciary duty has been established by Indiana law, but again this is not determinative. There are very few cases on point in Indiana, but it appears from the cases that do exist that a non-fiduciary can be liable for aiding and abetting another party's breach of its fiduciary duty.

> The law is well established that, when a trustee of an express trust has taken advantage of his fiduciary relationship to cheat and defraud the cestui que trust out of the property held by him in trust, the cestui que trust is not limited to an action for the breach of the trust agreement; he may elect to prosecute an action against the trustee in his individual capacity, in tort, for the damages sustained. *Holderman v. Hood* (1904) 70 Kan. 267, 78 P. 838; *Brys v. Pratt* (1909) 55 Wash. 122, 104 P. 169; *Sherwood v. Saxton* (1876) 63 Mo. 78; *Lathrop v. Bampton* (1866) 31 Cal. 17, 89 Am. Dec. 141. It is also {*37} the law that a third party, who

has aided and abetted the trustee in carrying out the fraudulent scheme, may be joined as defendant in the same action. *Holderman v. Hood, supra.*

*Sharts v. Douglas,* 94 Ind. App. 201, 163 N.E. 109, 111 (Ind. App. 1928) (*en banc*) (affirming verdict against trustee and non-fiduciary who participated in fraudulent scheme). Though the law in other jurisdictions is not uniform, the majority view is that a third-party non-beneficiary can be liable for aiding and abetting the breach of a fiduciary duty, especially where the third party is in privity with the fiduciary or has benefitted from the breach in some way. See Restatement (Second) of Torts § 874 cmt. c (1979) ("A person who knowingly assists a fiduciary in committing a breach of trust is himself guilty of tortious conduct and is subject to liability for the harm thereby caused."); 3 Am. Jur. 2d Torts § 299 (1986) ("A person who intentionally causes or assists an agent to violate a duty to the principal is subject to liability in tort for the harm he has caused to the principal ..."). Accordingly, {*38} dismissal of Count XVII is unwarranted.

The court is not persuaded by defendants' other objections to the common law counts. BOH and APAG have sufficiently pled a breach of fiduciary duty claim. Plaintiffs' negligence and breach of contract claims do not assert claims for negligent misrepresentation, but rather for professional malpractice. Finally, it is unnecessary to decide whether Indiana assigns liability for aiding and abetting negligent acts since plaintiffs have alleged that Roach and Ernst & Young were themselves negligent. Defendants' motion to dismiss Counts VI to XI and XVII is denied.

### C. Counts XII to XVI - Accessory Liability for Fraudulent Transfers Under the Bankruptcy Code and IUFTA

Counts XII and XIII assert fraudulent transfer claims under **sections 548 and 550** of the federal Bankruptcy Code. **11 U.S.C. §§ 548(a), 550**. BOH and APAG concede that Roach and Ernst & Young are not "transferees" within the meaning of the statute. See **11 U.S.C. § 550(a)**; *Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890, 893 (7th Cir. 1988) ("we think the minimum requirement of status as a 'transferee' {*39} is dominion over the money or other asset, the right to put the money to one's own purposes."). BOH and APAG contend, however, that with respect to the O'Neal loans, defendants are "entit[ies] for whose benefit such transfer was made," and that they are therefore subject to liability under the Bankruptcy Code. Plaintiffs' view

is that Roach and Ernst & Young were beneficiaries of the fraudulent loan transfers because they allegedly received fees and promises of future engagements in return for aiding O'Neal.

Plaintiffs' interpretation of who constitutes a beneficiary is too broad. The purpose of the fraudulent transfer provisions of the Bankruptcy Act "is clearly to preserve the assets of the bankrupt; they are not intended to render civilly liable all persons who may have contributed in some way to the dissipation of those assets." *Mack v. Newton*, **737 F.2d 1343, 1358 (5th Cir. 1984)**, quoting *Elliott v. Glushon*, **390 F.2d 514, 516 (9th Cir. 1967)**. Because these provisions are designed to facilitate the recovery of all of the fraudulently transferred property, the contemplated "benefit" of the transfer should be proportionate to the transfer itself. {*40} For instance, the Seventh Circuit's "paradigm 'entity for whose benefit such transfer was made'" is the guarantor of a debt that the transfer extinguished: "someone who receives the benefit but not the money." *Bonded Financial Services*, **838 F.2d at 895**.

The fact that Roach and Ernst & Young might have received a remote benefit as a result of the transfer does not mean that the transfer was made for their benefit. "Someone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a benefit from the initial transfer is within this language." *Id.* at 896. All of the loan transfers at issue here were received by O'Neal and his family. Whatever benefits Roach and Ernst & Young might have obtained after the transfers would have been "incidental, unquantifiable, and remote ... bearing no necessary correspondence to the value of the property transferred or received." *Mack*, **737 F.2d at 1359-60**. n5

- - -Footnotes- - -

n5 In rejecting the characterization of Roach and Ernst & Young as "entit[ies] for whose benefit such transfer was made" the court does not mean to suggest that monies paid as compensation for facilitating a fraudulent transfer - even if that compensation is provided under the guise of fees for legitimate services - will never amount to a "benefit" under **section 550 of the Bankruptcy Code**. Nevertheless, in this case, to the extent that BOH and APAG seek to recover the fees paid to Ernst & Young as a "benefit" of the fraudulent conveyances, these claims would only duplicate Counts I through V, which seek to achieve the same result by characterizing the fees themselves as avoidable preferences and fraudulent conveyances.

- - -End Footnotes- - -
{*41}

BOH and APAG argue that even if the Bankruptcy Code does not impose liability for the fraudulent transfers on Roach and Ernst & Young as accessories, they are still liable under the Indiana Uniform Fraudulent Transfer Act (IUFTA), **Ind. Code § 32-18-2-17**, which is more expansive than the Bankruptcy Code. Essentially adopting the argument of the plaintiffs in *Freeman v. First Union Nat'l*, **329 F.3d 1231, 1233-34 (11th Cir. 2003)**, BOH and APAG contend that the "catch-all" provision in IUFTA grants the court broad equitable powers to provide for a right of recovery against an aider and abettor of a fraudulent transfer. n6 The Eleventh Circuit certified this question to the Florida Supreme Court, which recently joined the multitude of other courts in holding that there is no accessory liability for fraudulent transfers under the Uniform Fraudulent Transfer Act. n7    So.2d  , **865 So. 2d 1272, 2004 Fla. LEXIS 106 2004 WL 178598 (Fla. Jan 29, 2004)**; accord, *Wortley v. Camplin*, **2001 U.S. Dist. LEXIS 20441, 2001 WL 1568368, *9 (D. Me. 2001)**; *FDIC v. White*, **1998 U.S. Dist. LEXIS 3020, 1998 WL 120298, *2 (N.D. Tex. March 5, 1998)**; *Litchfield Asset Mgmt. Corp. v. Howell*, **70 Conn. App. 133, 799 A.2d 298, 309 (Conn. App. 2002)**. {*42}

- - -Footnotes- - -

n6 **Section 17(a)(3)(C)** provides that in an action for relief from a fraudulent transfer, a creditor may obtain, subject to applicable principles of equity and rules of civil procedure, "any other relief the circumstances require."

n7 Florida, like Indiana, has adopted the Uniform Fraudulent Transfer Act. The statute examined in *Freeman* is identical to the IUFTA in all relevant respects.

