(C) 2006 West Group                                                                        Page 16
(Cite as: 2005 WL 975856 (N.J.Super.L.))

| | | |
|---|---|---|
| 2 | 196-205 | Aiding and Abetting Constructive Fraud |
| 3 | 206-212 | Negligent Misrepresentation |
| 4 | 213-223 | Aiding and Abetting Breach of Fiduciary Duty |
| 5 | 224-226 | Diversion of Corporate Assets |
| 6 | 227-229 | Unjust Enrichment |
| 7 | 230-234 | Aiding and Abetting Fraudulent Transfers |
| 8 | 235-249 | Deepening Insolvency |
| 9 | 250-257 | Civil Conspiracy |
| 10 | 258-298 | Violation of N.J.S.A. 2C:41-1 et. seq. |

1. Fraud

In order to establish a claim for common law fraud, one must show: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person relies on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997). The "[d]eliberate suppression of a material fact that should be disclosed" is viewed as "equivalent to a material misrepresentation (i.e., an affirmative misrepresentation)," which will support a common law fraud action. New Jersey Econ. Dev. Auth. v. Pavonia Restaurant, Inc., 319 N.J.Super. 435, 446 (App.Div.1998). "Fraud requires clear and convincing proof." Fox v. Mercedes-Benz Credit Corp., 281 N.J.Super. 476, 484 (App.Div.1995) (citing Stochastic Decisions, Inc. v. DiDomenico, 236 N.J.Super. 388, 395 (App.Div.1989), certif. denied, 121 N.J. 607 (1990)); Barsotti v. Merced, 346 N.J.Super. 504, 520 (App.Div.2002).

*16 The complaint alleges that the defendants were willing participants in a scheme that was designed to mislead the investing public, regulators, and the Parmalat corporate entities themselves into believing that Parmalat was an economically-healthy going concern. Bondi asserts that the defendants knew full well that Parmalat was insolvent for years and that their scheming had the capacity to prolong its economic life beyond all reason and fiscal utility. By engaging in allegedly illusory participation agreements and other masquerading investment vehicles with Parmalat affiliates that gave the false impression that defendants were mere investors--as opposed to lenders entitled to a guaranteed rate of return--the defendants are accused of perpetuating a myth. Although it is tricky to parse the complaint to find a direct allegation of how Parmalat as a corporate entity was defrauded, the complaint nevertheless clearly suggests such a result. Defendants demand too much at this stage of the case for plaintiff to come forth with exquisite detail concerning the effect of defendants' actions and representations upon Parmalat. On the other hand, rhetoric that accuses defendants of perpetrating a massive deception upon stakeholders is insufficient, by itself, to satisfy the elements of common law fraud. Nevertheless, I am convinced that fairly read, the complaint is sufficiently illuminating on the claim of common law fraud against Parmalat for plaintiff to press ahead.

2. Aiding and Abetting Constructive Fraud

The complaint is unclear as to exactly what Bondi means when he labels the second theory of liability as relating to constructive fraud. Indeed, perhaps the label appearing with Count II is a misnomer. The specific allegations sound as if plaintiff is really seeking remedies for aiding and abetting breach of a fiduciary duty, even though that theory of liability is specifically addressed in Count IV. Constructive fraud is not a commonly deployed stand-alone theory of liability in New Jersey pleading. It is obliquely described by Justice Clifford in Jewish Center of Sussex County v. Whale, 86 N.J. 619 (1981) as the following:

> Every fraud in its most general and fundamental conception consists of the obtaining of an undue advantage by means of some act or omission that is unconscientious or a violation of good faith. 3

(C) 2006 West Group
Page 17
(Cite as: 2005 WL 975856 (N.J.Super.L.))

> J. Pomeroy, A Treatise on Equity Jurisprudence 421 (5th ed.1941). Depending on the remedy sought, an action for fraud may be either legal or equitable in nature. See Commercial Cas. Ins. Co. v. Southern Sur. Co., 100 N.J. Eq. 92, 96, 135 A. 511 (Ch.1926), aff'd, 101 N.J. Eq. 738, 138 A. 919 (E. & A.1927); 3 J. Pomeroy, supra, at 419. In addition, fraud may be either actual or constructive. The distinguishing factor is the element of untruth between the parties required in the former but not in the latter. 3 J. Pomeroy, supra, at 625-26.
> Id. at 624.

A clearer and more useful description, in my opinion, is the following:

> *17 Preliminarily, we point out that "constructive fraud is not fraud at all but is descriptive of conduct which may in the eyes of the law give rise to certain consequences ensuing upon actual fraud; perhaps the law would be better without the term." (Emphasis added). Bedrock Foundations, Inc. v. Geo. H. Brewster & Son, Inc., 31 N.J. 124, 136 (1959) (italics in original).
> Foont-Freedenfeld v. Electro-Protective, 126 N.J.Super. 254, 256-257 (App.Div.1973).

Plaintiff seems to equate constructive fraud with equitable fraud by his citations to New Jersey Econ. Dev. Auth. v. Pavonia Restaurant, Inc., 319 N.J.Super. 435, 446 (App.Div.1998) and Konsuvo v. Netzke, 91 N.J.Super. 353, 371 (Chan Div.1966). Indeed, Konsuvo states, "[a] court of equity applies concepts of constructive fraud which, unlike actual fraud, requires no intent to deceive or obtain unfair advantage." Id. If constructive fraud is the functional equivalent of equitable fraud, then plaintiff has sufficiently described the conduct of the defendants that he thinks is actionable and may be entitled to equitable remedies. If plaintiff thinks constructive fraud means something else, he is well-advised to seek to amend his pleadings.

New Jersey common law has adopted the theory of aiding and abetting in a civil context. The Restatement of Torts provides that a person is liable for harm resulting to a third person from the conduct of another when he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself...." Restatement (Second) of Torts § 876(b). Courts have recognized that this Restatement provision sets forth the standard for civil aiding and abetting liability. See Landy v. Federal Deposit Ins. Co., 486 F .2d 139, 162 (3d Cir.1973), cert. denied, 416 U.S. 960, 94 S .Ct.1979, 40 L.Ed.2d 312 (1974). The New Jersey Supreme Court relied on this provision in Judson v. Peoples Bank and Trust Co., 25 N.J. 17 (1957), to determine a defendant's liability for furnishing funds to a corporation when it knew the corporate assets were being used for the personal advantage of the president and director.

Based upon the allegations in Count II, I am satisfied that plaintiff's theory of liability passes muster for today. It adequately suggests that the actions in concert by defendants had deleterious effects upon Parmalat in ways that may constitute constructive fraud.

3. Negligent Misrepresentation

Negligent misrepresentation is a legally sound concept. An incorrect statement, negligently made and justifiably relied upon, may be the basis for recovery of damages for economic loss or injury sustained as a consequence of that reliance. H. Rosenblum, Inc. v. Adler, 93 N.J. 324, 334 (1983). The element of reliance is the same for fraud and negligent misrepresentation. Compare H. Rosenblum, Inc. v. Adler, supra, 93 N.J. at 334 ("Negligent misrepresentation is ... [a]n incorrect statement, negligently made and justifiably relied on, [and] may be the basis for recovery of damages for economic loss ... sustained as a consequence of that reliance.") with Gennari v. Weichert Co. Realtors, supra, 148 N.J. at 610 ("The five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."). See also Kuhnel v. CNA Ins. Cos., 322 N.J.Super. 568, 581 (App.Div.1999) (affirming trial court's dismissal of fraud and negligent misrepresentation claims for plaintiffs' failure to show detrimental reliance).

*18 Bondi claims in Count III that "Citigroup knew and intended that Parmalat ... would and did reasonably rely ..." upon the actions of Citigroup relating to its financial activities vis- a-vis Parmalat and its affiliates. The count also appears to present claims on behalf of persons and entities that Bondi does not represent, "those persons who (i) invested in, (ii) purchased the bonds, debentures, notes or other securities or instruments of, (iii) loaned money to, (iv) sold goods to or (v) otherwise extended credit to Parmalat." These appear to be the stakeholders for whom Bondi can not, and will not, present individualized, discrete claims. Thus, to the extent it is still an issue, Count III may not be used to present claims, causes of action, or grievances of persons or entities other than those corporate entities under Bondi's wing as a result of the Extraordinary Administration. Nevertheless, because Bondi's Parmalat-related allegations are presumed true as of this writing and they support the maintenance of his negligent misrepresentation claim notwithstanding his effort to expand its coverage to non-parties, Count III

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo


(C) 2006 West Group
(Cite as: 2005 WL 975856 (N.J.Super.L.))

Page 18

survives scrutiny. It will not be dismissed.

### 4. Aiding and Abetting Breach of Fiduciary Duty

Fiduciaries appear in a variety of forms and in a variety of contexts. Managers, officers, agents, partners, receivers, trustees, and executors are entrusted in one way or another with the conduct of the affairs or the protection of the rights of another. In many instances, those rights are purely economic and a breach of the fiduciary's duty normally generates only economic loss. A breach in these contexts is generally controlled by the substantive law governing the relationship. Restatement (Second) of Torts § 874, Appendix and Reporter's Note (1982). A third party who knowingly aids and abets the agent of another in breach of fiduciary duty is liable to the principal. Jaclyn, Inc. v. Edison Bros. Stores, Inc., 170 N.J.Super. 334 (Law Div.1979).

Bondi has asserted unambiguous claims of breach of fiduciary duties relating to Parmalat's so-called culpable managers. Moreover, he has well articulated defendants' participation therein so as to amount to potential liability for aiding and abetting the managers' conduct. Although it goes without saying that plaintiff still needs to convince a trier of the facts that what it alleges is true, the multiple factual scenarios illustrated in the complaint present viable claims for relief under a theory of aiding and abetting breaches of fiduciary duties.

### 5. Diversion of Corporate Assets

The entirety of plaintiff's claim in Count V is distilled into this allegation, "Citigroup was an active, willing and knowing participant in the unlawful diversion and rechanneling of corporate funds or assets to purposes other than proper corporate purposes." This sounds like an accusation of aiding and abetting the conversion of property. On the other hand, it may just be a an added way to describe aiding and abetting another breach of fiduciary duties. If, indeed, either of these are the essence of the contention, then Count V states a claim upon which relief may be granted. On the other hand, if the theory is something other than a conventional aiding and abetting of a recognized tort like conversion, then the count must be discarded, because "diversion of corporate assets" does not exist as an independent cause of action under New Jersey law.

*19 Essentially, conversion consists of the wrongful exercise of dominion and control over the property of another in a manner inconsistent with that other's rights. Mueller v. Technical Devices Corp., 8 N.J. 201, 207 (1951); Prosser, Law of Torts (3 ed.1964), § 15 at 79. It is essential that the property converted must have belonged to the injured party. Commercial Ins. Co. of Newark v. Apgar, 111 N.J.Super. 108, 115 (App.Div.1970). Diversion of corporate assets is described as a species of misappropriation of corporate property. In re Greenwood Supply Co., 295 B.R. 787, 794 (Bankr.D.S.C.2002). This sounds cunningly similar to conversion. Accordingly, because there is a traditional remedy for the wrong asserted by plaintiff, it is wholly unnecessary to confabulate a new cause of action where extant tort remedies suffice. Unless plaintiff wishes to amend his complaint, Count V shall be considered another aiding and abetting count.

### 6. Unjust Enrichment

"Under New Jersey law, '[t]he constructive or quasi-contract is the formula by which enforcement is had of a duty to prevent unjust enrichment or unconscionable benefit or advantage." ' Suburban Transfer Serv., Inc. v. Beech Holdings, Inc., 716 F.2d 220, 226 (3d Cir.1983) (quoting Borough of West Caldwell v. Borough of Caldwell, 26 N.J. 9, 29 (1958)) (alteration in original). "Quasi-contractual obligations are imposed by the law for the purpose of bringing about justice." Id. Restitution for unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law. National Amusements, Inc. v. N.J. Tpk. Auth., 261 N.J.Super. 468, 478 (Law Div.1992), aff'd, 275 N.J.Super. 134 (App.Div.), cert. denied, 138 N.J. 269 (1994). Quasi-contract liability will not be imposed when a valid, unrescinded contract governs the rights of the parties. Van Orman v. Am. Ins. Co., 680 F.2d 301, 310 (3d Cir.1982); see also Suburban Transfer Serv., Inc. v. Beech Holdings, Inc., supra, 716 F.2d at 226. Therefore, recovery based on a quasi-contract theory is mutually exclusive of a recovery based on a contract theory. Caputo v. Nice-Pak Prods., Inc., 300 N.J.Super. 498, 507 (App.Div.), cert. denied, 151 N.J. 463 (1997).

"To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994). "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." Id.

A "contract implied in law" is a somewhat disfavored synonym for a "quasi- contract" because a quasi-contract is not a contract at all. Wanaque Borough Sewerage Auth. v. Township of W. Milford, 144 N.J. 564, 574 (1996). Quasi- contracts are imposed by law to bring about justice, without reference to the parties' intent. St. Paul Fire and Marine Ins. Co. v. Indemnity Ins. Co. of N. Am., 32 N.J. 17, 22 (1960). See also Bloomgarden v. Coyer,

(C) 2006 West Group
(Cite as: 2005 WL 975856 (N.J.Super.L.))
Page 19

479 F.2d 201, 210 (D.C.Cir.1973) ("The quasi-contract ... is not really a contract, but a legal obligation closely akin to a duty to make restitution.... [A] quasi- contract ... will be recognized in appropriate circumstances, even though no intention of the parties to bind themselves contractually can be discerned." (footnotes omitted)). "They 'rest on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another....' " St. Paul Fire and Marine Ins. Co. v. Indemnity Ins. Co. of N. Am., supra, 32 N.J. at 22 (citation omitted). "In the case of actual contracts the agreement defines the duty, while in the case of quasi-contracts the duty defines the contract." Callano v. Oakwood Park Homes Corp., 91 N.J.Super. 105, 108 (App.Div.1966).

*20 A plaintiff presents a successful quasi-contract claim if it can be demonstrated "that defendant received a benefit from plaintiff which it is unjust for [defendant] to retain without compensation, and that plaintiff, in conferring the benefit, expected remuneration ." Cohen v. Home Ins. Co., 230 N.J.Super. 72, 82 (App.Div.1989). Thus, in a quasi-contract claim, defendant must have been unjustly enriched. As the Callano court emphasized: "The key words are enrich and unjustly. To recover on the theory of quasi-contract the plaintiffs must prove that defendant ... received a benefit, and that retention of the benefit without payment therefor would be unjust." Callano v. Oakwood Park Homes Corp., supra, 91 N.J.Super, at 109. See also Shalita v. Township of Washington, 270 N.J.Super. 84, 90 (App.Div.1994) ("[A] quasi-contract rests on the equitable principle that a person should not be allowed to enrich himself unjustly at the expense of another

Giving the plaintiff the benefit of the doubt, as I must at this stage of the proceedings, I find that even the sparse allegations of Count VI sufficiently state a claim for remedies if proven. Count VI shall not be dismissed.

7. Aiding and Abetting Fraudulent Transfers

Count VII alleges that the conduct of defendants was proximately related to the fraudulent transfer of billions of dollars of Parmalat's assets. Bondi asserts that those transfers were violative of the New Jersey Uniform Fraudulent Transfer Act, N.J.S.A. 25:2-20 to -34. Hence, again, Bondi seeks tort remedies for defendants' aiding and abetting.

In 1984, the National Conference of Commissioners on Uniform State Laws (Commissioners) approved the Uniform Fraudulent Transfers Act (UFTA). At least thirty-nine states and the District of Columbia have since adopted the UFTA, either in whole or in part. In 1988, New Jersey enacted the UFTA, L.1988, c. 74, § 1, to replace this State's Uniform Fraudulent Conveyance Act (UFCA), which had been the law since 1919. Flood v. Caro Corp., 272 N.J.Super. 398, 403 (App.Div.1994). The UFTA modernizes the law respecting the rights and remedies of creditors in cases of transfers of assets by debtors, the design or effect of which is to prevent or impede satisfaction of claims out of the debtor's assets, or to prefer favored claimants. A prime purpose of the UFTA is to align state law on fraudulent transfers with the federal Bankruptcy Act, see 11 U.S.C. § § 547 and 548, and the Uniform Commercial Code-Secured Transactions, see N.J.S.A. 12A:9-101 et. seq. Another goal is to make uniform the law among the states that adopt the Act. See N.J.S.A. 25:2-33. Lastly, a purpose of the UFTA is to prevent a debtor from placing his or her property beyond a creditor's reach. Gilchinsky v. National Westminster Bank, 159 N .J. 463 (1999); In re Wintz Companies, 230 B.R. 848, 859 (8th Cir .1999).

Defendants argue that the UFTA is silent regarding liability for aiders and abettors, and therefore, plaintiff's assertion of such remedies in Count VII is invalid. However, N.J.S.A. 25:2-29(3)(c) permits expansive relief based upon the particular circumstances of the case. Since aiding and abetting liability is ensconced in New Jersey tort law, I can not say that it is beyond reason that the Legislature contemplated allowing parties to seek remedies within the framework of the UFTA that are bottomed upon a theory of aiding and abetting. Whether parsed as finely as defendants argue or under the indulgent standard of review that I must deploy the result appears the same: Count VIII states a claim upon which relief may be granted.

8. Deepening Insolvency

*21 Plaintiff urges the court to recognize the tort of deepening insolvency as asserted in Count VIII. The contours of the tort appear to involve the wrongful prolongation of a business entity's life when it should otherwise be declared insolvent, resulting in damage caused by an unwarranted increase in debt. See, e.g., Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., supra, 267 F.3d at 351 (holding Pennsylvania would recognize a "deepening insolvency" theory as independent harm to the corporation and listing other federal cases so holding); Schacht v. Brown, 711 F.2d 1343, 1350 (7th Cir.1983) (noting that fraudulently prolonging a corporation's life does not confer a benefit on the corporation). Its origin may be traced to Bloor v. Dansker (In re Investors Funding Corp. of New York Sec. Litig.), 523 F.Supp. 533 (S.D.N.Y.1980).

Although some courts recognize deepening insolvency as an independent tort, other courts have viewed it as a theory of damages, often raised in response to the defense

that increased debt injured the creditors, but did not harm (and actually helped) the corporation. Schacht, 711 F.2d at 1350; Hanover Corp. of America v. Beckner, 211 B.R. 849, 854 (M.D.La.1997); Allard v. Arthur Andersen & Co. (USA), 924 F.Supp. 488, 494 (S.D.N.Y.1996); Drabkin v. L & L Constr. Assocs., Inc. (In re Latin Inv. Corp.), 168 B.R. 1, 6 (Bankr.D.C.1993). Finally, some courts have rejected the theory outright, Coroles v. Sabey, 79 P.3d 974, 983 (Utah Ct .App.2003) (rejecting deepening insolvency as a theory of damages because shareholders rather than the corporation suffer harm), or raised serious questions about its viability. See Florida Dep't of Ins. v. Chase Bank of Texas Nat'l Ass'n, 274 F.3d 924, 935- 36 (5th Cir.2001) (questioning whether Texas recognizes the cause of action, but even if it did, concluding that the defendant was entitled to summary judgment because the plaintiff failed to quantify the additional debt or provide evidence of damages that might be compensable under the deepening insolvency theory); Feltman v. Prudential Bache Sec., 122 B.R. 466, 473-74 (S.D.Fla.1990) (rejecting argument that insolvent corporation was harmed by artificial extension of its life where complaint alleged that corporation was a sham, without a corporate identity and served as a conduit for stolen money).

There does not appear to be any reported authority in New Jersey that validates deepening insolvency as an independent tort for which remedies are available. It has been said that "[g]enerally, a new cause of action should be created by legislative enactment or by the Supreme Court rather than by an intermediate appellate court." Proske v. St. Barnabas Med. Ctr., 313 N.J.Super. 311, 316 (App.Div.1998), certif. denied, 158 N.J. 685 (1999). Of course, I stand in an even less envious position as a mere trial court. As such, it would be an abuse of discretion to accept plaintiff's invitation to recognize deepening insolvency as a theory of liability in this state. Count VIII is dismissed with prejudice. If a pleading does not state a claim that, if proven, would entitle the pleader to relief, it is facially defective and thus subject to dismissal under R. 4:6-2. Casinelli v. Manglapus, 181 N.J. 354, 360 (2004).

9. Civil Conspiracy

*22 A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, a principal element of which is to inflict a wrong against or injury upon another, together with an act that results in damage. Morgan v. Union Cty. Bd. of Chosen Freeholders, 268 N.J.Super. 337, 364 (App.Div.1993), certif. denied, 135 N.J. 468 (1994). While the unlawful agreement need not be expressed, and while the participants need not know all the details of the plan designed to achieve the objective or possess the same motives, they must share the general conspiratorial objective. Morgan v. Union Cty., supra, 268 N.J.Super. at 365. To establish a conspiracy, the plaintiff must demonstrate that there was a plan and that its essential scope and nature was known to each person who is charged with responsibility for its consequences. Ibid; Weil v.. Express Container Corp., 360 N.J.Super. 599 (App.Div.1999). Civil conspiracy was discussed in Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir.1988), in which the court said, "[i]t is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them."

Here, Bondi specifically identifies the constituent members of the putative conspiracy and asserts their purpose as constituting a deception, resulting in damages to Parmalat. Little more is required at this stage of the proceedings. These allegations firmly suggest the cause of action and Count IX shall not be dismissed.

10. Violation of N.J.S.A. 2C:41-1 et. seq.

Count X of the complaint alleges violations of New Jersey's Racketeer Influenced and Corrupt Organizations Act (RICO), N.J.S.A. 2C:41-1 to - 6.2. Defendants have dissected the language of Count X as if they were using a forensic MRI device. Slicing the claims into discrete cross-sections for fastidious analysis, defendants urge the court to find that plaintiff's abundant allegations are insufficient as a matter of law to support the draconian remedies available under the RICO. What defendants have failed to appreciate, however, is that the court is not concerned at this stage of the proceedings with whether plaintiff will ultimately prevail on his claim; rather, I am only interested in whether, within the precincts of the complaint, the elements of the claim are asserted with clarity. In other words, I take a macro-view of the pleadings, rather than exploit the micro-analysis suggested by defendants.

Defendants argue that plaintiff's Count X fails to allege territorial jurisdiction, fails to allege any predicate act, fails to allege criminal intent, fails to allege proximate causation, and fails to establish aiding and abetting liability. In each of these areas, plaintiff has adequately addressed the required information.

Territorial jurisdiction is a requirement of N.J.S.A. 2C:1-3. Legal accountability for one's conduct exists if
> *23 (1) Either the conduct which is an element of the offense or the result which is such an element occurs within this State;
> (2) Conduct occurring outside the State is sufficient under the law of this State to constitute an attempt to commit a crime within the State;
> (3) Conduct occurring outside the State is

sufficient under the law of this State to constitute a conspiracy to commit an offense within the State and an overt act in furtherance of such conspiracy occurs within the State;
(4) Conduct occurring within the State establishes complicity in the commission of, or an attempt, or conspiracy to commit, an offense in another jurisdiction which also is an offense under the law of this State; N.J.S.A. 2C:1-3.

Plainly, the allegations of the complaint relating to the Farmland RPA alone are sufficient to satisfy the territorial nexus. Moreover, the complaint's allegations that describe the effects of the defendants' alleged conspiratorial conduct upon stakeholders in this state provides a sufficient basis upon which territorial jurisdiction may be found under the RICO. If there remains a genuine issue of fact in dispute on this issue, the trier of the facts will resolve it at trial See State v. Schumann, 111 N.J. 470, 475 (1988); State v. Bragg, 295 N.J.Super. 459, 466-67 (App.Div.1996).

Defendants argue that the complaint fails separately to identify the role each defendant played in performing a predicate act required for liability to attach under the RICO. Although it requires some degree of back checking and cross referencing, the complaint--throughout its hundreds of separately detailed paragraphs--denominates and assigns to each defendant the acts that plaintiff claims are predicate acts. Although the complaint does not provide a grid or table to highlight the predicate acts and align them with particular defendants, the complaint is susceptible to reasonable explication in order to understand its allegations.

Without repeating them in this opinion in detail, it is clear that the nine predicate acts identified in Paragraph 264 of the complaint may be adequately cross referenced throughout the preceding paragraphs of the complaint. Plaintiff's pleadings are fair notice of the charges he has leveled against defendants. Indeed, the allegations concerning the wire transfers attributed to Zini and others contain excruciatingly detailed information.

Additionally, an indulgent reading of the complaint reveals that plaintiff has effectively alleged criminal intent by the defendants. These allegations are found in the allegations claiming the defendants' participation in allegedly fraudulent financing transactions, the allegations claiming concealment of Parmalat's true condition, and the allegations concerning willful conduct. If the question is whether the plaintiff could have more elegantly pleaded criminal intent, the answer is yes. Nevertheless, to ask the question is to realize its inappropriateness in the context of a motion to dismiss for failure to state a claim pursuant to R. 4:6-2(e). A stylish pleading is not required under New Jersey law; a pleading that fairly apprises the defendants of the nature of plaintiff's grievances is the touchstone.

*24 Lastly, plaintiff has adequately alleged proximate causation of damages arising from defendants' supposed wrongdoing. It is unnecessary at this time for plaintiff to be in a position actually to prove proximate causation with the necessary degree of certainty argued by defendants. Instead, all plaintiff need do is meaningfully claim that Parmalat suffered economic injuries as a result of the conduct of the defendants. This, plaintiff has accomplished.

Notwithstanding their lack of success in dismissing Count X thus far, defendants further argue that private remedies under the RICO are not available for mere aiding and abetting activities. In support of their argument, defendants cite Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644 (3d Cir.1999). Notwithstanding the cogent analysis of Rolo on the subject of the federal RICO, I believe that New Jersey's RICO jurisprudence permits a claim lodged under this theory because of this state's expansive adherence to aiding and abetting liability in other tort contexts and its liberal interpretation of the elements of the RICO. State v. Ball, 268 N.J.Super. 72, 107 (App.Div.1993) ("our Legislature intended the New Jersey RICO statute to be even broader in scope than the federal statute.") Thus, the RICO claim has been adequately alleged and Count X shall not be dismissed.

V. CONCLUSION

Except for the minor deficiencies identified previously, plaintiff's complaint boasts an unexpired shelf life and remains viable in the Superior Court of the State of New Jersey. This forum is fully capable of addressing Parmalat's intriguingly convoluted state of affairs that is likely to be revealed through discovery. It is hardly surprising that given the almost impenetrable network of complex relationships tolerated by Parmalat, this litigation will present similar challenges of complexity. The trick is not to get snared by the intimidation quotient of apparent difficulty. I remain confident that the due process available in this forum to all parties will result in a just, swift, and effective resolution for all concerned.

Nobel laureate James Tobin concluded his 1984 Fred Hirsch Memorial Lecture with the following apology and warning:
> I confess to an uneasy ... suspicion ... that we are throwing more and more of our resources, including the cream of our youth, into financial activities remote from the production of goods and services, into activities that generate high

(C) 2006 West Group
(Cite as: 2005 WL 975856 (N.J.Super.L.))

Page 22

> private rewards disproportionate to their social productivity ... I fear that ... the advantages of the liquidity and negotiability of financial instruments come at the cost of facilitating nth-degree speculation which is short-sighted and inefficient.
>
> Tobin, James, "On the Efficiency of the Financial System," Policies for Prosperity; Essays in a Keynesian Mode at 294.

Even if Parmalat remains emblematic of such nth-degree complexity, this litigation will ultimately simplify, reorder, and sort it out in a meaningful and final manner.

**\*25** I request that Mr. Quinn prepare the interlocutory order to memorialize this decision and submit it to the court and opposing counsel as soon as possible pursuant to R. 4:42-1(c). The parties are instructed to comply with Case Management Order No. 1 dated January 28, 2005.

2005 WL 975856 (N.J.Super.L.)

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

**TAB 3**

FEDERAL DEPOSIT INSURANCE CORPORATION, Receiver for Central Texas Savings & Loan Association, Plaintiff, v. JOHN A. WHITE, et al., Defendants.

No. 3:96-CV-0560-P

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

1998 U.S. Dist. LEXIS 3020

March 5, 1998, March 4, 1998, Decided

March 5, 1998, Filed; March 6, 1998, Entered on Docket

**DISPOSITION:** {*1} Defendant Sorenson's Motion for Summary Judgment GRANTED IN PART and DENIED IN PART and FDIC's motion to strike DENIED. Property Tax Accounting, Inc.'s Motion to Dismiss FDIC's Third Amended Complaint DENIED.

**COUNSEL:** For FEDERAL DEPOSIT INSURANCE CORPORATION, plaintiff: Andrew F Emerson, Attorney at Law, Richard Ernest Anderson, Attorney at Law, Richard C Jaramillo & Associates, Dallas, TX USA.

For JOHN A WHITE, defendant: Rosa Maria Orenstein, Attorney at Law, Orenstein & Associates, Dallas, TX USA.

For JOHN A WHITE, defendant: Duncan Eric McMillan, Attorney at Law, Orenstein & Simmons, Dallas, TX USA.

For JOHN A WHITE, defendant: Randy Ford Taub, Attorney at Law, Block & Balstri, Dallas, TX USA.

For DONNA A WHITE, defendant: Morgan Scott Stooksberry, Attorney at Law, Hill Gilstrap Moorhead White, Bodoin & Webster, Arlington, TX USA.

For DONNA A WHITE, defendant: Michael Menze Miner, Attorney at Law, Robinson & Miner, Arlington, TX.

For LAURA WHITE, MICHELLE WHITE KRUGER, MATT NEEDS, defendants: V Shane Goetz, Attorney at Law, Rossetti & Goetz, Arlington, TX USA.

For LAURA WHITE, MICHELLE WHITE KRUGER, MATT NEEDS, defendants: Daniel Aureliano Ortiz, Attorney {*2} at Law, Ortiz & Associates, Arlington, TX USA.

For LAURA WHITE, PROPERTY TAX ACCOUNTING SERVICE INC, PROPERTY TAX ACCOUNTING INC, defendants: Andrew F Emerson, Attorney at Law, Richard Ernest Anderson, Attorney at Law, Richard C Jaramillo & Associates, Dallas, TX USA.

For PROPERTY TAX ACCOUNTING INC, defendant: Christopher L Garrison, Attorney at Law, Garrison & Kiefer, Indianapolis, IN USA.

JAMES APOSTLE, trustee, Pro se, Dallas, TX.

For TIMOTHY W SORENSON, defendant: Andrew F Emerson, Attorney at Law, Richard C Jaramillo & Associates, Dallas, TX USA.

For TIMOTHY W SORENSON, defendant: Timothy William Sorenson, Attorney at Law, Law Office of Timothy Sorenson, Dallas, TX.

**JUDGES:** Jorge A. Solis, United States District Judge.

**OPINIONBY:** Jorge A. Solis

**OPINION: MEMORANDUM OPINION AND ORDER**

Now before the Court are Defendant Sorenson's Motion for Summary Judgment and Brief, filed June 4, 1997; FDIC's Response thereto, filed July 1, 1997; Sorenson's Motion for Judgment on the Pleadings and Amended Motion for Summary Judgment, filed August 11, 1997; Supplemental Affidavit of Timothy W. Sorenson In Support thereof, filed August 11, 1997; FDIC's Response thereto, filed {*3} September 2, 1997; FDIC's Motion to Strike Sorenson's Motion for Judgment on the Pleadings and Amended Motion for Summary Judgment, filed September 2, 1997; Sorenson's Response thereto, filed September 11, 1997; and FDIC's Reply, filed September 26, 1997.

Having considered the argument, authorities and the evidence, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Sorenson's motion(s), and **DENIES** FDIC's motion to strike.

Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and

admissions on file, together with any affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. **Fed. R. Civ. P. 56(c)**. Normally, when the state of mind is an essential element of a party's claim, summary judgment is not appropriate. **International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1265-66 (5th Cir. 1991).**

Analysis

The FDIC's Third Amended Complaint alleges two counts against Defendant Timothy Sorenson in his individual capacity--1) conspiracy to commit fraud upon the FDIC in its attempt to collect its judgment against Defendant {*4} John White; and 2) fraudulent conveyance of $ 1500 made to Sorenson with intent to hinder, delay or defraud the FDIC and in violation of the temporary injunction already entered by the Court. n1 Sorenson claims the FDIC is entitled to take nothing on its first count because as a matter of law the FDIC cannot recover for civil conspiracy to violate either state or federal fraudulent conveyance law. n2 See **Mack v. Newton, 737 F.2d 1343 (5th Cir. 1984); Elliott v. Glushon, 390 F.2d 514 (9th Cir. 1967); Jackson v. Star Sprinkler Corp., 575 F.2d 1223 (8th Cir. 1978); Duell v. Brewer, 92 F.2d 59 (2d Cir. 1937); Estate of Stonecipher v. Estate of Butts, 591 S.W.2d 806 (Tex. 1979).** Moreover, to the extent that the FDIC alleges Sorenson individually is in violation of either statute, recovery would be limited to fraudulently conveyed property which Sorenson actually received or in which he obtained an interest. Id. Sorenson contends that the only property or money he has received from the Whites in this case is $ 1500 in attorney fees which Sorenson claims are not subject to avoidance pursuant to **12 U.S.C. § 1821(d)(17)(C).** See also **United States v. Select Meat Co.,** {*5} **275 F. Supp. 38, 52 (W.D. Tex. 1967).**

- - -Footnotes- - -

n1 When Sorenson's motion for summary judgment was filed, FDIC's live pleading was its First Amended Complaint, which asserted against Sorenson individually strictly the conspiracy count. On June 19, 1997, the Court granted the FDIC leave to file its Second Amended Complaint. On July 28, 1997, after the deadline for filing dispositive motions, the Court granted the FDIC leave to file its Third Amended Complaint which included, inter alia, the count regarding the allegedly fraudulent transfer of $ 1500. While the FDIC urges the Court to strike Sorenson's second motion as untimely and as having been filed without leave, the Court finds that inasmuch as no prejudice occurs thereby, the Court grants Sorenson leave to file his second motion and will consider all issues raised under Federal Rule 56.

n2 The FDIC seeks recovery under both **12 U.S.C. § 1821(d)(17)** and **Tex. Bus. & Com. Code Ann. § 24.008(a)(3)** (Vernon's 1987).

- - -End Footnotes- - -

The FDIC contends that Sorenson relies on cases {*6} which are inapplicable because they interpret the former Texas Fraudulent Conveyance Act and the former Bankruptcy Act, neither of which are controlling in this action. Instead, argues the FDIC, the Uniform Fraudulent Transfer Act adopted by Texas and the Federal Crime Control Act are controlling and allow the FDIC to hold Sorenson liable for all the fraudulent conveyances made by the Whites pursuant to Sorenson's alleged conspiracy with them to defraud the FDIC and acts in furtherance thereof. Specifically, the FDIC relies on § 24.008(a)(3)(C) which it contends allows the FDIC to obtain "any . . . relief the circumstances require." See also **Airflow Houston, Inc. v. Theriot, 849 S.W.2d 928** (Tex. App.--Houston [1st Dist.] 1993, no writ). Moreover, the FDIC argues that **12 U.S.C. § 1821(d)(17)** is an "independent, stand alone" mode of recovery "not subject to the burdens and restrictions of state or federal fraudulent conveyance statutes." Finally, the FDIC reminds the Court that the FDIC's rights, by statute, are superior to those of a trustee or any other non-federal party. See **28 U.S.C. § 1821(d)(17)(D).**

The Court agrees with Sorenson that the pertinent statutes do not {*7} create personal liability on the part of a co-conspirator for fraudulent conveyances to an extent or in an amount beyond property which a co-conspirator actually receives or in which he acquires an interest. n3 See **Mack, 737 F.2d at 1361-62; In re Mortgage America Corp., 714 F.2d 1266, 1272-73 (5th Cir. 1983); Theriot, 849 S.W.2d at 934; Stonecipher, 591 S.W.2d at 808**; see also reasoning in **Jackson, 575 F.2d at 1234; Elliott, 390 F.2d at 515-16; Duell, 92 F.2d at 60-61.** The Court is not persuaded that the amendments to the Texas statute create a new substantive right of action. The FDIC relies heavily on the "broad" language allowing "any other relief the circumstances may require," yet the Court notes that this provision, by the statute's own terms, is "subject to applicable principles of equity." See **Tex. Bus. & Com. Code Ann. § 24.008(a)(3).** Equity may require, and the statute may allow, the Court flexibility in fashioning remedies, but the Court

does not construe this flexibility to include fashioning substantive rights of action with accompanying damages which are not otherwise implied or stated in the statute. n4 Such a construction reads {*8} too much into the amendment. The Court finds that the statutes upon which the FDIC relies seek, generally, to void, set aside and recover fraudulently conveyed property. It allows a creditor to track the property. Nowhere does the statute imply that recovery could exceed the fraudulently transferred property. Nor should the Court assume that recovery could be had from anyone not in receipt of such property given both the nature of the relief afforded thereby and the statute's silence as to liability of transferors or transferees beyond recovery of the property in question. While the cases cited by Sorenson admittedly involve repealed statutes, the analysis in each applies with equal force to the amended statute. A review of the Crime Control Act leads the Court to the same conclusion. Partial summary judgment is, therefore, **GRANTED** in Sorenson's favor in his individual capacity on this count.

- - -Footnotes- - -

n3 The FDIC points out that Sorenson, in his role as a co-trustee, was vested with possession of the trust estate which includes a portion of the fraudulently conveyed property, citing **Jameson v. Bain, 693 S.W.2d 676, 680** (Tex. App.-- San Antonio 1985, no writ). Sorenson's motions and this order deal with Sorenson's liability in his **individual** capacity. For the same reason, the Court does not find relevant the FDIC's reliance upon the trust agreement provision contemplating payment for Sorenson's services as co-trustee as evidence that Sorenson in his individual capacity received more than $ 1500 from Donna White.

{*9}

n4 An action to set aside and recover a fraudulent conveyance is not equivalent to an action for fraud. See **Mack, 737 F.2d at 1362; Elliott, 390 F.2d at 516-17.**

- - -End Footnotes- - -

Regarding the $ 1500 which Sorenson admittedly received from Donna White in alleged payment of unrelated legal services previously rendered, Sorenson claims that he received the "transfer" for value, for a present or antecedent debt, and in good faith. As a result, he claims that the FDIC cannot set aside and recover the $ 1500 pursuant to **12 U.S.C. § 1821**(C)(i). See also **Tex. Bus. & Com. Code Ann. § 24.009(a)**. The FDIC responds by noting that the alleged unrelated legal services were performed after commencement of this suit and payment of the fees occurred after entry of a temporary injunction prohibiting Donna White from transferring assets for expenses other than living without leave of court, that Donna White had moved the Court to allow payment of a retainer to Sorenson, and that the Court had not ruled on the motion when the payment was made. Given the nature and extent of the allegations raised by the FDIC against {*10} Sorenson both in his individual and co-trustee capacities, and the conflicting evidence addressing these allegations, the Court finds that a fact issue exists regarding Sorenson's "good faith" as to receipt of the $ 1500 precluding entry of summary judgment against the FDIC on that transfer at this time. Sorenson's motion is, therefore, **DENIED** on this count.

Signed this 5th day of March, 1998.

Jorge A. Solis

United States District Judge

MEMORANDUM OPINION AND ORDER

Now before the Court are Property Tax Accounting, Inc.'s Motion to Dismiss FDIC's Third Amended Complaint as to Property Tax Accounting, memorandum in support thereof, and Affidavits of William Zelibor and Timothy W. Sorenson, filed September 4, 1997; FDIC's Response thereto, filed September 24, 1997; Property Tax Accounting, Inc.'s Reply, filed November 10, 1997; Property Tax Accounting, Inc's Motion to Strike Portion of Affidavit of Andrew F. Emerson, filed November 10, 1997; and the FDIC's Response thereto, filed December 3, 1997.

Having considered the argument, authorities and the record, the Court **DENIES** Property Tax Accounting's motions.

Motion to Dismiss

Property Tax Accounting, Inc. {*11} (hereafter "PTA") moves the Court to dismiss the action against it pursuant to Federal Rule 12(b)(3) for improper venue. In the alternative, PTA seeks transfer of the action against it to the United States District Court for the Southern District of Indiana, Indianapolis Division pursuant to **28 U.S.C. § 1404.**

PTA has failed to establish that venue is improper in light of its joinder in this action as a transferee of interest under Federal Rule 25(c) and the holding in

**Minnesota Mining & Manufacturing Co. v. ECO Chem, Inc., 757 F.2d 1256 (Fed. Cir. 1985).** In the latter, the court stated:

> The transferee is not joined because its substantive rights are in question; rather, the transferee is brought into court solely because it has come to own the property in issue. The merits of the case, and the disposition of the property, are still determined vis-a-vis the originally named parties. . . . Venue relates to the locale in which a suit may properly be instituted, and not to the power of the court to hear the case or reach the parties. . . . Just as joinder of a new party does not disturb the district court's jurisdiction, we see no logical rationale for concluding that joinder {*12} in any way disturbs venue properly established as an initial matter.

**Minnesota Mining, 757 F.2d at 1263-64.** Venue has been properly established as to the initial matter prior to joinder of PTA. PTA's argument, therefore, fails.

Convenience Transfer

The Court may transfer this action to another district where it may have been brought for the convenience of the parties and witnesses and in the interest of justice. **28 U.S.C. § 1404**(a). In making its determination, the Court considers also the location of books and records, the place of the alleged wrong, and the possibility of delay and prejudice if transfer is granted, giving high esteem and substantial deference to plaintiff's choice of forum. See **Jarvis Christian College v. Exxon Corp., 845 F.2d 523, 528 (5th Cir. 1988); Time, Inc. v. Manning, 366 F.2d 690, 698 (5th Cir. 1986); Enserch Exploration, Inc. v. Attock Oil Co., 656 F. Supp. 1162, 1167 n.15 (N.D. Tex. 1987).**

Having considered the argument and evidence presented, the Court finds that the balance of all factors weighs in favor of denying transfer. n1 Regarding the convenience of the parties, the Court notes that half or more reside in Texas. {*13} Regarding the convenience of witnesses, the Court finds that the list proffered by PTA, when scrutinized, does not adequately support PTA's argument. The Court notes that four are parties, who would be subject to subpoena in this venue; one non-party witness is a Texas resident; and two non-party witnesses are employees under PTA's control. Moreover, as FDIC argues, it appears that several witnesses will offer redundant testimony, leading the Court to the conclusion that they have been listed primarily to sway the court in favor of transfer. Taking this into consideration, the Court finds that the convenience of witnesses weighs slightly in favor of transfer, but not nearly as heavily as PTA advocates.

- - -Footnotes- - -

n1 The Court denies PTA's Motion to Strike the Affidavit of Andrew F. Emerson because it finds the bases proffered not to be meritorious. The Court has considered the evidence presented in all three affidavits filed by the parties in reaching its determination.

- - -End Footnotes- - -

Consideration of the remaining factors, however, tilts {*14} the balance in favor of denying transfer. Regarding the location of books and records, the evidence indicates that, when responding to a fairly extensive subpoena duces tecum, PTA's representative arrived with one banker's box of documents purportedly responsive to the subpoena. The Court is hard-pressed to imagine how requiring the relocation of this box to Texas creates a hardship warranting transfer on the basis that defendants books and records are located in Indiana.

Regarding the possibility of delay and prejudice, the Court agrees that transfer likely will delay resolution of the action against PTA. As to prejudice, PTA argues it will be prejudiced by being forced to defend a fraud action outside its home state and by "guilt by association" that could come into play if it is a co-defendant in the underlying action. The FDIC argues that it will be prejudiced by a transfer because it has already expended great effort and resources which necessarily will be duplicated in part by having to present the same evidence in two separate actions. As to the location of the wrongdoing, given the nature of the action against PTA as a transferee in interest to an alleged fraudulent conveyance, {*15} the Court notes that the situs of the actual transfer may not be decisive as to the location of the alleged wrongdoing and, in any event, is not decisive in balancing all factors regarding transfer. The balance of those factors already addressed, combined with the interests of justice and deference to plaintiff's forum, leads the court to conclude that the better course is to deny transfer.

The interests of justice encompasses the concerns relating to the efficient functioning of courts--such as insuring speedy trials, trying related litigation together, and having a judge who is familiar with applicable law--and not to the merits of the dispute. See **Heller Financial, Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1293 (7th Cir. 1989); Coffey v. Van Dorn Iron Works, 796 F.2d 217, 221 (7th Cir. 1986).** The

interests of justice include the avoidance of multiplicity of litigation which **28 U.S.C. § 1404(a)** was designed to prevent. See **Continental Grain Co. v. Barge FBL-585, 364 U.S. 19, 26, 80 S. Ct. 1470, 4 L. Ed. 2d 1540 (1960).** The FDIC argues persuasively that, inasmuch as this action has been pending for nearly two years, the court--and the parties--have expended considerable time and resources on the case, {*16} and substantial discovery has been undertaken by all parties except PTA. Should the case against PTA be transferred, the FDIC would be required to present repetitive and/or fragmented evidence concerning the multiple conveyances forming the basis of its claims in two separate trials. This would disserve the interests of justice.

Finally, because PTA has not persuaded the Court that the hardship it would suffer considerably outweighs that the FDIC would suffer, and giving FDIC's choice of forum "high esteem", the Court finds that PTA's motion should be, and hereby is, **DENIED.**

Signed this 4th day of March, 1998.

Jorge A. Solis

United States District Judge

**TAB 4**

(C) 2006 West Group  
43 Bankr.Ct.Dec. 93  
**(Cite as: 2004 WL 1661016 (Bankr.D.Del.))**

Page 2

United States Bankruptcy Court,

D. Delaware.

**In re: NORTHWESTERN CORPORATION, Debtor.  
No. 03-12872(CGC).**

July 23, 2004.

Jess H. Austin, III, Karol K. Denniston, Paul, Hastings, Janofsky & Walker LLP, Atlanta, GA, David L. Finger, Charles Slanina, Finger & Slanina, LLC, Wilmington, DE, and Dennis E. Glazer, D. Scott Tucker, Catherine Lifeso, David Polk & Wardwell, New York, NY, for Paul, Hastings, Janofsky & Walker LLP.

Kathleen M. Miller, Smith, Katzenstein & Furlow LLP, Wilmington, DE, and Bijan Amini, Storch Amini & Munves PC, New York, NY, for Magten Asset Management Corporation.

Scott D. Cousins, William E. Chipman, Jr., Charles Michael Terribile, Greenberg Traurig, LLP, Wilmington, DE, for Debtors and Debtors- in-Possession.

*MEMORANDUM DECISION*

CASE, Bankruptcy J.

*1 Magten Asset Management Corporation ("Magten") has filed a motion to disqualify Debtor's counsel, Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings") [Docket No. 1502]. A hearing was held on July 15, 2004, after which the matter was taken under advisement. For the reasons set forth below, the motion will be denied.

I. *BACKGROUND FACTS*

In 2002, certain power and distribution assets owned by Montana Power Company were transferred to Montana Power LLC, now known as Clark Fork and Blackfoot, LLC ("Clark Fork"). The Debtor acquired the equity ownership in Clark Fork. Thereafter, the energy assets were transferred from Clark Fork to the Debtor; the Debtor assumed certain obligations of Clark Fork and Montana Power, including approximately sixty-seven million dollars in 8.45% junior subordinated deferrable interest debentures due 2036. Paul Hastings represented the Debtor and Clark Fork, its wholly owned subsidiary, in connection with this transfer of assets and assumption of liabilities, referred to in these proceedings as the "going flat" transaction. The Debtor has consistently alleged, and Magten has never disputed, that Magten did not own any of the debentures prior to the time the assets were transferred to the Debtor. Rather, Magten acquired the debentures after the transaction was complete. Therefore, the Debtor asserts and Magten has not disputed, that Magten was never a creditor of Clark Fork at a time when Clark Fork held the disputed energy assets. Rather, Magten became a holder of the debentures only after the transaction was completed and was a matter of public record.

On September 14, 2003, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. An application to employ Paul Hastings as counsel for the Debtor and Debtor-in-Possession was filed soon thereafter, accompanied by an affidavit of Jesse H. Austin III, lead counsel for Paul Hastings. An order approving the application was entered in due course thereafter.

On January 14, 2004, (Docket No. 686), Magten filed a notice of appearance and request for service of papers. This motion was filed by Magten on June 18, 2004.

A hearing on confirmation of the Debtor's plan is currently scheduled for August 25, 2004.

Boiled to its essence, Magten argues that Paul Hastings should be disqualified for two reasons:
> 1. Paul Hastings did not adequately disclose that it represented both the Debtor and Clark Fork in the "going flat" transaction. It therefore violated its obligations under section 327 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure to disclose "all connections" that it has with all parties in interest. [FN1] Because of this inadequate disclosure, Magten argues that Paul Hastings should now be disqualified.

FN1. Paul Hastings filed a supplemental affidavit disclosing this dual representation on July 7, 2004.
> 2. Whether the disclosure was adequate or not, Paul Hastings should be disqualified because it has an actual and irreconcilable conflict of interest resulting from its dual representation of the Debtor and Clark Fork. The basis for this assertion is Magten's contention that the interests of Clark Fork (and its creditors, to whom Magten argues Paul Hastings owed a fiduciary obligation) were harmed because the assets were transferred for virtually no consideration. Magten argues that it is a creditor of Clark Fork because it holds debt instruments, the junior subordinated debentures, on which Clark Fork was obligated at the time the assets were transferred.

(C) 2006 West Group  
43 Bankr.Ct.Dec. 93  
(Cite as: 2004 WL 1661016 (Bankr.D.Del.))

Page 3

II. *ANALYSIS*

A. *The Disclosure Issue*

*2 It is clear that the initial disclosure by Paul Hastings was inadequate. Although Paul Hastings now argues that there was no conflict because the transaction benefitted both parties, that is not the test for disclosure. Section 327 and Rule 2014 make it clear that *all connections* must be disclosed whether they give rise to an actual conflict of interest or not. Paul Hastings failed to do this.

At the hearing, the attorney for the United States Trustee advised the Court and other parties that he had thoroughly vetted the dual representation with Paul Hastings at the beginning of the case and that he was satisfied with the explanations given. While he stated that he believed the dual representation was a matter of public record, he did not share that information with others nor did he request that Paul Hastings file a supplemental affidavit of disclosure. In retrospect, he acknowledged that this was a mistake. Nevertheless, these representations by the attorney for the United States Trustee support the conclusion that there was no conscious effort by Paul Hastings to conceal its dual representation. This fact is relevant to what remedy, if any, should be imposed for the inadequate disclosure.

As noted above, following a hearing at which counsel for Magten asked the Court to direct Paul Hastings to file a supplement disclosure, and the Court so ordering, Paul Hastings did file the July 7, 2004 affidavit. Therefore, as of this time, the matter has been fully and adequately disclosed. The issue presented is whether the previous failure to disclose justifies disqualification at this point.

The answer is no. Inadequate disclosure does not mandate disqualification of counsel. Rather, the appropriate remedy is left to the broad discretion of the court. *See, e.g., In re Best Craft Gen. Contractor and Design Cabinet, Inc.,* 239 B.R. 462 (Bankr.E.D .N.Y.1999). In this case, the disclosure was made at the outset of the case to the United States Trustee and formal disclosure was later made. Also, as noted, the prior disclosure to the United States Trustee is indicative of a lack of intent to conceal. Further, as discussed in the next session, this is not a case where full disclosure would have revealed an actual conflict. Rather, full disclosure would have alerted all parties to facts that should have been known but which, in the end, do not bear upon Paul Hastings' qualification to serve as counsel. For these reasons, the Court will not now disqualify Paul Hastings for its previous failure to disclose.

B. *Is There a Conflict?*

A primary purpose of the disclosure rules is to allow parties in interest, and the Court, to determine whether the proposed counsel is disinterested and whether such counsel holds or represents an interest adverse to the estate. The question presented here, therefore, is whether Paul Hastings prior dual representation meets either of those standards. It does not.

This motion has been brought solely by Magten; no other creditor has joined. As noted above, Magten was not a creditor of Clark Fork at the time the transaction took place. Rather, it only became a creditor of the Debtor after the Debtor assumed the liability associated with the junior subordinated debenture initially issued by Montana Power Company. Thus, Magten is not only not a party directly affected by the transaction--such as Clark Fork itself-- but it was also not an indirect party at the time the transaction took place. Thus, its relationship to the transaction for the purposes of asserting a disqualification motion is tenuous at best.

*3 Here, neither the Debtor nor Clark Fork, the two parties directly involved, have complained. Indeed, the transaction was approved by the boards of directors of each company and was perceived by them to be in the best interests of those companies.

At bottom, Magten's argument is that Paul Hastings must be disqualified for its dual representation because Magten, as a third party who claims to have been injured by the transaction, is now challenging it. This is a novel theory that does not withstand scrutiny. First, as noted, even if third party creditors were injured by the transaction, Magten was not one of them. Second, there is no present proof of injury in any event; while that issue has been asserted in Adversary Proceeding No. 04-53324, captioned *Magten Asset Management Corporation v. NorthWestern Corporation,* pending before this Court, no such finding has yet been made. Thus, there is no basis for asserting actual injury that may create an actual conflict. Finally, even if actual injury were eventually proven, the fact that Paul Hastings represented the injured party, Clark Fork, would not necessarily mean that it holds an interest adverse to this estate or any class of its creditors. Clark Fork is not a debtor; therefore, the test is not whether Paul Hastings holds an interest adverse to a class of Clark Fork's creditors but whether it holds an interest adverse to a class of Northwestern's creditors. Yes, Magten is a member of a class of the Debtor's creditors-the subordinated debenture holders-but it asserts it has been injured not in that capacity (after all, the Debtor assumed its debt), but in its non-existent capacity as a creditor of Clark Fork. [FN2] The prohibition against counsel holding an "adverse interest" does not stretch so

(C) 2006 West Group
43 Bankr.Ct.Dec. 93
**(Cite as: 2004 WL 1661016 (Bankr.D.Del.))**

Page 4

far.

FN2. The gist of the fraudulent conveyance claim asserted in Adv. Proc. 04-53324 is that the utility assets should be returned to Clark Fork to be shared only by its creditors, rather than be subject to claims of NorthWestern's other creditors whose debts did not originate with Montana Power.

III. *CONCLUSION*

For the foregoing reasons, Magten's motion to disqualify is denied. An order is to be submitted under certification of counsel.

2004 WL 1661016 (Bankr.D.Del.), 43 Bankr.Ct.Dec. 93

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo