# Exhibit A

David R. Paoli
PAOLI & SHEA, P.C.
P.O. Box 8131
Missoula, Montana 59802
Telephone: (406) 542-3330
Facsimile: (406) 542-3332

Bijan Amini (*Pro Hac Vice* Application forthcoming)
STORCH AMINI & MUNVES, P.C.
405 Lexington Avenue 51st Floor
New York, New York 10174
Telephone: (212) 490-4100
Facsimile: (212) 490-4208

*Attorneys for Plaintiff*



FILED

MAY 2 0 2004

LORI MALONEY CLERK

By_____
                Deputy Clerk

## MONTANA SECOND JUDICIAL DISTRICT COURT, SILVER BOW COUNTY

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION Suing individually and derivatively on behalf of CLARK FORK AND BLACKFOOT, LLC <br><br> Plaintiff, <br><br> v. <br><br> PAUL HASTINGS JANOFSKY & WALKER LLP, <br><br> Defendant. | Cause No. DV-04-131 <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Magten Asset Management Corporation ("Magten" or the "Plaintiff"), by and through its

attorneys Storch Amini & Munves, P.C., and Paoli & Shea, P.C., as and for its Complaint against

Paul Hastings Janofsky & Walker LLP ("Paul Hastings" or the "Defendant") alleges as follows:

### INTRODUCTION

1.     This complaint involves a scheme to defraud the creditors of Northwestern

Energy LLC, now known as Clark Fork and Blackfoot LLC (herein, "Clark Fork"), and

Defendant's breach of its duties to Clark Fork and its creditors in connection therewith.  To

cover up losses from poor investment decisions, the Northwestern Corporation ("Northwestern") decided to strip the assets of Clark Fork, its solvent and profitable subsidiary. In doing so, Northwestern defrauded the creditors of the subsidiary, including a trust that had invested in the subsidiary on the basis of those very same valuable assets.

2.      The chronology of the events in question is stark testimony to the fraudulent nature of the scheme. In September 2000, Northwestern agreed to acquire the profitable transmission assets and the Milltown Dam of the Montana Power Company. By the time the transaction was consummated on February 15, 2002, Northwestern was drowning in red ink from bad investment decisions. A mere nine months later, slowed only by regulatory requirements, Northwestern transferred Clark Fork's profitable assets of between $1.1 and 1.4 billion in value for no payment whatsoever. Consideration supplied in the form of assumption of $700 million in Clark Fork's debt, on its face inadequate, was in fact itself illusory. Northwestern promptly encumbered the assets with new debt to temporarily cover its ineptitude, disenfranchising Clark Fork's creditors altogether. A mere ten months later, Northwestern was bankrupt.

3.      The officers and directors of Clark Fork were fully complicit in placing the company they had a duty to protect into insolvency. They willfully disregarded the fiduciary duties they owed to the creditors of Clark Fork by blindly obeying the orders of their parent.

4.      The Defendant served as counsel to Clark Fork, advising these same officers and directors. While the scheme's premise was simple, the execution of it was quite complex. Paul Hastings' assistance was crucial in guiding Northwestern and Clark Fork through the complex legal and regulatory hurdles necessary to effect Northwestern's desired result.

5.      In reality, Paul Hastings, which was hopelessly conflicted, devised, structured and negotiated the entire scheme. As counsel to Northwestern, the only party that benefited in the

transaction, Paul Hastings not only aided and abetted the Clark Fork officers and directors fiduciary breaches, but breached its own duties to Clark Fork in merely doing whatever it took to aid Northwestern in its fraudulent undertaking.

6.    By this action, Magten, as a creditor of Clark Fork and by virtue of its rights to enforce obligations under the Trust, seeks damages from Paul Hastings for its role in aiding and abetting the breach of fiduciary duties owed to the creditors of Clark Fork, aiding and abetting the fraudulent transfer of Clark Fork's assets to Northwestern, and its malpractice.

## THE PARTIES

7.    The Plaintiff, Magten, is a corporation organized under the laws of the State of Delaware, with its principle place of business in the State of New York.

8.    The Defendant, Paul Hastings, is a limited liability partnership organized under the laws of California.  It has significant offices in New York.  Many of its partners reside in the state of New York.

9.    Northwestern is a corporation incorporated in the State of Delaware with its corporate headquarters in Sioux Falls, South Dakota.

10.    Clark Fork and Blackfoot LLC is a Montana corporation, with its principal place of business in Montana.  The energy assets at stake in this litigation were all situated in Montana.

## JURISDICTION

11.    This Court has jurisdiction over this action pursuant to Rule 4(B) of the Montana Rules of Civil Procedure.

12.    In connection with its representation of Clark Fork, Paul Hastings regularly communicated with and visited Clark Fork at its location in Montana.

13.     Additionally, in connection with the transactions complained of, at least throughout 2002, Paul Hastings represented Clark Fork before the Federal Energy Regulatory Commission.

14.     As set forth below, in connection with the acts complained of herein, Paul Hastings caused over $1 billion of Clark Fork's assets located in the State of Montana to be transferred out of Clark Fork and out of the reach of Clark Fork's creditors.

## BACKGROUND

15.     The Montana Power Company was incorporated in 1961, as successor to an energy corporation formed in 1912. It operated as the sole gas and electric utility throughout the state of Montana.

16.     In 1996, the Montana Power Company and the Bank of New York ("BNY") as Trustee entered into an Indenture for the Unsecured Subordinated Debt Securities dated November 1, 1996 (the "Indenture"), pursuant to which the Montana Power Company issued $65 million in 8.45% Junior Subordinated Debentures (the "Junior Debentures").

17.     At or about the same time, pursuant to the Amended and Restated Trust Agreement (the "Trust Agreement") between itself and various other persons, the Montana Power Company created Montana Power Capital I (the "Trust"), a business trust established pursuant to the Delaware Business Trust Act. BNY was designated as the Property Trustee of the Trust as well as serving as Trustee under the Indenture.

18.     As detailed below, as of November 2002, Clark Fork had succeeded to the Montana Power Company's obligations with respect to the Junior Indentures. The BNY has been succeeded as Property Trustee of the Trust as well as Trustee under the Indenture by the Law Debenture Trust Company of New York ("Law Debenture").

19.    The Junior Debentures were not sold directly to investors. Instead, they were sold to the Property Trustee of the Trust. The Trust holds 100% of the Junior Debentures, with a total face amount of approximately $67 million, which constitute its sole meaningful asset.

20.    The Trust is a special purpose vehicle which, pursuant to the Trust Agreement, issued the Series A 8.45% Quarterly Income Preferred Securities ("QUIPS"). The value of the QUIPS is entirely based on the value of the Junior Debentures, and thus on the ability of Clark Fork to pay interest and principal to the Trust. The amounts paid by Clark Fork to the Trust would, in turn, be passed on by the Trust to the holders of the QUIPS.

21.    The Trust's purpose, structured solely for accounting purposes, is to hold all of the Junior Debentures. Purchasers of QUIPS acquire an indirect undivided beneficial interest in the Junior Debentures and obtain substantially the same rights and the same potential investment return as they would have, had they owned the Junior Debentures directly.

22.    The entire structure of the transaction was designed to put investors in the same position as if they had directly purchased the Junior Debentures, while providing the Montana Power Company with a more favorable accounting treatment than would have been possible had the Junior Debentures been sold directly to the investing public.

23.    In Section 610 of the Indenture, Clark Fork (as successor to the Montana Power Company) expressly acknowledges that the holders of the QUIPS are intended beneficiaries of the Company's obligations with respect to the Junior Debentures and that if the Property Trustee of the Trust (the legal titleholder to the Junior Debentures) fails to act, any holder of the QUIPS can sue directly to enforce the Property Trustee's rights.

24.    Magten owns in excess of 33% of the QUIPS.

25.    In connection with the Trust Agreement and the Indenture, Montana Power also entered into a Guarantee Agreement with the BNY as Guarantee Trustee (the "Guarantee Agreement").    Pursuant to the Guarantee Agreement, the Montana Power Company, as guarantor, agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the Trust, and to the extent the Property Trustee had funds available in a specified account.  As with the Indenture and the Trust Agreement, Clark Fork and Law Debenture have succeeded to the original roles and responsibilities of the Montana Power Company and BNY, respectively.

## EVENTS LEADING UP TO THE CLAIMS

26.    In 1997, the Montana legislature passed the Energy Deregulation Act, deregulating the administrative controls Montana had put on the Montana Power Company for the better part of a century.  Almost immediately, the Montana Power Company began looking for ways to unload its energy assets ("The Montana Power Assets"), its long term debt and its environmental liabilities.

27.    The plan developed as follows: the Montana Power Company transferred the Montana Power Assets into a new, wholly-owned subsidiary to which it also transferred the liability saddled Milltown Dam as well as the obligation to fund the Junior Debentures. Northwestern then purchased the Montana subsidiary and in due turn transferred the assets to itself, leaving the liabilities unfunded.  As Northwestern later stated (see below) the sole purpose of structuring the transaction this way was to avoid the liabilities associated with these assets.

28.    On September 29, 2000, the Montana Power Company entered into a Unit Purchase Agreement with Northwestern.  The Montana Power Company agreed to create a

subsidiary, the Montana Power Company LLC ("MPLLC") to which it would transfer the Montana Power Assets. Northwestern agreed to purchase this subsidiary.

29.     Paul Hastings represented Northwestern in this transaction and was instrumental in structuring and negotiating it. Another of Paul Hastings' clients, Credit Suisse First Boston Corporation ("CSFB"), served as Financial Consultant for Northwestern on the transaction.

30.     Over the next two years, Paul Hastings assisted Northwestern in clearing the state and federal regulatory hurdles necessary to consummate the purchase of MPLLC.

31.     However, by October of 2001, Northwestern and Paul Hastings knew that Northwestern was running out of funds. Therefore, Paul Hastings, as counsel to Northwestern, assisted Northwestern in preparing a $720 million securities offering in which Paul Hastings' other client, CSFB, would act as lead initial purchaser and underwriter of $250 million 7 7/8% Five Year Notes and $470 million 8 ¾% Ten Year Notes. That purchase agreement was finally signed March 8, 2002.

32.     To finance the acquisition of MPLLC, on January 14, 2002, Northwestern entered into a $1 billion credit agreement with CSFB and other lenders. The credit facility consisted of a $280 million revolving credit facility and a $720 million acquisition term loan. CSFB, Paul Hastings' client, also served as administrative agent. Paul Hastings represented Northwestern in connection with this credit agreement.

33.     On February 13, 2002, following the clearance of regulatory hurdles, the Montana Power Company merged the Montana Power Assets into MPLLC (the "Merger"). As a result of the Merger, MPLLC thereafter held and operated the Montana Utility Assets and succeeded to all of Montana Power's obligations with respect to the Junior Debentures and the QUIPS.

34.     On February 15, 2002, Northwestern purchased 100% of the equity of MPLLC, and, thus, the corresponding control of the Montana Utility Assets, for $478 million in cash. None of this consideration was received or retained by MPLLC. Thus, it was not thereafter available to Clark Fork to assist Clark Fork in meeting its obligations to its creditors.

35.     Paul Hastings represented Northwestern in its purchase of MPLLC. In connection with this purchase, Paul Hastings issued an Opinion Letter to the Securities and Exchange Commission ("SEC") regarding Northwestern's Form U-1 Application. In it, Paul Hastings represented that, among other things, the purchase of MPLLC would "not violate the legal rights of the holders of any securities issued by Northwestern or any 'associate company of Northwestern'.

36.     In its Form U-1 Application, Northwestern maintained that it was exempt from the stringent requirements of the Federal Public Utility Holdings Act ("PUHCA") in part on the grounds that its utility interests comprised only a small and not substantial part of Northwestern's business. This statement to the SEC was materially false. Through the purchase of the Montana Utility Assets, Northwestern's most valuable revenue producing arm would be those utility assets. Paul Hastings represented Northwestern on this filing and submitted its Opinion Letter in connection with it.

37.     Furthermore, in its Form U-1 Application, Northwestern revealed that the *sole* purpose of structuring the acquisition so that Northwestern would first purchase a subsidiary and then a few months later transfer the assets to itself was to avoid the liabilities associated with those assets.

38.    On March 19, 2002, MPLLC was renamed Northwestern Energy LLC ("Northwestern Energy"). Northwestern Energy was a duly organized Montana limited liability company. It is now known as Clark Fork.

## THE FRAUDULENT TRANSFER

39.    By the time Northwestern acquired control of Clark Fork in 2002, Northwestern was insolvent. Consequently, Northwestern and its counsel Paul Hastings worked out a plan whereby Northwestern would acquire the assets of Clark Fork for vastly less consideration than they were worth. Then they would immediately apply to borrow additional funds.

40.    On August 13, 2002, in accordance with the plan worked out by Paul Hastings, Northwestern entered into a series of agreements whereby it assumed on a joint and several basis with Clark Fork all of Clark Fork's obligations under the Indenture, the Guarantee Agreement and the Trust Agreement. On information and belief, Paul Hastings structured the transaction, and actually drafted these agreements as counsel to both Northwestern and Clark Fork.

41.    This transfer was illusory in that Northwestern did not have the resources by which to meet the assumed obligations. Northwestern was insolvent both immediately before and immediately after the assumption of these liabilities. Paul Hastings knew or should have known these facts.

42.    On November 15, 2002, in accordance with the prearranged plan worked out by Paul Hastings, Clark Fork and Northwestern entered into the Asset Transfer and Stock Purchase Agreement (the "Asset Transfer"), discussed below. On information and belief, Paul Hastings structured the transaction, and actually drafted the Asset Transfer as counsel to both Northwestern and Clark Fork.

43.     Through this Asset Transfer, the officers of Clark Fork and Northwestern, carried out a scheme to defraud, injure and deprive the Trust of the ability to receive the benefits due to it from Clark Fork in connection with the Junior Debentures, and consequently holders of the QUIPS, by, in the Transaction, transferring substantially all of Clark Fork's assets, to Northwestern without receiving adequate consideration in return. Clark Fork received no cash for the Transfer, and the consideration purportedly received was dramatically less than the value of the assets; over $1 billion dollars in assets were transferred to Northwestern, and only approximately $700 million dollars in Clark Fork liabilities were purportedly assumed by Northwestern. Indeed, with respect to some if not all of the liabilities purportedly assumed, Northwestern was already a co-obligor with Clark Fork prior to the Transaction and/or Clark Fork remained obligated jointly and severally with Northwestern subsequent to the Transaction, thus making any purported assumption of the liabilities in connection with the Transaction valueless. Northwestern's assumption of the debt was illusory in any event, having already predetermined to encumber the very assets that were available to satisfy them to repay prior losses, effectively leaving Clark Fork's creditors without recourse.

44.     In particular, Northwestern was already a co-obligor as to Clark Fork's obligations with respect to the Junior Indentures and QUIPS prior to the transaction, and Clark Fork remained obligated jointly and severally with Northwestern with respect to the Junior Indentures and QUIPS subsequent to the Transaction. Indeed, Clark Fork, through Paul Hastings, requested BNY (at the time still the Trustee under the Indenture) to execute a supplement to the Indenture purporting to release Clark Fork from its continuing obligations under the Indenture, but BNY refused to provide such a release.

45.    As an immediate result of the consummation of the Transfer, Clark Fork was insolvent.  Stripped of its assets, Clark Fork was thereafter unable to meet its obligations with respect to the Junior Debentures and QUIPS and did not do so.

46.    Under the Asset Transfer, Clark Fork transferred substantially all of its assets, the energy assets from the Montana Power Company, and retained only the Milltown Dam.  The Milltown Dam was, and still is, saddled with enormous environmental liabilities.  The Milltown Dam operates under a license set to expire in 2007.

47.    Also in connection with the Asset Transfer, and also in accord with the plan devised by Paul Hastings, on November 15, 2002, Northwestern purported to execute a Third Supplemental Indenture, a Guarantee Assumption Agreement, and a Trust Assumption Agreement pursuant to which the Debtor would assume all of Clark Fork's obligations on the Junior Debentures.  On information and belief, Paul Hastings structured the transaction, and actually drafted these agreements as counsel to both Northwestern and Clark Fork.

48.    Article Eleven of the Indenture purports to release the Montana Power Company (or its successor in interest) upon the transfer of substantially all of the assets of the Montana Power Company if the successor company, among other things, is a corporation validly organized under or subject to the laws of the United States or any state thereof and assumes the due and punctual payment of the principal, premium (if any) and interest on the securities and the performance of every covenant of the Indenture.

49.    Additionally, notwithstanding any purported release effectuated by the Third Supplemental Indenture, because the Transfer was a fraudulent transfer, no release could have been effectuated solely by the operation of Article Eleven of the Indenture.

## EVENTS FOLLOWING THE ASSET TRANSFER

50.     Following the Asset Transfer, Northwestern operated the energy assets it had sought in 2000 and acquired through the assistance of Paul Hastings as part of its Northwestern Energy Division.

51.     On November 20, 2002, Clark Fork became the official name of the subsidiary.

52.     On December 17, 2002, only days thereafter, Northwestern entered into a new $390 million senior secured credit agreement with CSFB and other financial institutions. This credit agreement was partly secured by $280 million in aggregate principal amount of First Mortgage Bonds, which granted a first mortgage in the energy assets previously held by Clark Fork.

53.     Ten months after the Asset Transfer, on September 14, 2003, Northwestern filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.

54.     The Montana Utility Assets generate approximately 80% of Northwestern's consolidated EBITDA, although Northwestern did not pay fair value for those assets, thus injuring Magten and Clark Fork's other creditors.

55.     The Montana Utility Assets are now available to all creditors of Northwestern, most of whom were not creditors of Clark Fork and thus had not previously had any claim to Clark Fork's assets. Accordingly, Magten and other QUIPS holders are likely to receive little or no recovery for their claims in Northwestern's reorganization plan.

56.     On April 8, 2004, the United States Bankruptcy Court for the District of Delaware granted Magten's motion in Northwestern's bankruptcy case for leave to commence an adversary

proceeding against Northwestern seeking to have the Asset Transfer set aside as a fraudulent transfer.

57.    On April 8, 2004 Magten filed a complaint against Northwestern in the United States Bankruptcy Court for the District of Delaware to avoid the Asset Transfer as a fraudulent transfer.

58.    On April 19, 2004, Magten filed a complaint against the officers and directors of Clark Fork for breach of fiduciary duty in the District Court of Montana, Butte Division.

## FIRST CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duties Owed to Creditors of Clark Fork in the Zone of Insolvency

59.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

60.    Clark Fork was a company within the zone of insolvency on November 15, 2002. Accordingly, the officers of Clark Fork owed individual fiduciary duties to Clark Fork's creditors, including without limitation the Trust and all QUIPS holders, including Magten's predecessors in interest, not to engage in any transaction that would make Clark Fork insolvent and thus unable to perform its obligations with respect to the Junior Debentures and QUIPS.

61.    The Trust and the QUIPS holders, including Magten's predecessors in interest, were creditors of Clark Fork, and were injured by the Transaction which transferred the Montana Utility Assets to Northwestern without adequate consideration, thereby rendering Clark Fork insolvent.

62.    The Property Trustee has failed to enforce the Trust's rights, so Magten has standing under the Indenture to enforce both the Trust's rights and its own individual rights as successor to the QUIPS holders who were its predecessors in interest.

63.    The Defendant aided and abetted the officers of Clark Fork in breaching their fiduciary duties owed to the Trust and Magten's predecessors in interest by willfully and wantonly carrying out the Transaction and transferring the Montana Utility Assets to Northwestern without adequate consideration, thereby rendering Clark Fork insolvent.

64.    The Defendant also aided and abetted the officers of Clark Fork in breaching their fiduciary duties to the Trust and Magten's predecessors in interest by purporting to assign Clark Fork's obligations with respect to the Junior Debenture and QUIPS to Northwestern, when they knew Northwestern was insolvent and would remain insolvent, and would thus be unable to perform those obligations.

65.    Paul Hastings knew or should have known that the conduct of the Clark Fork officers constituted a breach of their fiduciary duties. However, conflicted due to their joint representation of Northwestern, Paul Hastings substantially assisted and encouraged these breaches in order to benefit its long time client, Northwestern.

66.    By reason of the foregoing acts, practices and course of conduct, the Defendant aided and abetted the Clark Fork officers and directors breach of their fiduciary duties to the Trust and Magten's predecessors in interest, causing financial loss, in an amount to be proven at trial.

67.    Punitive damages in an amount to be determined at trial should also be awarded due to the willful, malicious, and outrageous nature of these breaches of fiduciary duty.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Fraudulent Transfer

68.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

69.     The Montana Uniform Fraudulent Transfer Act § 31-2-333, MCA provides that a transfer made by a debtor is fraudulent as to any creditor where it was made 1) with actual intent to hinder, delay or defraud any creditor of the debtor, or 2) without receiving a reasonably equivalent value in exchange and the debtor was engaged or about to engage in a business for which its remaining assets were unreasonably small or believed, or reasonably should have believed, that the debtor would incur debts beyond the Debtor's ability to pay as they came due.

70.     Pursuant to § 31-2-333, MCA in determining actual intent to hinder, delay, or defraud any creditor, consideration may be given, among other factors, to whether:  the transfer was to an insider; before the transfer was made, the debtor had been sued; the transfer was of substantially all the debtor's assets; and the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred.

71.     The Montana Uniform Fraudulent Transfer Act § 31-2-334, MCA provides that a transfer made by a debtor is fraudulent as to creditors whose claims arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange and the debtor was insolvent at that time.

72.     Magten was a creditor of Northwestern and of Clark Fork by operation of the Guarantee Agreement and the Indenture.

73.     Northwestern was a parent of Clark Fork and, as such, exercised complete control over Clark Fork.  As a result of this relationship, Northwestern qualified as an insider under Montana law.

74.     In connection with the Transfer, Clark Fork transferred assets to Northwestern that are valued between $1.15 billion and $1.4 billion, and the only alleged consideration

received for the Transfer was the assumption of approximately $700 million in liabilities, itself illusory.

75.    Prior to the Transfer, Clark Fork was a solvent entity.    The transfer of substantially all of Clark Fork's assets to Northwestern caused Clark Fork to become insolvent.

76.    Prior to the Transfer, Clark Fork was a reasonably capitalized entity.  The transfer of substantially all of Clark Fork's assets to Northwestern caused Clark Fork to become undercapitalized.

77.    Because the Montana Utility Assets that Northwestern received in the Transfer were worth substantially more than the value of the liabilities that were assumed by the Northwestern, Clark Fork did not receive reasonably equivalent value for the transfer.

78.    Paul Hastings knew or should have known that by structuring the Asset Transfer the way it did, Clark Fork would be rendered insolvent and the QUIPS holders would be hindered, delayed or defrauded.

79.    Paul Hastings knew or should have known that by structuring the Asset Transfer in the way that it did, Clark Fork would transfer assets without receiving a reasonably equivalent value in exchange leaving Clark Fork with unreasonably small remaining assets or without ability to pay its debts as they became due.

80.    Paul Hastings knew or should have known that by structuring the Asset Transfer in the way that it did, Clark Fork would transfer assets without receiving a reasonably equivalent value in exchange leaving Clark Fork insolvent as a result.

81.    Paul Hastings provided substantial assistance to Northwestern and Clark Fork to effect this fraudulent transfer.  The Defendant substantially assisted the directors and officers of Clark Fork by structuring and effectively orchestrating the entire Asset Transfer.

82.     Magten, on its own behalf and on behalf of the Trust, seeks the payments which the Trust should have received had the assets not been fraudulently transferred out of Clark Fork.

### THIRD CAUSE OF ACTION

### Civil Conspiracy to Conduct Fraudulent Transfer

83.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

84.     Paul Hastings and Northwestern intended when fraudulently transferring the Montana Utility Assets of Clark Fork to Northwestern to hinder, delay or defraud the creditors of Clark Fork.

85.     Paul Hastings and Northwestern intended to fraudulently transfer the Montana Utility Assets of Clark Fork to Northwestern without receiving reasonably equivalent value in exchange, rendering Clark Fork engaged in a business or a transaction for which the remaining assets of Clark Fork were unreasonably small.

86.     Paul Hastings and Northwestern intended to fraudulently transfer the Montana Utility Assets of Clark Fork to Northwestern without receiving a reasonably equivalent value in exchange, leaving Clark Fork with only the liability saddled Milltown Dam, and rendering Clark Fork insolvent.

87.     Paul Hastings and Northwestern agreed on a course of action whereby Paul Hastings and Northwestern would enact the requisite agreements in order conduct that fraudulent transfer.

88.     In furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the

Montana Uniform Fraudulent Transfers Act in order to hinder, delay or defraud the creditors of Clark Fork.

89.    Also, in furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the Montana Uniform Fraudulent Transfers Act without receiving a reasonably equivalent value in exchange and Clark Fork became insolvent as a result.

90.    Also, in furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the Montana Uniform Fraudulent Transfers Act without receiving a reasonably equivalent value in exchange rendering Clark Fork engaged in a business or transaction for which the remaining assets of Clark Fork were unreasonably small.

91.    As damages, Magten, on its own behalf and on behalf of the Trust, seeks the payments which the Trust should have received had the assets not been fraudulently transferred out of Clark Fork.

### FOURTH CAUSE OF ACTION

#### Malpractice
#### Magten suing directly, on behalf of the Trust and derivatively on behalf of Clark Fork

92.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

93.    The Defendant owed a duty of care to Clark Fork.

94.    The Defendant also owed a duty of care to Northwestern.

95.    The Defendant breached its duty to Clark Fork by failing to disclose its conflict of interest to Clark Fork's officers and directors.

96.    Because Paul Hastings failed to disclose its conflict of interest to Clark Fork and instead structured a transaction for Clark Fork whereby Clark Fork was forced to relinquish substantially all of its assets, Clark Fork and its creditors suffered an amount to be determined at trial.

97.    In as much as Paul Hastings' actions caused Clark Fork to become insolvent, and enter the zone of insolvency, Magten, on its own behalf, on behalf of the Trust and on behalf of Clark Fork, is entitled to recover for Paul Hastings' malpractice.

WHEREFORE, Plaintiff prays for all damages caused by the actions of defendant and enter judgment against defendant as follows:

1.    For Plaintiff's compensatory damages;

2.    An award of punitive damages to punish defendant for its intentional and malicious conduct;

3.    For Plaintiff's costs, attorneys' fees and any other recoverable expenses related to this litigation; and

4.    Such further and additional relief this Court deems just and proper.

DATED this 19th day of May, 2004.

PAOLI & SHEA, P.C.

By: _David R. Paoli_____
     David R. Paoli
     *Attorney for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues.

DATED this 19th day of May, 2004.

PAOLI & SHEA, P.C.

By: _____

David R. Paoli
*Attorney for Plaintiff*

# Exhibit B

Brendon J. Rohan, Esq.
J. Richard Orizotti, Esq.
POORE, ROTH & ROBINSON, P.C.
1341 Harrison Avenue
P. O. Box 2000
Butte, Montana  59702
(406) 497-1200
(406) 782-0043 (Fax)

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF MONTANA

## BUTTE DIVISION

---

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION Suing individually and derivatively on behalf of CLARK FORK AND BLACKFOOT, LLC, | ) ) ) ) | |
| | ) | Cause No. CV-04-49-BU-SEH |
| Plaintiff, | ) ) | |
| | ) | **ANSWER** |
| v. | ) ) | |
| PAUL HASTINGS JANOFSKY & WALKER LLP, | ) ) ) | |
| | ) | |
| Defendant. | ) ) | |

---

COMES NOW Defendant, Paul Hastings Janofsky & Walker LLP

("Paul Hastings"), by and through its counsel, and hereby answers the

complaint of plaintiff Magten Asset Management Corporation ("Magten")

as follows:

1.    **ANSWER**

1.     Denies paragraph 1.

2.     Denies paragraph 2, except admits that in September 2000 NorthWestern Corporation ("NorthWestern") agreed to acquire certain assets owned by the Montana Power Company; admits that one portion of this transaction was completed on February 15, 2002; and admits that certain assets were subsequently transferred from NorthWestern Energy LLC, which subsequently renamed itself Clark Fork and Black Foot LLC ("Clark Fork"), to NorthWestern in November 2002 in exchange for consideration that included the assumption of approximately $500 million of Clark Fork's debt securities as well as other consideration (the "Asset Transfer").

3.     Denies paragraph 3.

4.     Denies paragraph 4, except admits that Paul Hastings served as counsel to NorthWestern and, its wholly owned subsidiary, Clark Fork in connection with the Asset Transfer.

5.     Denies paragraph 5, except that admits that Paul Hastings served as counsel to NorthWestern and, its wholly owned subsidiary, Clark Fork in connection with the Asset Transfer.

6.     States that no response is required to paragraph 6 to the extent that it merely describes plaintiff's legal claims, and denies

2.     **ANSWER**

paragraph 6 to the extent that it describes Magten as a creditor of Clark Fork or makes any other factual assertions.

       7.      Denies knowledge or information sufficient to form a belief as to paragraph 7.

       8.      Denies paragraph 8 except admits that Paul Hastings is a limited liability partnership organized under the laws of the State of California with offices in several states, including New York, and admits that certain of its partners reside in the State of New York.

       9.      Admits paragraph 9.

      10.      Admits paragraph 10.

      11.      States that no response is required to paragraph 11.

      12.      Denies paragraph 12.

      13.      Denies paragraph 13.

      14.      Denies paragraph 14.

      15.      Denies knowledge or information sufficient to form a belief as to the truth of paragraph 15.

      16.      Denies knowledge or information sufficient to form a belief as to the truth of paragraph 16, and refers to the documents related to the transaction for their contents.

3.    **ANSWER**

17.    Denies knowledge or information sufficient to form a belief as to the truth of paragraph 17, and refers to the documents related to the transaction for their contents.

18.    Admits paragraph 18.

19.    Denies paragraph 19 as incomplete, and refers to the Trust Agreement for its terms.

20.    Denies paragraph 20 as incomplete and inaccurate, and refers to the Trust Agreement for its terms.

21.    Denies paragraph 21 as incomplete, and refers to the Trust Agreement for its terms.

22.    Denies paragraph 22 as incomplete, and refers to the Trust Agreement for its terms.

23.    Denies paragraph 23 as incomplete and inaccurate, and refers to the Trust Agreement for its terms.

24.    Denies knowledge or information sufficient to form a belief as to the truth of paragraph 24.

25.    Denies paragraph 25 as incomplete and inaccurate, except admits that Montana Power Company entered into a Guarantee Agreement with the Bank of New York as Guarantee Trustee, and refers to the Trust Agreement and Guarantee Agreement for their terms.

4.    <u>ANSWER</u>

26.    Denies knowledge or information sufficient to form a belief as to the truth of paragraph 26.

27.    Denies paragraph 27, except admits that the Montana Power Company transferred certain assets and liabilities to a wholly-owned subsidiary, and refers to the documents related to the transaction for their contents.

28.    Denies paragraph 28, except admits that, on September 29, 2000, the Montana Power Company entered into a Unit Purchase Agreement with NorthWestern.

29.    Denies paragraph 29, except admits that Paul Hastings represented NorthWestern in connection with this transaction and was involved in negotiating the terms of the transaction, and admits that Credit Suisse First Boston Corporation ("CSFB") served as a financial consultant to NorthWestern, but was not represented by defendant, in connection with the transaction.

30.    Denies paragraph 30, except admits that Paul Hastings provided legal services to NorthWestern in connection with obtaining state and federal regulatory approvals associated with NorthWestern's acquisition of Montana Power LLC ("MPLLC").

31.    Denies paragraph 31, except admits that Paul Hastings represented NorthWestern in connection with a $720 million securities

offering in which CSFB acted as lead initial purchaser and underwriter of $250 million 7 7/8% Five Year Notes and $470 million 8 3/4% Ten Year Notes, and admits that the purchase agreement between NorthWestern and CSFB was signed March 8, 2002.

32.     Admits paragraph 32, except denies that Paul Hastings represented CSFB in connection with the credit agreement.

33.     Denies paragraph 33.

34.     Denies paragraph 34, except admits that, on February 15, 2002, NorthWestern purchased all of the equity of MPLLC.

35.     Denies paragraph 35, except admits that Paul Hastings represented NorthWestern in its purchase of MPLLC and that, in connection with that transaction, Paul Hastings issued an Opinion Letter to the Securities and Exchange Commission regarding NorthWestern's Form U-1 application, and refers to that letter for its contents.

36.     Denies paragraph 36, except admits that Paul Hastings represented NorthWestern in connection with filing the Form U-1 application and issued an opinion letter in connection with that application, and admits that NorthWestern maintained in that application that it was exempt from the requirements of the Federal Public Utility Holdings Act ("PUHCA"), and refers to the application for its contents.

6.     **ANSWER**

37.    Denies paragraph 37, and refers to the application for its contents.

38.    Admits paragraph 38.

39.    Denies paragraph 39.

40.    Denies paragraph 40, except admits that, on August 13, 2002, NorthWestern entered into a series of agreements with its wholly owned subsidiary, Clark Fork; admits that Paul Hastings drafted the agreements as counsel to both NorthWestern and Clark Fork; and refers to those agreements for their content.

41.    Denies paragraph 41.

42.    Denies paragraph 42, except admits that, on November 15, 2002, NorthWestern and its wholly owned subsidiary, Clark Fork, entered into an Asset Transfer and Stock Purchase Agreement drafted by Paul Hastings as counsel to both parties.

43.    Denies paragraph 43.

44.    Denies paragraph 44, except admits that the Bank of New York refused to execute a supplement to the Indenture, and refers to the supplement to the Indenture for its contents.

45.    Denies paragraph 45.

7.    **ANSWER**

46.     Denies paragraph 46, except admits that Clark Fork retained the Milltown Dam and admits that the Milltown Dam operates under a license scheduled to expire in 2007.

47.     Denies paragraph 47, except admits that, on November 15, 2002, NorthWestern executed a Third Supplemental Indenture, a Guarantee Assumption Agreement and a Trust Assumption Agreement, drafted by Paul Hastings as counsel to both NorthWestern and its wholly owned subsidiary, Clark Fork, and refers to these agreements for their contents.

48.     Denies paragraph 48 as incomplete, and refers to the terms of the Indenture for its contents.

49.     Denies paragraph 49.

50.     Denies paragraph 50, except admits that, following the Asset Transfer, NorthWestern operated the energy assets it acquired as part of its NorthWestern Energy Division.

51.     Admits paragraph 51.

52.     Denies paragraph 52 as incomplete, except admits that, on or about December 17, 2002, NorthWestern entered into a new senior secured credit agreement with CSFB and other financial institutions, and that the credit agreement was partly secured by $280 million in aggregate

8.     **ANSWER**

principal amount of First Mortgage Bonds, and refers to the terms of the

credit agreement for its contents.

     53.     Admits paragraph 53.

     54.     Denies paragraph 54.

     55.     Denies paragraph 55, except admits that the assets

transferred from Clark Fork to NorthWestern in November 2002 are now

available to all creditors of NorthWestern, most of whom were not

creditors of Clark Fork.

     56.     Admits paragraph 56.

     57.     Admits paragraph 57.

     58.     Admits paragraph 58.

### FIRST CAUSE OF ACTION

Aiding and Abetting Breach of Fiduciary Duties Owed
to Creditors of Clark Fork in the Zone of Insolvency

     59.     Repeats and realleges defendant's responses to the

allegations contained in the preceding paragraphs as if fully set forth

herein.

     60.     Denies paragraph 60.

     61.     Denies paragraph 61, except admits that, prior to November

15, 2003, the Trust was a creditor of Clark Fork.

     62.     Denies paragraph 62.

9.     **ANSWER**

63.     Denies paragraph 63.

64.     Denies paragraph 64.

65.     Denies paragraph 65.

66.     Denies paragraph 66.

67.     Denies paragraph 67.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Fraudulent Transfer

68.     Repeats and realleges defendant's responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

69.     States that no response is required to paragraph 69 and refers to the statute for its content.

70.     States that no response is required to paragraph 70 and refers to the statute for its content.

71.     States that no response is required to paragraph 71 and refers to the statute for its content.

72.     Denies paragraph 72, except admits that Magten claims to be a creditor of NorthWestern.

73.     Denies paragraph 73, except admits that Clark Fork is a wholly owned subsidiary of NorthWestern.

10.     **ANSWER**

74.    Denies paragraph 74, except admits that Clark Fork transferred assets to NorthWestern on November 15, 2002.

75.    Denies paragraph 75, except admits that Clark Fork was solvent before the Asset Transfer.

76.    Denies paragraph 76, except admits that Clark Fork was adequately capitalized before the Asset Transfer.

77.    Denies paragraph 77.

78.    Denies paragraph 78.

79.    Denies paragraph 79.

80.    Denies paragraph 80.

81.    Denies paragraph 81, except admits that, as counsel, Paul Hastings provided legal services to NorthWestern and Clark Fork in connection with the Asset Transfer.

82.    States that no response is required to paragraph 82, and further states that, if any response is required, it denies paragraph 82.

### THIRD CAUSE OF ACTION

Civil Conspiracy to Conduct Fraudulent Transfer

83.    Repeats and realleges defendant's responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

84.    Denies paragraph 84.

11.    **ANSWER**

85.    Denies paragraph 85.

86.    Denies paragraph 86.

87.    Denies paragraph 87.

88.    Denies paragraph 88.

89.    Denies paragraph 89.

90.    Denies paragraph 90.

91.    States that no response is required to paragraph 91, and further states that, if any response is required, it denies paragraph 91.

## FOURTH CAUSE OF ACTION

### Malpractice
Magten suing directly, on behalf of the Trust
and derivatively on behalf of Clark Fork

92.    Repeats and realleges defendant's responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

93.    Admits paragraph 93.

94.    Admits paragraph 94.

95.    Denies paragraph 95.

96.    Denies paragraph 96.

97.    Denies paragraph 97.

12.    **ANSWER**

## FIRST DEFENSE

98.     The complaint fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

99.     The claims asserted in the complaint are barred, in whole or in part, by the applicable statute of limitations.

## THIRD DEFENSE

100.    The claims asserted in the complaint are barred, in whole or in part, under the doctrines of waiver, estoppel and laches.

## FOURTH DEFENSE

101.    The claims asserted in the complaint are barred, in whole or in part, because the plaintiff lacks standing to assert some or all of the claims asserted in the complaint.

## FIFTH DEFENSE

102.    The claims asserted in the complaint are barred, in whole or in part, because the plaintiff does not have the legal authority to bring a derivative action on behalf of Clark Fork, or to bring a claim on behalf of the Trust or a class of Clark Fork's creditors.

## SIXTH DEFENSE

103.    The claims asserted in the complaint are barred, in whole or in part, because the plaintiff was never a creditor of Clark Fork.

13.     **ANSWER**

## SEVENTH DEFENSE

104.   The claims asserted in the complaint are barred, in whole or in part, because the sole member and manager of Clark Fork and Clark Fork's officers never owed or breached a fiduciary duty to the plaintiff.

## EIGHTH DEFENSE

105.   The claims asserted in the complaint are barred, in whole or in part, because the defendant was not retained by the plaintiff and did not otherwise owe or breach any duty to the plaintiff.

## NINTH DEFENSE

106.   The claims asserted in the complaint are barred, in whole or in part, because the plaintiff cannot prove reliance since the transaction at issue was publicly disclosed and completed before the plaintiff purchased the debt securities that are the alleged basis for its claims.

## TENTH DEFENSE

107.   The claims asserted in the complaint are barred, in whole or in part, by the doctrines of assumption of risk and comparative negligence.

## ELEVENTH DEFENSE

108.   The claims asserted in the complaint are barred, in whole or in part, by the doctrine of unclean hands.

14.   **ANSWER**

## TWELFTH DEFENSE

109. The claims asserted in the complaint are barred, in whole or in part, because the actions of the defendant were not the cause of the plaintiff's alleged losses.

## THIRTEENTH DEFENSE

110. The claims asserted in the complaint are barred, in whole or in part, by the doctrines of avoidable consequences and mitigation of damages.

## FOURTEENTH DEFENSE

111. Because there are concurrent proceedings pending which are related to Magten's claims, the claims asserted in the complaint may be barred, in whole or in part, by the doctrines of res judicata and collateral estoppel.

## FIFTEENTH DEFENSE

112. The claims asserted in the complaint are barred, in whole or in part, because the plaintiff's claimed injuries and resulting damages were not reasonably foreseeable to the defendant.

## SIXTEENTH DEFENSE

113. The imposition of punitive damages against defendant would be a violation of its Federal and State Constitutional rights including due process and excessive fines and punishments.

15.    **ANSWER**

Paul Hastings reserves the right to plead or withdraw such further affirmative defenses which are found to be applicable or inapplicable to the facts of this case.

WHEREFORE, Defendant Paul Hastings, having fully answered plaintiff's complaint, prays that the same be dismissed and that judgment be entered and that it be granted all such other and further relief as the Court deems equitable and just.

DATED this _23_ day of July, 2004

POORE, ROTH & ROBINSON, P.C.,

By _Brendon J Rohan / JRO_
  Brendon J. Rohan
  **Attorney for the Defendant**
  **1341 Harrison Avenue**
  **Butte, MT 59701**

16. **ANSWER**

## CERTIFICATE OF SERVICE BY MAILING

This is to certify that on the __23__ day of July, 2004, the foregoing

attached **ANSWER** was duly served upon the following attorneys of

record, by depositing a true copy thereof in the United States mails,

postpaid, addressed as follows, to-wit:

David R. Paoli, Esq.
Paoli & Shea, P.C.
257 West Front Street
P.O. Box 8131
Missoula, Montana  59802

Bijan Amini, Esq.
Storch Amini & Munves, P.C.
405 Lexington Avenue 51st Floor
New York, New York  10174

       Attorneys for Plaintiff

           POORE, ROTH & ROBINSON, P.C.,

         By _*Brendon J. Rohan* / JRO_
           Brendon J. Rohan

17.    **ANSWER**

# Exhibit C



FILED
BILLINGS DIV.

2005 JAN 27 PM 2 04

PATRICK E. DUFFY, CLERK
BY _____Susan L. Nybo_____
DEPUTY CLERK

| JHG | ✓ |
|---|---|
| DG | |
| Secty | |
| Calendared | |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

MAGTEN ASSET MANAGEMENT )
CORPORATION, )              Cause No. CV-04-26-BU-RFC
                          )
           Plaintiff, )
                          )
       vs. )                    **ORDER**
                          )
MIKE J. HANSON AND ERIE J. KINDT, )
                          )
          Defendants. )

---

## BACKGROUND

On February 15, 2002, pursuant to the terms of a Unit Purchase Agreement ("UPA")

entered into between NorthWestern, as purchaser, and Montana Power Company ("MPC") and

Touch America Holdings, Inc. ("TAH"), as sellers, NorthWestern acquired sole unit interest in

Montana Power, LLC ("MPLLC"). Two days previously, as part of a corporate reorganization of

MPC into TAH, the electric and natural gas transmission and distribution assets of MPC, as well

as MPC's interest in the Milltown Dam, was transferred from MPC to MPLLC. The assets and

liabilities transferred to MPLLC were certain 8.45% Junior Subordinated Debentures due in 2036

which had been issued by MPC in or about 1996. The interest paid on these Junior Debentures

created the cash flow to make dividend payments on certain Series A 8.45% Quarterly Income

Preferred Securities ("QUIPS") which had previously been issued by Montana Power Capital I

(The "Trust"). The sole assets of the Trust are the Junior Debentures. Plaintiff Magten is a

holder of 33% of the Series A 8.45% QUIPS, with a principal face value in excess of $20

million.

In August 2002, NorthWestern authorized and directed the transfer of the electric and

natural gas transmission and distribution assets and liabilities held by its subsidiary to it, the

parent corporation. The transfer was effected on November 15, 2002. The Montana Utility

Assets and Liabilities transferred included the obligations associated with the Junior Debentures

and QUIPS. Other assets and liabilities remained with the limited liability company, whose

name was changed to Clark Fork and Blackfoot, LLC. Pursuant to the operation of the QUIPS

Trust Documents, as amended on or about August 13, 2002, upon the closing of the transfer,

Magten ceased to be a creditor of Clark Fork and became a creditor of NorthWestern only.

Subsequently, on September 14, 2003, NorthWestern filed a voluntary petition for

reorganization in bankruptcy pursuant to Chapter 11 of the Bankruptcy Code. Magten filed an

adversary proceeding against NorthWestern in the bankruptcy proceeding. On April 19, 2004

Magten filed a complaint against Officers of Clark Fork, Mike J. Hanson, Jack D. Haffey, Ernie

J. Kindt and Ellen Senechal, alleging that Defendants had breached a fiduciary duty to Plaintiff

because Clark Fork transferred certain assets and liabilities of Clark Fork (the "Montana Utility

Assets and Liabilities") to its corporate parent and sole owner, NorthWestern.

2

Defendants have moved the Court for summary judgment on the grounds that Magten was not a creditor of Clark Fork, and therefore, Clark Fork does not have standing to assert a creditor's claim and Defendants owe no duty to Magten.

### STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150 (9th Cir. 1997) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Even if the evidence is merely colorable or is not significantly probative, a grant of summary judgment is still appropriate. *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1288 (9th Cir. 1987). The party moving for summary judgment bears the initial burden of proof to identify the absence of a genuine issue of material fact.

Once the moving party has satisfied this burden, the opposing party must set forth specific facts showing there remains a genuine issue for trial, in order to defeat the motion. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Kaiser Cement Corp. v. Fischback & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986) (*cert. denied* 479 U.S. 949 (1986)). Mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 252.

3

## ANALYSIS

I.   **Does a prior judicial determination that Magten was not a creditor of Clark Fork and Magten's admission it was not a Creditor of Clark Fork at the time of the transaction result in Magten not having standing to assert a creditor's claim that Defendant owed a duty to Magten?**

Defendants argue that it has been judicially determined that Magten never was a creditor of Clark Fork and Magten has admitted that it was not a creditor of Clark Fork at the time of the transaction, and therefore, Clark Fork does not have standing to assert a creditor's claim and Defendants owe no duty to Magten.

In an opinion dated July 23, 2004, Hon. Charles B. Case, II, who is presiding over Northwestern's bankruptcy held as follows:

> The Debtor [Northwestern] has consistently alleged, and Magten has never disputed, that Magten did not own any of the debentures prior to the time the assets were transferred to the Debtor [Northwestern]. Rather, Magten acquired the debentures after the transaction was complete. Therefore, the Debtor [Northwestern] asserts and Magten has not disputed, that Magten was never a creditor of Clark Form at a time when Clark Form had the disputed energy assets. Rather, Magten became a holder of the debentures only after the transaction was completed and was a matter of public record.

> \*   \*   \*

> As noted above, Magten was not a creditor of Clark Form at the time the transaction took place. Rather, it only became a creditor of the Debtor [Northwestern] after the Debtor [Northwestern] assumed the liability associated with the junior subordinated debenture initially issued by Montana Power Company. Thus, Magten is not only not a party directly affected by the transaction – such as Clark Fork itself – but it was also not an indirect party at the time the transaction took place.

Memorandum Decision at 3, 6-7.

This Court may take judicial notice of the adjudicative facts determined by Judge Case in the Bankruptcy proceedings and entered in his July 23, 2004 Memorandum and Order. Fed.R.Evid. 201. Defendants argue that Judge Case's finding that Magten was not a creditor of Clark Fork is dispositive of the issues in this case and rely on the theories of issue preclusion and collateral estoppel to support their argument that summary judgment should be granted in their favor.

However, as pointed out Plaintiffs, Judge Case did not hold that Magten lacked standing to challenge the validity of the transaction. Judge Case's decision did not even address Magten's standing to sue here, but rather decided that NorthWestern's counsel would not be disqualified from representing the debtor in the ongoing Bankruptcy proceeding. Judge Case did not address Magten's ability to pursue damage claims with respect to the QUIPS against Defendants, NorthWestern, or any other entity. Accordingly, Magten's standing to pursue their breach of fiduciary duty claim has not been precluded by Judge Case's decision.

Defendants further argue that Magten has admitted it was not a creditor of Clark Fork at the time of the transfer. Magten concedes that it has never claimed to be a creditor of Clark Fork at the time of the transaction and it was not necessary for Magten to be a creditor. Magten's standing to pursue the breach of fiduciary duty claim derives from the Trustee, who failed to enforce the Trust's rights and the QUIPS holders who were Magten's predecessors in interest.

5

**II.    Did Magten's Acquisition of QUIPS After-the-Fact and with Full Knowledge of the Transfer Preclude Magten from Alleging Innocence?**

Defendants argue that Tolton Embry, Magten's sole owner, testified at his deposition that he acquired his interest in the QUIPS with full knowledge of the Transfer of the Montana Utility Assets and Liabilities to NorthWestern before his first acquisition of QUIPS. Magten has conceded that it knew the transfer to NorthWestern had occurred prior to acquisition of the QUIPS. Defendants cite no specific authority in support of their position that because Magten knew of the Transfer of the Montana Utility Assets and Liabilities to NorthWestern it is precluded from making a claim for breach of fiduciary duty. Instead, Defendants rely on general maxims of legal jurisprudence. Without providing further specific authority in support of their position, Defendants' argument must fail.[1]

**III.    Can Magten Stand in the Shoes of its Predecessor-in-Interest to Assert its Creditor Status?**

Defendants argue that Magten is precluded from asserting a claim for breach of fiduciary duty because the claim was not conveyed or assigned to Magten in writing, and Defendants rely upon Mont. Code Ann. § 30-1-206, to support their argument, which states:

---

[1] As an aside, Magten cites to *United States ex rel. Hill v. Teledyne, Inc.*, 103 F.3d 143 (9th Cir. 1996) in support of their argument. However, this is an unpublished opinion and Magten gave no indication to the Court in their argument that said opinion was unpublished. Further, the Federal Rules of Appellate Procedure with Ninth Circuit Rules and Circuit Committee Notes Rule 36-3 specifically states that unpublished dispositions and orders of the Ninth Circuit are not binding precedent and a copy of any cited unpublished disposition or order must be attached to the document in which it is cited, as an appendix. Counsel for Magten should take note of and abide by Rule 36-3 for all future filings with this Court.

6

(1) Except in the cases described in subsection (2) a contract for the sale of personal property is not enforceable by way of action or defense beyond $5,000 in amount or value of remedy unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by the party's authorized agent.

However, a further reading of Mont. Code Ann. § 30-1-206(2), supports Plaintiff's argument that Mont. Code Ann. § 30-1-206 is inapplicable because Mont. Code Ann. § 30-1-206(2) states that subsection (1) of the statute does not apply to contracts for the sale of goods (30-2-201) nor of securities (30-8-123) nor to security agreements (30- 9A-203).

Further, Section 610 of the Indenture provides that if the Property Trustee "fails to enforce its rights with respect to the Securities or the related Trust Agreement, a holder of Preferred Securities may institute legal proceedings directly against the Company to enforce the Property Trustee's rights with respect to the Securities or such Trust Agreement, to the fullest extent permitted by law . . ." The Trustee did not bring a claim against Defendants, and Magten is acting as an express third party beneficiary to the Indenture. Therefore, Defendants's argument fails.

IV.    **Did Magten Waive Complaints Stemming from the Transfer?**

Defendant argues that Magten waived any complaints it may have from the transfer because Magten's predecessor and the Trustee acquiesced to the transfer. Magten relies on case law from other jurisdictions in support of their argument that waiver is a question of fact for the jury and summary judgment is appropriate only when waiver is the sole reasonable inference that can be drawn from the evidence (cited by Magten as *Lynch v. CIBY 2000*, No. Civ.A 97-9022, 1998 U.S. Dist. LEXIS 23497, *13-14 (D.Cal., July 6, 1998). Magten also argues that failure to

7

object immediately to a party's unlawful act does not by itself constitute a waiver. *See* 28 Am. Jur. 2d Estoppel and Waiver § 209; *Hansen v. 75 Ranch Company*, 1998 MT 77, 957 P.2d 32.

It appears that this argument or a similar argument has appeared before Judge Case, and in his August 20, 2004 Opinion, Judge Case discusses Magten's allegations that Defendants had a fraudulent intent and whether NorthWestern's assumption of obligations pursuant to the transaction was meaningless. Magten asserts that the Second and Third Supplemental Indentures were executed at a time when the only financial information publicly available concerning NorthWestern's financial condition were fraudulent and, therefore, the execution of the supplement indentures cannot be deemed a waiver of a right to assert a claim based upon the transaction. Because of these allegations by Magten, there appears to be several issues of material fact raised by Magten which would be best left to a jury's determination.

For the foregoing reasons, Defendants' Motion for Summary Judgment (*Doc. #14*) is DENIED. The Clerk of Court is directed to notify the parties of the making of this Order.

DATED this 21th day of January, 2005.

Richard F. Cebull
U.S. DISTRICT COURT JUDGE

CERTIFICATE OF MAILING
DATE: 1/27/05 BY:
I hereby certify that a copy
of this order was mailed to:
J. Goetz
J. Devlan Geddes
B. Steingart
J. Brewer
K. Beatty
S. Kalezye

8