- - -End Footnotes- - -

The court agrees with the results these other courts have reached. At most, IUFTA's "catch-all" provision gives a court flexibility to fashion remedies not explicitly provided for in the statute. The provision does not permit the court to assign liability where the Act did not, or to create out of whole cloth "substantive rights of action with accompanying

damages which are not otherwise implied or stated in the statute." *FDIC v. White,* **1998 U.S. Dist. LEXIS 3020, 1998 WL 120298 at \*2**. Accessory liability for fraudulent transfers cannot be supported by either the Bankruptcy Code or the IUFTA. Accordingly, Counts XII through XVI {\*43} are dismissed.

*Conclusion*

Plaintiffs' motion for leave to amend the complaint is granted and the tendered Fourth Amended Complaint shall be deemed filed today. Defendants' motion to dismiss, as applied to the Fourth Amended Complaint, is denied with respect to Counts VI to XI and XVII, and granted with respect to Counts XII through XVI. Defendants shall respond to the remaining counts of the Fourth Amended Complaint no later than April 30, 2004.

So ordered.

Date: March 24, 2004

DAVID F. HAMILTON, JUDGE

United States District Court

Southern District of Indiana

**TAB 2**

(C) 2006 West Group
(Cite as: 2005 WL 975856 (N.J.Super.L.))

Page 6

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of New Jersey, Law Division.

**Dr. Enrico BONDI, as Extraordinary Commissioner
of Parmalat Finanziaria, S.P.A,
Parmalat S.P.A., and Other Affiliated Entities in
Extraordinary Administration,
Plaintiff,
v.
CITIGROUP, INC., Citibank, N.A.. Vialattea LLC,
Buconero LLC, and Eureka PLC,
Defendants,
No. BER-L-10902-04.**

Feb. 28, 2005.

Michael R. Cole, Jeffrey D. Smith, and Gregory J.
Bevelock, (DeCotiis, Fitzpatrick, Cole & Wisler, LLP,
attorneys) argued the cause for plaintiff.

John B. Quinn, Michael B. Carlinsky, and Marc L.
Greenwald, (Quinn Emanuel Urqhart Oliver & Hedges
LLP, attorneys) argued the cause for plaintiff.

Herbert J. Stern, and Jeffrey Speiser, (Stern & Kilcullen,
attorneys) argued the cause for defendants.

George A. Schieren, Mark A. Kirsch, Mark Holland, and
Jeff E. Butler, (Clifford Chance U.S. LLP, attorneys)
argued the cause for defendants.

I. INTRODUCTION

HARRIS, J.

*1 Defendants have applied to the court for an order
dismissing the complaint on several grounds ranging from
want of jurisdiction, to forum non conveniens, to failure
to state a claim upon which relief may be granted. Before
addressing the contentions of the parties, a little
background information is necessary in order to place this
litigation in its appropriate global context. This gram of
history now may ultimately be worth a kilo of analysis
later.

Parmalat Finanziaria S.p.A., Parmalat S.p.A., and
several of their affiliates and subsidiaries (Parmalat), all
foreign corporations, are currently undergoing
reorganization in Parma, Italy under the auspices of an
Extraordinary Administration managed by plaintiff Dr.
Enrico Bondi (Bondi), the Extraordinary Commissioner
appointed for that purpose by the Italian government.

Having styled itself as the Coca-Cola of milk, [FN1]
Parmalat has today lost much of its fizz.

FN1. This tagline is attributed to several high ranking
managers affiliated with Parmalat, including its founder
Calisto Tanzi, (http://
www.coandshare.com/issue2/parma.php (last visited on
February 25, 2005)); Domenico Barili, the company's
former director general http:// notizie.parma
.it/page.asp?IDCategoria=127 & IDSezione=1083 &
ID=32180 (last visited on February 25, 2005)); and Eric
Dailey, president of Parmalat Atlanta Dairies
(http://atlanta.bizj
ournals.com/atlanta/stories/1997/01/27/story8.html (last
visited on February 25, 2005)). At least one wag has
referred to Parmalat as the "Coca-Cola of milk (sort of)"
(http://www.alibi.com/editor ial/section_
display.php?di=2005-01-06 & scn=food (last visited on
February 25, 2005).

Largely due to the entrepreneurial efforts of Calisto
Tanzi, Parmalat grew from modest origins as a small
family business in the 1960s in a ham-producing region
about Parma, Italy, to become a worldwide force in
consumer food products by the 21 st Century. Starting
out with a small pasteurization plant, Tanzi capitalized
upon the use of ultra-high temperature pasteurization and
aggressive marketing tactics--plastering the brand on
sports figures--to become one of the world's biggest and
best-known producers of long-life milk and dairy
products.

Although the tale is still unfolding in the courts of Italy
and is soon to be told here in the United States, Parmalat's
financial woes apparently were not due to ordinary market
forces and competition. Rather, criminality, venality, and
greed are said to have driven managers of Parmalat to
concoct a Ponzi-like scheme that misrepresented the
economic health of the company allowing insiders to
obtain personally--some say steal--millions (maybe
billions) of corporate euros. With its accounting
operations and financial statements not quite as
wholesome as milk and honey, Parmalat was declared
bankrupt shortly after Christmas 2003, and criminal
investigations gathered speed. Through perhaps
uninquisitive accountants and enabling bankers held
together, as alleged by Bondi, by a web of reciprocal
favors, the soured Coca-Cola of milk found itself with a
hole in its balance sheet that exceeded 3.9 billion. Assets
were discovered to be contrived falsifications, created by
Parmalat managers who are alleged to have connived with
defendants to pass off as authentic their obscure financial
statements demonstrating putative solvency upon an
unsuspecting financial community.

In a stunningly swift fashion, even as Parmalat's

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2006 West Group
(Cite as: 2005 WL 975856 (N.J.Super.L.))

managers were being interrogated by Italian authorities
and some were temporarily imprisoned on charges of
committing financial crimes, Bondi grabbed the reins of
command of the company in Italy. He immediately
commenced a multi-faceted strategy to restore Parmalat to
economic health and recover damages incurred by the
Parmalat corporate entities. One module of Bondi's
approach has been to use several American courts and
their litigational processes to pry damages from putative
wrongdoers. [FN2] In the instant action, he seeks
compensatory and punitive damages primarily from
Citigroup, Inc (Citigroup), for conduct that Bondi claims
fed its company pockets with windfall fees and profits
while at the same time enabling Parmalat to fob off its
financial phantasmagoria to the world and end up as
Europe's Enron. [FN3]

FN2. The record indicates that Bondi has filed actions
in Illinois, New York, and North Carolina against an array
of parties who he claims contributed to the downfall of
Parmalat.

FN3. Also in the competition for this moniker are
Netherlands' Royal Ahold, France's Credit Lyonnais and
Vivendi Universal, and Germany's KirchMedia.

*2 Distilled to its essence, Bondi alleges that through
craftily intricate accounting artifices, defendants were
able to maintain the facade that Parmalat was fiscally
alive and well for almost a decade after it expired. His
assertions call to mind the necrotic hijinks depicted in the
1989 movie, Weekend at Bernie's, where the young leads
try to convince everyone that their murdered boss Bernie
is still alive for the weekend so they can have a splendid
time. In like vein, Bondi proclaims that the real life
machinations of defendants were designed for the purpose
of enabling them to continue beyond all reason to profit
from Parmalat's spurious existence.

II. BACKGROUND

The Parties

On December 24, 2003, following the fast-track
adoption of the so-called Marzano Decree [FN4] by the
Italian cabinet to enable the matter to proceed, plaintiff
Bondi was named the Extraordinary Commissioner to
oversee the restructuring of Parmalat pursuant to
insolvency proceedings in an Italian court convened in
Parma. [FN5]

FN4. Decree law No. 347 of 23 December 2003--a
decree law is a sort of bill laid down by the Council of
Ministers that must be approved by the Parliament within
60 days--aims to supplement rules on Extraordinary
Administration of Large Corporations in Distress; the
updated version is embodied in Legislative Decree No.

270 of 5 July 1999. The decree is named after Antonio
Marzano, Minister for Productive Activities.

FN5. See http://cp22.etdotcom.it/en/ (last visited on
February 21, 2005).

Parmalat S.p.A. is part of a group of companies that had
operations in over 30 countries throughout the world.
Parmalat Finanziaria S.p.A. was a public company traded
on the Milan stock exchange. At one time generating
more than 7 billion in annual revenue, Parmalat-related
entities employed over 36,000 workers in plants located
on six continents. In addition to its nameplate milk
products that can be stored at room temperature for
months, Parmalat's 40-some brand product line includes
yogurt, cheese, butter, cakes and cookies, breads, pizza,
snack foods, vegetable sauces, soups, and juices.

Parmalat built a strong brand name in its main markets,
produced high quality products, had an extensive
distribution network, and was strong in its advertising
programs. It was Italy's 8th-largest business. With its
Archway, Mother's, and Salerno brands, Parmalat was the
number three cookie maker in the United States, behind
Kraft Foods, Nabisco, and Kellogg's Keebler. In Canada,
the Company controlled 25% of the fluid milk market and
baked cookies under the Colonial brand. As part of its
aggressive marketing strategy, Parmalat had sports
interests, owning the AC Parma football team and the
Palmeiras in Brazil.

Parmalat is linked with subsidiaries and affiliates
worldwide, including Farmland Dairies, LLC ("Farmland
Dairies"), a New Jersey corporation headquartered in
Wallington, New Jersey. Farmland Dairies is not a party
to this action and, in fact, is the subject of voluntary
bankruptcy proceedings in the United States Bankruptcy
Court for the Southern District of New York. [FN6]

FN6. After Parmalat commenced its plenary insolvency
proceeding in Italy on Christmas Eve 2003, its United
States affiliates, Parmalat USA Corp, Farmland, and Milk
Products of Alabama, LLC commenced a plenary case
pursuant to 11 U.S.C.A. 301 (In re Parmalat USA Corp, et
al, 04- 11139(RDD) (Bankr SDNY 2004) on February 25,
2004. Additionally, foreign representatives of certain
Cayman Island affiliates (Parmalat Capital Finance Ltd.,
Dairy Holdings Ltd., and Food Holdings Ltd) commenced
a proceeding under 11 U.S.C.A. 304 in the same court (In
re Petition of Gordon I Macrae and James Cleaver as Joint
Provisional Liquidators of Parmalat Capital Finance
Limited, et al, Case No 04-10362(RDD) (Bankr SDNY
2004)), which is ancillary to a plenary case pending in the
Cayman Islands. Insolvency proceedings involving other
Parmalat affiliates have been pending in other countries
including Brazil, Hungary, and Ireland.

Defendant Citigroup is a Delaware-incorporated financial services company [FN7] with a principal place of business in New York. It operates defendant Citibank, N.A. (Citibank) as a national banking institution with a presence in over 100 countries worldwide. Buconero LLC (Buconero) and Vialattea LLC (Vialattea) are Delaware limited liability companies that operate through Citigroup's offices in New York.

FN7. Under the Citigroup umbrella are 300,000 employees that manage 200 million customer accounts across six continents in more than 100 countries.

*3 Eureka Securitisation plc (Eureka) is a public limited company organized under the laws of England and Wales, with its principal place of business in London. In cooperation with the London Branch of Citibank, Eureka operates as a vehicle for the securitization of trade receivables and other financial assets from a wide variety of companies in Europe and other parts of the world. Eureka claims to be an independent company, owned by RP Funding Limited (RP Funding) and not owned by Citibank or any Citibank employee. Eureka is funded, in part, by its subsidiary Eureka Securitization, Inc. (Eureka Inc.), a Delaware corporation. Eureka Inc. sells commercial paper through brokers based in New York to large institutional investors. Eureka Inc. claims that it has never defaulted on any of the commercial paper it has issued. Eureka entered into agreements to purchase receivables from various subsidiaries and affiliates of Parmalat in Italy and in North America, either directly or through Eureka's subsidiary Archimede Securitisation S.r.L. (Archimede).

Parmalat's Collapse

Although it is yet to be learned when exactly Parmalat's cream began to curdle, Bondi claims the firm has been insolvent since 1994. Investigating judges supervising the interrogation of Parmalat managers are still at work. One possible explanation is the collapse of Latin American economies and exchange rates during the 1990s, an area where the company was heavily exposed; another is the threatened bankruptcy of a family travel company, Parmatour, run by one of Tanzi's daughters. The Latin American and Parmatour debacles threatened to sully the Tanzi family's good name, and desperate measures became the order of the day.

Whatever the motivation, it is alleged that Tanzi ordered the creation of a bafflingly complex labyrinth of hundreds of affiliate companies, which would appear to be holding billions of euros in credits from other Parmalat markets. Parmalat vigorously engaged in debt financing while at the same time anomalously purporting to maintain large

cash balances among its diverse corporate family tree. These borrowings were justified by allegedly inflating Parmalat's revenues through fictitious sales to retailers. Other debt may have been moved off the company's consolidated financial statements using Caribbean-based affiliates located in offshore havens. This concoction constituted a recipe for catastrophe.

One of these offshore affiliates, Bonlat Financing (Bonlat), was located in the Cayman Islands. The jewel in Parmalat's offshore crown was a purported Bonlat account in a branch of Bank of America, which was said to contain 3.95 billion. As it turned out, the evidence to confirm the existence of this fund was probably a forgery compiled using office equipment. In order to keep the fiction of the firm's prosperity alive, a scanner was utilized to make imitation Bank of America notepaper, then cut and pasted company stamps and signatures were appended to it, and finally the forgery was photocopied and faxed several times to make it look authentic.

*4 In December 2003, Parmalat had need of 150 million to redeem an issue of bonds. It apparently was advised to use some of the mountains of cash residing in the Cayman Islands, but the Bank of America announced that the account did not exist. Whereupon the whole edifice came reeling down. When all is said and done, Parmalat may owe creditors over 14 billion.

Receivables Securitization Programs

Eureka's relationship with Parmalat began in 1995, when its subsidiary Archimede entered into an "Agreement for the Purchase of Receivables" with two affiliates of Parmalat, Parmalat S.p.A. and Giglio S.p.A. (1995 Agreement). This agreement provided for the purchase of receivables generated by Parmalat in Italy. The 1995 Agreement contained a forum selection clause, providing the courts of Milan, Italy with exclusive jurisdiction over any action "arising out of or relating to this Agreement."

Over time, Eureka's relationship with Parmalat was expanded through the execution of three new agreements for the purchase of receivables. First, the 1995 Agreement was replaced on March 16, 2000, with a new receivables purchase agreement among Archimede, Citibank, and Parmalat that governed receivables generated by a number of Parmalat subsidiaries in Italy (Italian RPA). The Italian RPA contained a forum selection clause, providing the courts of London, England with exclusive jurisdiction over any action brought by Parmalat "arising out of or relating to this Agreement." Second, on March 31, 2000, Eureka and Citibank entered into a receivables purchase agreement with Parmalat Dairy and Bakery, Inc. and Parmalat Food, Inc. relating to receivables generated in Canada (Canadian RPA). The Canadian RPA contained

(C) 2006 West Group
(Cite as: 2005 WL 975856 (N.J.Super.L.))

a forum selection clause, providing the courts of the province of Ontario, Canada with exclusive jurisdiction over any action brought by the sellers "arising out of or relating to this Agreement." Third, on November 2, 2000, Eureka and Citibank entered into a receivables purchase agreement with Farmland and Milk Products of Alabama, LLC relating to receivables generated in the United States (Farmland RPA). The Farmland RPA contained a forum selection clause, conferring upon the courts of the State of New York exclusive jurisdiction over any action brought by the sellers "arising out of or relating to this Agreement." The Farmland RPA was amended on December 19, 2001 to provide for the participation in the agreement by two additional Parmalat subsidiaries in the United States, Mothers Cake & Cookies Co. and Archway Cookies, LLC.

Bondi alleges that Parmalat's operating subsidiaries in Italy, Canada, and the United States assigned receivables associated with the sale of dairy products to Eureka, which paid for the receivables using cash raised from investors. These arrangements may have operated like traditional factoring relationships, with Eureka and Archimede providing cash to Parmalat's subsidiaries on a discounted basis in exchange for the right to collect the full amount of their receivables in the future.

*5 Bondi contends that Parmalat insiders were able to manipulate the securitization arrangement in Italy in order to assign non-existent receivables to Archimede. This was possible because of a system of wholesale dealers, or concessionaires, in Italy that resulted in the creation of duplicate invoices for sales of milk to Italian retailers. Parmalat's subsidiaries were able to issue invoices not only to their distributors for the sale, but also to the supermarket for the same transaction. The companies issued duplicate invoices and used the fictitious revenues as collateral for bank credits. Debts were shunted into offshore, off-the-books companies. The complaint alleges that as a result, by selling these fictitious receivables, Parmalat was able to inflate its reported cash flow and give the appearance of reducing debt.

Geslat Transactions

Beginning in 1995, Citigroup entered into a corporate financing transaction with Parmalat involving a Parmalat subsidiary called Gestione Centrale Latte (Geslat) and defendants Buconero and Vialattea. Under this transaction, Citigroup contributed funds to Geslat through a participation agreement. Geslat, in turn, used those funds to make loans to other companies in the Parmalat group. Buconero and Vialattea made additional contributions to Geslat for the same purpose.

Bondi contends that these contributions operated as

loans because Citigroup was virtually guaranteed a stated return on its investment. Parmalat, however, accounted for these contributions as equity investments in Geslat. According to Bondi, Parmalat--allegedly with Citigroup's full knowledge--mischaracterized the Geslat transaction in its financial reports and, as a result, understated its debt and interest expenses and overstated its shareholder equity. Additionally, it is alleged that Citigroup was paid handsome fees and commissions for providing the funding to Parmalat through its affiliates.

Parmalat Canada

In 1997 and 1998, Parmalat expanded its operations in North America by acquiring three Canadian food companies and operating them under the name Parmalat Canada. Citigroup provided financing for these acquisitions and allegedly purchased an equity stake in Parmalat Canada. It also may have been paid a retainer to advise Parmalat in the acquisition. In 2002, pursuant to a pre-existing put agreement, Citigroup sold its interest in Parmalat Canada back to Parmalat for a significant profit.

According to Bondi, the transactions were a sham because Citigroup's investment was actually a disguised loan and the put agreement was a secret. By this sleight of hand, Bondi contends that Parmalat was able to maintain the overall pretense of a lower debt-to-equity ratio.

Gian Paolo Zini

The complaint asserts claims relating to a series of bank transactions involving escrow and other accounts maintained by Parmalat's former outside counsel, Gian Paolo Zini (Zini), at Citibank. Bondi asserts that hundreds of millions of dollars were channeled through Zini's accounts and that key parts of the fraud at Parmalat were accomplished using these accounts.

*6 Separately, Bondi makes allegations relating to bank transactions between Zini and two Parmalat subsidiaries, Parmalat Capital Finance Ltd. and Parmalat Trading Limited Malta. Bondi alleges that $27 million was transferred from these two entities to Zini over the course of two years. Bondi also asserts that Zini's accounts were used to funnel funds for Tanzi-family purposes. Based upon the size and nature of these transfers, Bondi alleges that Citibank knew or should have known that Zini's accounts were being used for money-laundering and other irregular transactions.

III. MOTION TO DISMISS FOR LACK OF IN PERSONAM JURISDICTION
Eureka asserts that it is wholly inappropriate for a New Jersey court to dispose of the dispute that now festers between it and Bondi. Eureka neither resides in New

(C) 2006 West Group
(Cite as: 2005 WL 975856 (N.J.Super.L.))

Jersey nor regularly conducts business activities here. It is not authorized to do business in this state; it has no employees present here; it neither advertises nor solicits business in New Jersey; it does not own, lease, or manage any real property in New Jersey; it pays no taxes to the state; it does not maintain an office, bank account, or brokerage account in New Jersey; and it does not maintain a agent for the service of process within New Jersey's borders. Accordingly, it says that it lacks the minimum contacts necessary to a support a finding that it would be fair to hale it into court in Hackensack.

Bondi claims otherwise. He argues that Eureka's receivables securitization program with Farmland demonstrates Eureka's presence in the state. He furthermore insists that although he presently has no evidence of accounting shenanigans arising from Farmland activities, the Farmland program was but a cog in an enormous fraudulent scheme to make Parmalat's financial situation appear sound. If nothing else, Farmland's authentic factoring activities may have masked the underhanded double counting of receivables that emanated from Italy. Accordingly, Bondi says that Eureka's Farmland activities are inextricably linked to a pattern of deceit and fraud on a planetary scale that contributed to the economic injuries incurred by Bondi's Parmalat charges. Moreover, Bondi says that because Parmalat's bonds--fortified by the Eureka financing facility--were peddled to unnamed New Jersey investors, Eureka has the minimum contacts necessary to defeat its motion to dismiss.

A New Jersey court may exercise personal jurisdiction over a non-resident defendant to the "outermost limits permitted by the United States Constitution." Avdel Corp. v. Mecure, 58 N.J. 264, 268 (1971); R. 4:4- 4(b)(1). In assessing the reasonableness of subjecting a non-resident defendant to personal jurisdiction, I look to whether there have been minimum contacts with the forum state that are consistent with due process. See Matsumoto v. Matsumoto, 335 N.J.Super. 174, 182 (App.Div.2000); See also, International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945).

*7 There are two types of personal jurisdiction: specific and general. See Accura Zeisel Machinery Corp. v. Timco, Inc., 305 N.J.Super. 559, 565 (App.Div.1997); Giangola v. Walt Disney World Co., 753 F.Supp. 148, 154 (D.N.J.1990). Specific jurisdiction is established when a defendant's acts within the forum-state give rise to the cause of action. Accura Zeisel Machinery Corp. v. Timco, Inc., supra, 305 N.J.Super. at 565; Waste Management, Inc. v. Admiral Ins. Co., 138 N.J. 106, 119 (1994); Lebel v. Everglades Marina, Inc., 115 N.J. 317, 322 (1989). In contrast, when the defendant's presence in the state is unrelated to the subject matter of the lawsuit,

general jurisdiction may be obtained based on the defendant's "continuous and substantial" contacts with the forum. Accura Zeisel Machinery Corp. v. Timco, Inc., supra, 305 N.J.Super. at 565; Waste Management, Inc. v. Admiral Ins. Co., supra, 138 N.J. at 119; Lebel v. Everglades Marina, Inc., supra, 115 N.J. at 322.

The minimum contacts analysis consists of two parts. First, a court must determine whether minimum contacts exist at all. Waste Management, Inc. v. Admiral Ins. Co., supra, 138 N.J. at 122. Second, a court must decide, "whether those minimum contacts establish jurisdiction consistent with considerations of fair play and substantial justice." Id. at 121; International Shoe, supra, 326 U.S. at 316, 66 S.Ct. at 158, 90 L.Ed. at 102. Essentially, it must be determined whether the defendant has purposely availed itself of jurisdiction in the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-75, 105 S.Ct. 2174, 2183, 85 L.Ed 2d 528, 542 (1985); Severinsen v. Widener University, 338 N.J.Super. 42, 48 (App.Div.2001).

" 'The quality and nature of the [defendant's] activity in relation to the fair and orderly administration of the laws' must be examined on a case-by-case basis to determine if the minimum contacts standard is satisfied." Charles Gendler & Co. v. Telecom Equip. Corp., 102 N.J. 460, 470 (1986) (quoting International Shoe Co. v. Washington, supra, 326 U.S. at 319, 66 S.Ct. at 159-60, 90 L.Ed. at 103-04). Therefore, even where there are "continuous and systematic" contacts, general jurisdiction may be denied if subjecting the defendant to suit in the forum state does not comply with fair play and substantial justice. Waste Management, Inc. v. Admiral Ins. Co., supra, 138 N.J. at 120; Maro v. Potash, 220 N.J.Super. 90, 98 (Law Div.1987).

While the controlling principles can be articulated with disarming ease, the difficulty is in their application to concrete disputes. Creative Business Decisions, Inc. v. Magnum Communications, Ltd., 267 N.J.Super. 560, 567 (App.Div.1993). Making that job easier is the principle that at this early stage of analysis, Bondi needs only to make a prima facie demonstration of personal jurisdiction. Jacobs v. Walt Disney World, Co., 309 N.J.Super. 443, 454 (App.Div.1998). On the other hand, when a defendant asserts lack of personal jurisdiction, "the plaintiff bears the burden of demonstrating that the defendant's contacts with the forum state are sufficient to confer personal jurisdiction on the court." Ibid. The plaintiff must establish defendant's contacts with the jurisdiction through the use of "sworn affidavits, certifications, or testimony." Catalano v. Lease & Rental Management Corp., 252 N.J.Super. 545, 547-48, (Law Div.1991) (citing Stranahan Gear Co. v. N.L. Indus., Inc., 800 F.2d 53 (3d Cir.1986); Nelson by Carson v. Park Indus. Inc.,

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2006 West Group
(Cite as: 2005 WL 975856 (N.J.Super.L.))

717 F.2d 1120 (7th Cir.1983), cert. denied, 465 U.S. 1024, 104 S.Ct. 1277, 79 L.Ed.2d 682 (1984); American Telephone & Telegraph Co. v. MCI Communications Corp., 736 F.Supp. 1294 (D.N.J.1990)).

  *8 I conclude, based upon the pleadings and the certifications submitted by Eureka, that minimum contacts exist to warrant the exercise of personal jurisdiction over it. Although it remains to be seen what the extent of Eureka's Farmland activities played in the bigger picture of Parmalat's collapse and injuries, it is quite apparent that Eureka was no stranger to the tangled matrix of intra-corporate interconnections being maintained by Parmalat managers with the tacit encouragement of Eureka operatives. For instance, it is unlikely that its subsidiary Archimede's activities were wholly unconnected with other of Eureka financing facilities to render a fair conclusion that Farmland's factoring was merely an attenuated appendage to the financial schemata. This is not to say that Bondi has authoritatively demonstrated alter ego status between Archimede and Eureka, or even that Eureka was a willing participant in the perpetuation of Parmalat's opaque appearance to the world. However, the linkage between all of the financing endeavors on behalf of Parmalat's affiliates and subsidiaries cannot be gainsaid on this record, leaving Eureka subject to having this dispute resolved here.

  As a backup argument if general jurisdiction were found, Eureka claims that it bargained for a different forum to resolve disputes, thereby strengthening its claim of lack of jurisdiction and providing an escape hatch to across the Hudson River. In this regard, it relies upon the forum selection clause in the Farmland RPA conferring upon the courts of the State of New York exclusive jurisdiction over any action brought by the sellers "arising out of or relating to this Agreement." Of course, Bondi is neither a "seller" nor otherwise even an indirect party to the Farmland RPA.

  As a general rule, a forum selection clause is enforceable unless it is the result of "fraud, undue influence, or overweening bargaining power," is "unreasonable," or violates a "strong public policy." M/S Bremen v. Zapata Off Shore Co., 407 U.S. 1, 10-15, 92 S.Ct. 1907, 1913-16, 32 L.Ed.2d 513, 520- 23 (1972); Paradise Enterprises Ltd. v. Sapir, 356 N.J.Super. 96 (App.Div.2002), certif. denied, 175 N.J. 549, 816 (2003). In Caspi v. Microsoft Network, the court quoted with approval the trial court's observation that generally such agreements "are prima facie valid and enforceable in New Jersey[,]" and that:
      New Jersey courts will decline to enforce a clause only if it fits into one of three exceptions to the general rule: (1) the clause is a result of fraud or "overweening" bargaining power; (2)

enforcement would violate the strong public policy of New Jersey; or (3) enforcement would seriously inconvenience trial. Wilfred MacDonald, Inc. v. Cushman, Inc., 256 N.J.Super. 58 (App.Div.), certif. denied, 130 N.J. 17 (1992). The burden falls on the party objecting to enforcement to show that the clause in question fits within one of these exceptions.
  *9 Caspi v. Microsoft Network, 323 N.J.Super. 118, 122 (App.Div.), certif. denied, 162 N.J. 199 (1999).

  The New Jersey Supreme Court has stated that Bremen "represents the prevailing view on the enforceability forum-selection clauses," and "has been applied by federal and state courts confronted by jurisdictional choices involving forum-selection clauses." Kubis & Perszyk Assoc., Inc. v. Sun Microsystems, Inc., 146 N.J. 176, 188 (1996). General acceptance of the validity of forum selection agreements is corroborated by the Restatement (Second) of Conflict of Laws § 80 (1988 rev.):
      The parties' agreement as to the place of the action will be given effect unless it is unfair or unreasonable.
  See also Kubis & Perszyk Assoc., Inc. v. Sun Microsystems, Inc., supra, 146 N.J. at 195 (holding that forum selection clauses in franchise agreements were invalid because they violated public policy); Hendry v. Hendry, 339 N.J.Super. 326, 334-36 (App.Div.2001) (enforcing New Jersey forum selection embodied in divorce settlement agreement even though both parties no longer resided in New Jersey); Copelco Capital, Inc. v. Shapiro, 331 N.J.Super. 1 (App.Div.2000) (finding forum selection was unenforceable because clause did not give proper notice; Caspi v. Microsoft Network, supra, 323 N.J.Super. at 124 (enforcing forum selection clause where there was no evidence of fraud, overweening bargaining power, violation of public policy or trial inconvenience); McNeill v. Zoref, 297 N.J.Super. 213, 222-24 (App.Div.1997) (declining to enforce forum selection clause because enforcement would be contrary to entire controversy doctrine); Param Petroleum Corp. v. Commerce and Indus. Ins. Co., 296 N.J.Super. 164, 170-72 (App.Div.1997) (finding clause was unenforceable in insurance policy because it was contrary to public policy requiring all foreign insurance companies to submit to jurisdiction in New Jersey).

  In this action, Bondi does not argue that the forum selection clause is invalid. Rather, he simply asserts that it is irrelevant because, among other reasons, none of the companies under his stewardship were signatories and therefore he cannot be bound to its terms. This argument raises the ugly specter that Bondi is seeking to have his cake and eat it too; he seeks to jettison the forum selection

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2006 West Group
Page 12
(Cite as: 2005 WL 975856 (N.J.Super.L.))

provision of the Farmland RPA that does not suit his purposes, while at the same time he seeks remedies (and maintenance of personal jurisdiction) as a result of supposed injuries caused by the same agreement. Eureka vigorously points out the apparent hypocrisy in Bondi's argument in urging the court to dismiss all of Bondi's claims and send him packing to the bargained-for forum in the State of New York.

However, Bondi's arguments do not, in fact, create an Emersonian contradiction of hobgoblinian proportions. There is nothing logically inconsistent about arguing on the one hand that Parmalat suffered tortious economic injuries as a result of monumental fraud--a portion of which was allegedly facilitated by the Farmland RPA-- while at the same time maintaining that there was no privity between the companies Bondi is now responsible for and Eureka over where the inevitable business tort claims might be resolved. The facile elegance of Eureka's argument insisting upon a monolithic consistency of approach is belied by the realities of the commercial world that allows contractual relationships and separate potential tort victims to be created from the same instrument. Those realities are further demonstrated by the phenomenon that is pitting Bondi and Farmland as adversaries in ongoing litigation elsewhere. I decline to find that the Farmland RPA forum selection clause requires dismissal of Bondi's claims against Eureka. His rights to pursue tort remedies are not circumscribed by the four corners of the Farmland RPA.

*10 As a last ditch argument, Bondi claims that the forum selection clause is permissive in nature and not mandatory because of its use of the word "may" in the passage. As for this last argument, I reject it as being clearly contrary to the expressed intention of the parties. My function in construing this forum selection agreement, as with any other contract, is to search broadly for the probable common intent of the parties in an effort to find a reasonable meaning in keeping with the express general purposes of the clause. In this pursuit, I cannot emphasize too strongly that when an agreement is clear and unambiguous the court is bound to enforce it as it is written. It is not the function of the court to make a better contract for the parties than they themselves have seen fit to enter into or to alter it for the benefit of one party and to the detriment of the other.

## IV. MOTION TO DISMISS FOR FORUM NON CONVENIENS

All defendants seek to dismiss the Complaint because they insist that New Jersey is not an appropriate forum within which to resolve the instant disputes. They contend that New Jersey has no legitimate role to play in the outcome of the parties' contest, that plaintiff is an Italian citizen suing on behalf of Italian entities, that none of the events giving rise to potential liability occurred in New Jersey, and that none of the witnesses and evidence are located in New Jersey. Accordingly, they urge the court to dismiss the action--perhaps permitting plaintiff to commence a new action elsewhere--based upon the doctrine of forum non conveniens.

Plaintiff disputes defendants' analysis of the situation and reminds the court that his choice of forum is entitled to some deference that may not easily be dislodged. In fact, according to plaintiff, unless I am prepared to find that New Jersey is demonstrably inappropriate for purposes of disposing of this dispute, the matter may remain here. Plaintiff notes that the Farmland connection to the overall collapse of Parmalat creates local interest and concern, that New Jersey stakeholders may have been affected by Parmalat's malfeasance; that the collection of evidence in New Jersey will not create hardships to any of the parties, and that Citigroup has strong ties to New Jersey. Thus, plaintiff argues, it can not be confidently said that a New Jersey court will impose real hardship on defendants or that litigating here will result in undue harassment and vexation to them or to the legal system.

We have in this nation a deep-rooted historic tradition that everyone should have his own day in court. New Jersey courts subscribe to this salutary open door policy. In matters of standing, requisites of pleading, and determination of conveniences, our jurisprudence adheres to a generous and indulgent standard. Our courts should function neither as magnets for litigation, nor as advocates for increased litigious conduct; nevertheless, it is this state's public policy that its publicly funded system of dispute resolution--the judiciary created by the Judicial Article of the 1947 Constitution, Art. VI--will be available for all appropriate controversies. I hold that the instant dispute is appropriate for this court.

*11 It is obvious that a cause of action involving citizens of different countries, events occurring in different countries, and evidence and witnesses located in different countries is necessarily affected by convenience considerations. I am, however, guided by well-settled principles. Most noteworthy is that the plaintiff's choice of forum will ordinarily not be disturbed except upon a showing that it is demonstrably inappropriate. Civic Southern Factors Corp. v. Bonat, 65 N.J. 329, 332-333 (1974); Am. Home Products Corp. v. Adriatic Ins., 286 N.J.Super. 24, 35 (App.Div.1995). Application of that standard requires a consideration of both private interest and public interest factors. Private interest factors include accessibility to sources of proof, the availability of compulsory process, whether there are premises to be viewed, and the practical concerns making a case susceptible to effective trial, including the enforceability of the ultimate judgment. The public interest factors

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2006 West Group
Page 13
(Cite as: 2005 WL 975856 (N.J.Super.L.))

address the burden imposed on the chosen forum as balanced against the forum's interest in the matter. See D'Agostino v. Johnson & Johnson, Inc., 225 N.J.Super. 250, 262-263 (App.Div.1988), aff'd, 115 N.J. 491 (1989); Mowrey v. Duriron Co., 260 N.J.Super. 402, 409-410 (App.Div.1992); Westinghouse v. Liberty Mut. Ins., 233 N.J.Super. 463, 469- 470 (App.Div.1989). Ultimately, the question is just whether plaintiff's choice of forum imposes a real hardship on defendants or results in undue harassment and vexation to them or to the legal system. See, e.g., Creative Business v. Magnum, 267 N.J.Super. 560, 572 (App.Div.1993).

I conclude that there is nothing observably inappropriate about plaintiff's choice of forum. Citigroup has a significant operational presence in New Jersey. Plaintiff credibly alleges that substantial evidence of defendants' conduct--particularly related to the receivables securitization program and Farmland's involvement therewith--is to be found in this jurisdiction. Witnesses and evidence that are located outside this jurisdiction's ambit of authority are likely readily obtainable through international treaties and local rules of court. Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Art. 1 et seq., 28 U.S.C.A. § 1781 note; R. 4:11-5. Documentary evidence not located here is easily transportable physically or capable of being converted into digital form for electronic transmission. Choice of law determinations that involve Italian, English, or Welsh law do not appear more confounding than those arising between states of the United States, even though some translation efforts and expenses will be required.

Defendants argue that to manage and try the case here will place an undue burden on the New Jersey court system and those who pay for its good offices through taxes or filing fees. The populace of the Garden State is, I am sure, grateful for defendants' concern and solicitude on behalf of all New Jersey citizens. Nevertheless, defendants have simply failed to show that this matter will invoke any sense of dislocation or incongruity in the minds of reasonable people. Notwithstanding plaintiff's concession at oral argument that it is unlikely that the Farmland RPA itself is the source of wrongdoing, plaintiff may still be able to prove that the agreement was used as a subterfuge to cloak conduct of a not so benign nature. For that reason, New Jersey clearly has an interest in the matter. Jurors will neither be regaled with wholly foreign fact patterns nor relegated to resolving disputes that have no relation to the forum.

*12 Defendants' argument that another forum--the Italian Republic--is appropriate raises interesting questions relating to choice of law, but invokes considerations that are not material to the convenience calculus. It is

completely premature to assess the full measure of choice of law determinations. Although there may be some duplication of efforts if matters are tried both here and in Europe, the mere availability of the sovereign nation of Italy and its judiciary are not enough to strip from this court its mantle as an appropriate, non-vexatious forum. It will be here that defendants shall be permitted to insist that plaintiff prove all of the elements of his theories of liability and quantum of damages, and vigorously press a defense of their actions if they so wish.

V. MOTION TO DISMISS FOR LACK OF STANDING

Among the cluster of doctrines that ensure adherence to the requirement that New Jersey courts not render advisory opinions, the doctrine that requires a litigant to have standing to invoke the power of a court is one of the most important. The party invoking the court's jurisdiction has the burden to establish his standing to sue. To do so, a litigant must satisfy three elements that constitute the minimum to possess standing. First, a party must present a sufficient stake in the outcome of the litigation; second, a real adverseness with respect to the subject matter must exist; and third, there must be a substantial likelihood that the party will suffer harm in the event of an unfavorable decision. N.J. State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n, 82 N.J. 57, 67-69 (1980).

Unlike its federal counterpart, our Constitution contains no express language confining the exercise of judicial power to deciding actual cases and controversies. Compare U.S. Const. art. III, § 2 with N.J. Const. art. VI, § 1. Our courts, nevertheless, have long held that we will not render advisory opinions or function in the abstract. Crescent Park Tenants Ass'n v. Realty Eq. Corp. of N.Y., 58 N.J. 98, 107 (1971). Nor will we entertain proceedings initiated by litigants who are mere intermeddlers, interlopers, or strangers to the dispute. Id. at 107 (citations omitted); see also Bergen County v. Port of N.Y. Authority, 32 N.J. 303, 307 (1960); N.J. Tpke. Auth. v. Parsons, 3 N.J. 235, 240 (1949). Ordinarily, a litigant may not claim standing to assert the rights of third parties. Jackson v. Dept. of Corr., 335 N.J.Super. 227, 231 (App.Div.2000), certif. denied, 167 N.J. 630 (2001); Jersey Shore Med. Center-Fitkin Hosp. v. Estate of Baum, 84 N.J. 137, 144 (1980). This principle has particular efficacy where one seeks to vindicate the constitutional rights of strangers to the dispute. See In re D'Aconti, 316 N.J. Super 1, 13 (App.Div.1998); State Dept. Envtl. Prot. & Energy v. Dopp, 268 N.J. Super 165, 174 (App.Div.1993); In re Ass'n of Trial Lawyers of Am., 228 N.J. Super 180, 185 (App.Div.), certif. denied, 113 N.J. 660 (1988). The related doctrines of standing, justiciability, ripeness, and mootness are incidents of the primary conception that judicial power is to be exercised to provide remedies for proven wrongs only at the

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2006 West Group
(Cite as: 2005 WL 975856 (N.J.Super.L.))

instance of one who is himself harmed, or immediately threatened with harm, by the challenged conduct. Poe v. Ullman, 367 U.S. 497, 504, 81 S.Ct. 1752, 1756, 6 L.Ed.2d 989, 996 (1961).

*13 Standing cannot be waived. New Jersey Citizen Action v. Riviera Motel Corp., 296 N.J. Super 402, 412 (App.Div.1997). A magnanimous and lenient approach to standing to seek remedies applies in this state. See Crescent Park Tenants Ass'n, supra, 58 N.J. at 107-08 (1971); Dome Realty, Inc. v. City of Paterson, 150 N.J. Super 448, 452 (App.Div.1977). "[The] courts have considered the threshold for standing to be fairly low. In other words, so long as the litigant evidences a sufficient stake with real adverseness, standing will be found." Reaves v. Egg Harbor Tp., 277 N.J. Super 360, 366 (Ch. Div.1994) (citations omitted). More specifically, there must be a substantial likelihood that the plaintiff will experience some harm in the event of an unfavorable decision. Loigman v. Township Committee of the Twp. of Middletown, 297 N.J.Super. 287, 295 (App.Div.1997).

Defendants urge a dismissal of Bondi's claims insofar as they seek to vindicate the rights of bondholders, creditors, shareholders, stakeholders, and other third parties allegedly harmed by defendants' alleged mischief. The complaint is littered with vague references to Bondi's championing the claims of these persons. To one extent, defendants are correct; Bondi's rights appear entirely derivative of the rights of the corporate entities on whose behalf he was appointed to protect. Bondi was not appointed to pursue directly the grievances of those who invested in, lent money to, or did business with Parmalat. Those persons and entities may enjoy some of the fruits of Bondi's harvest if he is successful in this and other litigation. However, Bondi is not invested with authority to claim or try to prove the incremental injuries asserted by stakeholders.

On the other hand, at its core, the complaint only seeks remedies on behalf of the corporate entities under his stewardship. The rhetorical flourishes in the complaint and briefs do not grant Bondi a roving commission to advance claims on behalf of all those aggrieved by the Parmalat debacle. In a nutshell, the stakeholders may be beneficiaries of Bondi's works, but Bondi neither represents their interests nor may he argue their entitlements. This limitation, however, does not require a dismissal of Bondi's action. It remains to be seen exactly how he will pursue any of his theories of liability and it would be utterly rash to judge whether he will stray from his particularized mandate into unauthorized areas. Suffice it to say that at the present time, Bondi may continue this action on behalf of all of those corporate entities that were admitted into the Extraordinary Administration on December 23, 2003, or later added by

appropriate amendment.

## VI. MOTION TO DISMISS BASED UPON THE DOCTRINE OF IN PART DELICTO

Defendants claim that the rule of in pari delicto prevents the plaintiff from suing them. This doctrine precludes a party, usually a trustee, [FN8] from asserting a claim against a third party where management has participated with that third party in the wrongful acts. "Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the ... rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." Wight v. BankAmerica Corp., 219 F.3d 79, 86-87 (2d Cir.2000); Shearson Lehman Hutton,. Inc. v. Wagoner, 944 F.2d 114, 117 (2d Cir.1991). This principle derives from presumptions in agency law that presumes an agent communicates with and acts for her principal and that the principal has control over the agent. Even at this incipient stage of the proceedings, it is undisputed that at least some of Parmalat's managers probably committed acts of fraud that may be proven to involve some or all of the defendants. It is important to emphasize that defendants deny all wrongdoing. However, for purposes of this branch of their motion, defendants readily broadcast the wrongdoing of Parmalat's managers. If their knowledge and possibly that of other members of management can be fairly imputed to the corporation, then Bondi will lack the ability to sue the defendants for participating in that fraud, unless there is some other reason not to impute.

FN8. In this case, the plaintiff is not a bankruptcy trustee, but is in a sufficiently analogous position that he has standing to institute any suit that the insolvent Parmalat entities under his dominion and control could have instituted were they not subject to reorganization in Italy.

*14 The expression in pari delicto is a portion of the longer Latin sentence, in pari delicto potior est conditio defendentis, which means that where the wrong of both parties is equal, the position of the defendant is the stronger. See Stella v. Dean Witter Reynolds, 241 N.J.Super. 55, 73-74 (App.Div.1990). Recognized as a defense in both law and equity, in pari delicto dictates that "[n]either party to an illegal contract should be aided by the court, whether to enforce it or set it aside." United States v. Farrell, 606 F.2d 1341, 1348 & n. 21 (D.C.Cir.1979). This is also the meaning with which New Jersey courts have used the phrase. For example, where a borrower knowingly conspired with a lender to violate the small loan law, the borrower was held in pari delicto with the lender and therefore not entitled to be relieved from the consequences of his default on his loan. Ryan v. Motor Credit Co., Inc., 132 N.J. Eq. 398 (E. & A.1942). To the same affect see Cameron v. International Alliance Of

(C) 2006 West Group
(Cite as: 2005 WL 975856 (N.J.Super.L.))

Page 15

Theatrical Stage Employees, Local 384, 118 N.J. Eq. 11, 20 (E. & A.1935); Marx v. Jaffe, 92 N.J.Super. 143, 146-147 (App.Div.1966). See also Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 884 (3d Cir.1975) (holding that "the fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the benefit of the corporation" because, inter alia, "a corporation can speak and act only through its agents"); Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 361 (3d Cir.2001) (citing same).

In pari delicto is an affirmative defense, as to which, like all affirmative defenses, defendants bear the burden of persuasion. Standing in their way at the present time is an exception to the rule that enables institutional victims to pursue remedies if the culpable managers were acting for interests other than the entity. According to this adverse interest exception, if the actions of management are adverse to the corporation and benefit management or a third party, a court will not impute those actions to the corporation. See In re Bennett Funding Group, 336 F.3d 94, 100 (2d Cir.2003). For this exception to apply, however, the officer, board member, or agent "must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes." Center v. Hampton Affiliates, Inc., 66 N.Y.2d 782, 783 (1985); Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., supra, 267 F.3d at 361.

Here, it would appear that there is no single culprit in the Parmalat inner circle or outside. Although several top managers may have been involved either as witting participants or knowing observers, it is simply too early in the litigation to assign conclusive fault to anyone, no matter how many fingers are being pointed at certain actors. Plumbing the states of mind of the participants, exploring their motivations and purposes, and discovering the ultimate resting place of the fruits of the alleged defalcations remains to be accomplished. Who knows what will be uncovered when the parties ultimately follow the money. [FN9] These circumstances suggest that the adverse interest exception may well apply and it is hasty to award defendants a directed verdict either upon the basis of plaintiff's trustee-like status or the incompleteness of discovery. It is not enough to trumpet the probable

criminality of the individuals involved, and argue therefrom the possible vicarious criminal exposure of Parmalat, in order to invoke in pari delicto. Any determination of whether defendants have demonstrated that they are conclusively entitled to the benefits of the affirmative defense of in pari delicto must await the orderly unfolding of information through discovery.

FN9. It was more than three decades ago, during the Watergate era, that Deep Throat told Washington Post reporter Bob Woodward he had to "follow the money" to understand the scandal.

## VII. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

**\*15** Defendants further move to dismiss the Complaint on the ground that it is wholly lacking in merit and fails to state a claim upon which relief may be granted. R. 4:6-2(e). The standard against which I measure defendants' argument is well-developed. I accept as true the complaint's factual assertions. Smith v. SBC Comm. Inc., 178 N.J. 265, 268-289 (2004); Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 625 (1995). I give plaintiff the benefit of all reasonable inferences from factual allegations in the complaint. Troxclair ex rel Troxclair v. Aventis Pasteur, Inc., 374 N.J.Super. 374, 377 (App.Div.2005); Ballinger v. Delaware River Port Authority, 311 N.J.Super. 317, 319 (App.Div.1998). In addition, my examination is ordinarily limited to the four corners of the complaint, perused with great liberality to determine whether a cause of action can be gleaned from even an obscure statement. Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 746 (1989). Courts should grant these motions with caution and in "the rarest instances." Id. at 772; Van Natta Mech. Corp. v. DiStaulo, 277 N.J.Super. 175, 181 (App.Div.1994).

The complaint consists of 61 pages, subdivided into 298 separately identified paragraphs, which assert ten different theories of liability. Each cause of action incorporates the factual allegations of the preceding claims, thereby building upon and blending many of the factual assertions. These causes of action are summarized as follows:

| COUNT | PARAGRAPHS | THEORY OF LIABILITY |
| --- | --- | --- |
| Preamble | 1-183 | |
| 1 | 184-195 | Fraud |

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo